# Exhibit A

# Exhibit A

# Exhibit A

Wesley D. Felix (Utah Bar No. 6539)
Brenda E. Weinberg (Utah Bar No. 16187)
FELIX WEINBERG PLLC
68 Main St., Suite 800
Salt Lake City, Utah 84101
wfelix@felixweinberg.com
bweinberg@felixweinberg.com
*Attorneys for the Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| ROSA DiTUCCI, an individual; STEVEN R. LaROZA, an individual; DEBRA A. LaROZA, an individual; BRUCE I. ROSE, an individual; MAUREEN A. ROSE, an individual; SANFORD ROBERTS, an individual; HELAINE B. ROBERTS, an individual; RUSSELL E. HERTRICH, an individual; FRED JACOB, an individual; EDWARD A. HENNESSEY, an individual; RUSSELL E. HERTRICH REVOCABLE TRUST; SANFORD ROBERTS REVOCABLE TRUST;HELAINE B. ROBERTS REVOCABLE TRUST; THE FRED JACOB LIVING TRUST; EDWARD A. HENNESSEY 2001 REVOCABLE LIVING TRUST; CAMAC, INC., a Kansas corporation; and BLUSH PROPERTY, LLC., a Florida limited liability company; <br><br>*Plaintiffs*, <br><br> vs. <br><br> CHRISTOPHER J. ASHBY, an individual; JORDAN S. NELSON, an individual; SCOTT W. BEYNON, an individual; ROCKWELL DEBT FREE PROPERTIES, INC., a Utah Corporation; ROCKWELL TIC, INC., a Utah Corporation; ROCKWELL INDIANAPOLIS, LLC, a Utah limited liability company. <br><br> *Defendants*. | **FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF; DEMAND FOR ARBITRATION** <br><br><br> George M. Haley Arbitrator |

Plaintiffs ROSA DiTUCCI, an individual; STEVEN R. LaROZA, an individual; DEBRA

A. LaROZA, an individual; BRUCE I. ROSE, an individual; MAUREEN A. ROSE, an

individual; SANFORD ROBERTS, an individual; HELAINE B. ROBERTS, an individual;

RUSSELL E. HERTRICH, an individual; FRED JACOB, an individual; EDWARD A.

HENNESSEY, an individual; RUSSELL E. HERTRICH REVOCABLE TRUST; SANFORD

ROBERTS REVOCABLE TRUST; HELAINE B. ROBERTS REVOCABLE TRUST; THE

FRED JACOB LIVING TRUST; EDWARD A. HENNESSEY 2001 REVOCABLE LIVING

TRUST; CAMAC, INC., a Kansas corporation; and BLUSH PROPERTY, LLC, a Florida

limited liability company (hereinafter "Plaintiffs"), by and through undersigned counsel, hereby

complain, state, and allege as follows:

## INTRODUCTION AND BACKGROUND

1.     This action involves a fraudulent scheme by sophisticated promoters, real estate

brokers and an event venue operator who conspired to sell to unsuspecting investors interests in

event venues represented to be managed by an independent third-party entity.  Each event center

was represented to be a financially separate and independent investment and these investments

were represented to have a solid track record of returns in the neighborhood of ten (10) percent

per annum.  These representations were false and mispresented both the true nature of the

investment and concealed the substantial risk to investors due to, among other things, the

precarious financial position of the Defendants.

2.     Defendants sold the Plaintiffs a beautiful event center in Carmel, Indiana, which

Defendants represented was either under construction or already constructed. The building,

however, was never under construction and was never constructed.  Plaintiffs were sold vacant

land.

3.      The Carmel investments were structured as undivided Tenant-in-Common ("TIC") interests in the real property located at 13315 Illinois Street, Carmel, Indiana ("Noah's Carmel") bundled with a lease of the Property to Noah Corporation ("Noah's"), an entity who would operate it.

4.      Under the TIC structure, investors would be allowed to purchase undivided TIC interests in Noah's Carmel as small as $150,000, thereby enabling Defendants to spread the massive purchase price over a large group of unsuspecting purchasers.

5.      Defendants sold approximately 40 other investment properties with similar structures.

6.      The sale and lease with a third-party management structure enabled Defendants to target primarily older and relatively unsophisticated investors with little knowledge of or experience in the commercial real estate business. Defendants sold these securities to investors nationwide. Defendants told potential investors that the event venue would be operated and managed by Noah's and that Noah's was a financially strong company and that individual venues produced sufficient revenue to sustain consistent and reliably rental income..

7.      Contrary to the representations made by many of the Defendants to Plaintiffs, the event venues were not operated as financially independent entities, and funds from one investment were used to prop up others.  Indeed, Defendants Rockwell and Noah's ran the business as a single integrated enterprise, comingling investor funds and operational revenue. Older investment venues paid steady returns to investors, not on the basis of successful management and profitability, as represented by Defendants, but through cash generated by new investments or cash generated from other facilities.  These facts were not disclosed to Plaintiffs.

8.     Defendants' scheme worked. The investors who purchased Rockwell investments in Noah's Carmel are ordinary people, all retired or nearing retirement, who purchased their interests through Rockwell Debt Free Properties, Inc. and Rockwell TIC, Inc. (collectively, "Rockwell"), and Rockwell Indianapolis, LLC.  The Rockwell entities used finders or feeders such as John D. Hamrick ("Hamrick") and Chris Brown ("Brown") of Edmund & Wheeler ("E&W"), who were also 1031 Qualified Intermediaries, to steer investors to the Rockwell investments.   E&W, Hamrick and Brown received commissions of 5% on the sale of Noah's TIC securities. Defendants lied to investors directly when asked about commissions or failed to disclose that total commissions on the sale of these securities reached as high as 20% of the invested funds. Ashby, Beynon and Nelson all each earned millions of dollars in commissions in the form of distributions from the fraudulent sale of TIC securities.

9.     Plaintiffs are individuals and entities whose owners/members are comprised of mostly older, retired individuals who collectively invested nearly $5 million dollars to purchase investments in the Noah's Carmel operation. The investment was sold as a TIC investment or 1031 Exchange -- a reference to Section 1031 of the Internal Revenue Code. Section 1031 allows individuals who have earned capital gains from the sale of real estate to legally defer paying federal taxes on those capital gains when they are re-invested in a qualifying property.

10.     Plaintiffs were fraudulently induced to purchase the TIC investments by Rockwell or agents working on Rockwell's behalf, including but not limited to Beynon, Ashby, Nelson, Rutherford, Hamrick and Brown.  These Rockwell Defendants directly and through their sales agents made false and misleading representations or omitted information concerning the value of the TIC interests, the historical operating experience of the Noah's event venues, and the nature of the risk associated with the TIC securities.

11.     Commissioned agents such as Hamrick were in continuous contact with Rockwell and Noah's.  Hamrick met at least twice annually with Rockwell and Noah's.  The parties held an annual February marketing and strategy event in Arizona.  The parties also met annually at Rockwell's Christmas party.  In addition, Hamrick, Bowser and each of the Rockwell Defendants were active participants in the creation of marketing materials and marketing strategies.  Ashby, Beynon and Nelson distributed those marketing materials for the purpose of selling TIC securities to Plaintiffs.

12.     E&W, Hamrick and Brown knew or were reckless in not knowing that: a) the Noah's leases were not profitable; b) that the Noah's leases were not market rate; c) that Noah's was insolvent by at least January of 2017 and possibly was never solvent; d) that in 2018 invested money was being used to prop up other properties; and, e) that the TIC investments did not qualify as valid 1031 exchanges.

13.     Hamrick's role went well beyond that of a salesperson and as Rockwell's largest seller, he was also involved in decisions as to how the properties should be developed and managed.  For example, in the summer of 2016 Hamrick presented a power point presentation in Utah describing how he believed Cadence could better manage the properties purchased by TIC securities investors.

14.     The information misrepresented to or concealed from Plaintiffs was material to their decisions to invest. Plaintiffs relied upon, among other things, the Sales Package prepared and disseminated by Defendants, principally Rockwell, Ashby, Nelson, Beynon, Scott Rutherford, E&W, Hamrick, and Brown in deciding to invest in the TIC interests, and would not have invested in the TIC interests had the true facts and risk factors relevant to the investment been fully and accurately disclosed to them.

15.     Beynon was instrumental in determining the content of the sales materials as Vice President of Marketing for Rockwell. He was primarily responsible for creating the Sales Package.  Beynon misrepresented the construction status of Carmel multiple times to sales agents and directly to Plaintiffs.  In July, August and September of 2018 Beynon stated that the Carmel venue was under construction when he knew no construction was taking place.

16.     Ashby, Nelson and Beynon drafted and approved the sales and marketing materials used by Rockwell and its commissioned agents to sell the Carmel investment.  Ashby, Nelson and Beynon were in possession of financial information from Noah's that showed the representations made in the marketing materials regarding the financial stability of Noah's were completely false and that Noah's was insolvent and in fact had never been solvent.

17.     After Plaintiffs purchased Noah's Carmel, "Bil" Bowser and others, including the individual Rockwell Defendants, misappropriated nearly all of the $6.26 million collected that was to be used for the purchase of land and construction.

18.     Plaintiffs collectively invested approximately $4.9 million, and other investors invested the remaining $1.36 million.

19.     Bowser directly misappropriated a portion of these funds, among other things, for personal expenses, to fund operations, to pay debts, and to be used by Bowser's construction company, Gabriel Management Corporation ("Gabriel Construction") to complete construction on other Rockwell properties. Bowser also directly misappropriated at least $500,000 to use in the construction of his home in Park City, UT.

20.     All of the Defendants concealed from Plaintiffs that individual event venues were not independent financial entities, but funds from one investment entity were used for other properties; that Noah's was, in fact, a Ponzi scheme.  Earlier investors were paid with proceeds

from new investments to create the illusion of a profitable enterprise. In reality, Noah's was insolvent at least by January 1, 2017 and by the end of 2017 Noah's financials reflected some $57 million in operating losses. All of this was hidden from Plaintiffs by Defendants.

21.     Plaintiffs never realized the benefits of their TIC investment because, among other reasons, Defendants Ashby, Bowser, and Nelson, the individuals who owned and/or controlled the TIC investment sponsors, Rockwell, Rockwell Indianapolis, and Noah's misappropriated at least $4.9 million from Plaintiffs' properties. Ashby, Beynon, and Nelson knew that the invested money earmarked for construction was being used to prop up the Noah's Ponzi scheme and not to build an event center. Ashby, Beynon and Nelson personally benefitted in an amount not less than $1.5 million dollars from the sale of the Carmel TIC securities.

22.     As alleged below, Defendants were only able to steal millions of dollars from Plaintiffs because they had the help of others, including Gabriel Construction, LeFevre Management, Inc. d/b/a Cadence Property Advisors d/b/a Cadence Property Administrators ("Cadence"), Scott B. LeFevre ("LeFevre"), E&W, and E&W's employees Hamrick and Chris Brown ("Brown"). These Defendants knew or were reckless in not knowing that the Carmel property was not constructed and was worth far less than its represented fair market value, and that investment funds were misappropriated in the amount of more than $4.9 million.

23.     Bowser and Gabriel Construction, Bowser's alter ego, directly misappropriated at least $500,000 from Plaintiffs' investment for personal use in addition to the millions of dollars meant for constructing the Carmel site that were instead used to run his company's operations.

24.     All Defendants concealed or failed to alert Plaintiffs as to the misappropriation and fraud. Ashby, Beynon and Nelson concealed the financial condition of Noah's in order to continue receiving millions in commissions or distributions from the sale of new TIC securities.

Ashby, Beynon and Nelson continued to sell fraudulent TIC securities until the collapse of their

Ponzi scheme in the spring of 2019.

25.     In March 2019, Bowser abruptly announced that Noah's would stop making rent

payments to Plaintiffs.  In May of 2019, Noah's declared bankruptcy.

26.     Cadence provided property administrator services for Noah's Carmel that is the

subject of this Complaint. LeFevre is the Principal of Cadence and a licensed real estate agent

who managed Noah's Carmel. Among Cadence's duties were the collection of funds from

Noah's and/or Rockwell, disbursement of those funds to Plaintiffs and other investors as "rents,"

reporting of rent statements to Plaintiffs and other TIC owners to an online portal, and issuing

IRS Form 1099-MISC, Miscellaneous Income to Plaintiffs and other investors. Cadence did not,

however, control or manage the day-to-day operations at Noah's Carmel. Instead of preventing,

stopping, or alerting Plaintiffs about the misappropriation, Cadence and LeFevre actively

assisted Ashby, Bowser, Nelson, and Rutherford to continue and conceal the misappropriation.

27.     Hamrick, a Vice President of E&W from 2000 to the present, is a licensed real

estate professional and Qualified Intermediary ("QI") who provided QI services, among other

things, to 1031 investors and introduced the 1031 investors who relied upon E&W, Hamrick, and

Brown as professionals with a fiduciary duty to act in the best interests of their 1031 clients. In

those cases where Hamrick was not the 1031 Qualified Intermediary he nonetheless touted his

expertise in Exchanges to assure clients that these investments met the very stringent IRS

guidelines for 1031s, which they did not. Hamrick concealed the failure of Rockwell and Noah's

to commence construction and concealed the misuse of funds from the investment.  Hamrick

misrepresented the 5% commission he earned on the sale of TIC securities telling investors he

received a flat $700 fee. Hamrick also falsely stated that TIC investments were not securities

under state and federal law.  Hamrick actively induced many Plaintiffs and other investors to purchase securities in Rockwell properties by recommending TIC interests, liaising between Rockwell and investors, and acting as QI for some Plaintiffs. Hamrick knew that a valid 1031 exchange required that the substitute property be constructed within 180 days of the sale of the original property, and he knew the Carmel building could not be constructed within that time-frame.

28.     As a result of the misappropriation facilitated and concealed by the Defendants, Plaintiffs have suffered or will suffer more than $4.9 million in damages from loss of their investment principal alone. Plaintiffs have also suffered additional losses arising from unpaid monthly "base rents" or distributions due on their investments. Plaintiffs also face potential tax-related losses and fines as a result of failed 1031 Exchanges.

**SUBJECT MATTER JURISDICTION**

29.     This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act of 1934 (The "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because Plaintiffs' claims arise under Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5, and under Section 12 of the Securities Act of 1933 (the "Act")  15 U.S.C. § 77l.

30.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' claims that arise under the laws of the State of Massachusetts, the State of New Hampshire, the State of California, the State of Indiana, the State of Florida, the State of Maine, and the State of Kansas.

31.     The parties stipulated that state and federal claims would be submitted to a single arbitrator for an arbitration to be conducted in Utah consistent with AAA arbitration as modified by the Federal Rules of Civil Procedure for purposes of discovery.

## PARTIES

**Plaintiffs**

32.     Plaintiff Rosa DiTucci is an individual and resident of Massachusetts.

33.     Plaintiff Steven R. LaRoza is an individual and resident of New Hampshire.

34.     Plaintiff Debra A. LaRoza is an individual and resident of New Hampshire.

35.     Plaintiff Bruce I. Rose is an individual and resident of Florida.

36.     Plaintiff Maureen A. Rose is an individual and resident of Florida.

37.     Plaintiff Russell E. Hertrich Revocable Trust is a New Hampshire entity with its principal place of operation in New Hampshire.

38.     Plaintiff Russell E. Hertrich is an individual and resident of New Hampshire. Hertrich is a beneficiary of the Russell E. Hertrich Revocable Trust.

39.     Plaintiffs Sanford Roberts Revocable Trust and Helaine B. Roberts Revocable Trust are Maine entities with their principal place of operation in Maine.

40.     Plaintiff Sanford Roberts is an individual and resident of Maine. Sanford Roberts is a beneficiary of the Sanford Roberts Revocable Trust and the Helaine B. Roberts Revocable Trust.

41.     Plaintiff Helaine B. Sanford Roberts is an individual and resident of Maine. Helaine B. Roberts is the beneficiary of the Helaine B. Roberts Revocable Trust.

42.     Plaintiff, The Fred Jacob Living Trust, is a California entity with its principal place of operation in California.

43.     Plaintiff Fred Jacob is an individual and resident of California. Jacob is a beneficiary of The Fred Jacob Living Trust.

44.     Plaintiff Edward A. Hennessey 2001 Revocable Living Trust is a New Hampshire entity with its principal place of operation in New Hampshire.

45.     Plaintiff Edward A. Hennessey is an individual and resident of New Hampshire. Edward A. Hennessey is a beneficiary of the Edward A. Hennessey 2001 Revocable Living Trust.

46.     CAMAC, INC., is a Kansas corporation with its principal place of operation in Kansas.

47.     Plaintiff Blush Property, LLC ("Blush") is a Florida entity with its principal place of operation in Florida.

48.     Plaintiff Linda Camp is an individual and resident of Florida. Camp is a principal of Blush.

49.     Plaintiff Bryan Merklin is an individual and resident of Florida. Merklin is a principal of Blush.

**Defendants**

50.     Defendant Christopher J. Ashby is an individual and resident of Utah. Ashby is President and CEO of Rockwell.

51.     Defendant Jordan S. Nelson is an individual and resident of Utah. Nelson is Director of Operations of Rockwell.

52.     Defendant Scott W. Beynon is an individual and resident of Utah. Beynon was Executive Vice President of Real Estate of Rockwell.

53.     Defendant Rockwell Debt Free Properties, Inc. is a Utah corporation with its principal place of business in Sandy, Salt Lake County, Utah.

54.     Defendant Rockwell TIC, Inc. is a Utah corporation with its principal place of business in Sandy, Salt Lake County, Utah.

55.     Defendant Rockwell Indianapolis, LLC is a Utah limited liability company with its principal place of business in Sandy, Salt Lake County, Utah.

## FACTUAL BACKGROUND

56.     Plaintiffs are investors in an Indiana Tenant-in-Common investment, which purported to be an eligible 1031 Exchange, marketed, sponsored and sold by Rockwell through its sales representatives or agents.

57.     This investment interest was bundled with a leaseback and management agreement.

58.     The investment was a passive interest in an enterprise operated and managed by Noah.

59.     Specifically, the investment was in a common enterprise with profits to come solely from the efforts of others.

60.     A TIC investment allows up to 35 investors to hold title to real property, such as an office building, as common law "tenants in common" whereby each investor owns a physically undivided interest in the property.

61.     Each co-tenant's share in the property is expressed as a percentage interest of the whole.

62.     For example, twenty TIC investors can come together to purchase an entire office building whereby each investor owns 5% of the building. The twenty TIC investors thus own

100% of the building, but each investor's interest is 5% of the whole building, rather than an interest in any given defined space within the building.

63.     TIC investments as 1031 exchange properties are appealing to many investors because of their federal tax benefits.

64.     Section 1031 of the IRS Code allows individuals who have earned capital gains from the sale of real estate to legally defer paying federal taxes on those gains when they are re-invested in a similar property, subject to certain restrictions.

65.     TIC investments are therefore attractive to investors who wish to defer capital gains tax liability from a prior sale of real estate.

66.     TIC investments offer other benefits, too. TIC investors, for example, can earn a steady stream of income from base rents generated by the property during the term of the investment.

67.     TIC investments are also passive, which many investors prefer because it relieves them of the responsibility of actively managing their investment property.

68.     The passive nature of the investment, potential tax benefits, and anticipated stream of steady income make TIC investments particularly attractive to older and retired investors such as many of the Plaintiffs.

69.     A TIC investor, however, must take care to ensure that their TIC investment is classified by the IRS as an investment in rental real property – what the IRS refers to as "an undivided fractional interest in rental real property" – rather than an interest in a business entity, such as a partnership. A TIC investment in real property is eligible for "tax-free exchange" under Section 1031(a)(1) of the Internal Revenue Code, *see* 26 U.S.C. § 1031(a)(1), whereas a TIC

investment that the IRS concludes is an interest in a partnership subjects the TIC investor to the very federal taxes that the investor sought to defer by investing in a TIC.

70.     To guide TIC investors, the IRS issued Revenue Procedure 2002-22 ("Procedure 2002-22") in 2002. Procedure 2002-22 sets forth certain guidelines that the IRS uses to determine whether a TIC investment should be considered an interest in real property, where taxes are deferred, or an interest in a partnership, where taxes cannot be deferred. Procedure 2002-22 contains 15 different guidelines.

71.     One of those guidelines is the "No Business Activities" rule.

72.     In sum and substance, the TIC investment must be passive with no significant management role by the 1031 investor.

73.     The No Business Activities rule prohibits individual TIC investors from participating in the management of the property to ensure that the investment is passive.

74.     To comply with this rule, TIC investors usually hire a third party to manage the property rather than managing it themselves.

75.     A TIC investor who fails to follow IRS rules and guidelines for TIC investments can suffer significant adverse tax consequences, including liability for back taxes, interest, and penalties.

***Rockwell Sponsored and Sold Approximately 40 TIC Investment Properties with Nearly Identical Structures***

76.     At all material times, Ashby, Nelson, Beynon, Rutherford, Hamrick and Bowser were close business associates.

77.     On information and belief, from approximately 2015, Ashby, Nelson, Beynon, Rutherford, Hamrick, Brown, Bowser conspired with one another to develop a scheme to

fraudulently induce investors to purchase TIC investments at a grossly inflated price through marketing TIC interests in commercial properties located throughout the United States.

78.     The TIC interests were sold through packages of sales documents, financial calculators demonstrating return rates, and utilization of sales representatives such as Hamrick and Brown at E&W.   Each outside sales representative entered into a commission agreement with Rockwell whereby Rockwell would pay commissions of 3 to 6 percent on each sale of a TIC interest.  An additional 8 to 12 percent in commissions went to Ashby, Beynon and Nelson.

79.     Under the scheme, Ashby, Beynon, Nelson, Rutherford, Hamrick and Brown made misleading representations and material omissions designed to create the appearance that the commercial properties were capable of generating sufficient revenue to service a $438,000 annual rent secured by Noah's, and provide a return on a $6,260,000 equity investment in the range of 7.00% to 10.20% over the course of twenty years.

80.     The Rockwell Defendants, Bowser, Noah's and outside sales representatives all met at least annually, typically in Arizona, to develop strategy for maximizing the sales of Noah's TIC securities.

81.     These Defendants also met frequently in Utah for purposes of managing their conspiracy.

82.     LeFevre began his relationship with Rockwell as a real estate agent selling Rockwell TIC interests.

83.     Rockwell then hired LeFevre to investigate a relationship with an IRA business, which never transpired.

84.     LeFevre also taught real estate classes and realtors that Rockwell TICs should be included as part of their offerings.

85.    Approximately four years ago, Rockwell contracted with Sentinel Sales and Management ("Sentinel") as property administrator for most of its properties.

86.    After Rockwell's relationship with Sentinel deteriorated, Rockwell approached LeFevre and asked him to open a property administrator company.

87.    LeFevre Management, Inc., which then adopted the d/b/a Cadence, was incorporated on or about January 19, 2015. For a period of time Cadence and LeFevre were based out of Rockwell's offices.

88.    Sentinel kept Rockwell's existing customers and the new ones went to Lefevre thereafter.

89.    DeSalvo has sold TIC interests in approximately seven Rockwell properties over the years.

90.    Based upon his sales agreement with Rockwell, DeSalvo earned approximately 3% in commissions from each sale of TIC interests in Rockwell properties, including Noah's Carmel.

91.    However, based on their experience operating or working with Noah's over the previous several years with access to operational and financial performance information, Ashby, Nelson, Beynon, Hamrick, and Bowser knew that Noah's was not capable of generating sufficient revenue to service the rent, let alone provide a 7.00% to 10.20% on a $6,260,000 investment.  Indeed, Ashby, Beynon and Nelson knew that Noah was insolvent at the time they sold the Carmel TIC securities to Plaintiffs.

92.    Defendants recognized that potential investors gravitated to Noah's because Rockwell represented that high "CAP rates" in the form of guaranteed lease payments would be paid to investors.  Ashby, Beynon, and Nelson knew that the Noah's lease terms were artificially

inflated, that Noah's did not have sufficient revenue to pay even existing leases and taxes, and that Noah's was insolvent.

93.     DeSalvo, for example, asked LeFevre, Ashby, and Bowser about whether there was a statement that he could make about the performance of Noah's to potential investors touting its financial condition.  The Rockwell Defendants, on a regular basis, provided misleading financial information to their sales people stating or implying that Noah's was profitable and financially sound when it was in fact insolvent.  Ashby, Beynon, and Nelson knew Noah's was not profitable and could not pay its debts as they became due.

94.     Bowser spoke regularly with Ashby, Beynon, Nelson, LeFevre, and Hamrick about the sale and the status of construction of the Rockwell properties.  Ashby, Beynon, and Nelson knew that Bowser had stopped construction on new TIC investment properties by the beginning of 2017 and that he was using all new investment money to pay past investors and to keep the Ponzi scheme afloat.  Bowser told Ashby in January 2017 that Noah's could not make a profit.  Ashby told Bowser not to rock the boat or they might kill the golden goose that was making them all millions in fraudulent sales commissions.

95.     In an effort to prop up the business, Rockwell made a $6.0 million loan to Noah's in 2017 specifically earmarked towards construction projects and not for use in operations. At this point, Noah's was already behind on construction and did not have the money to complete the existing projects in the pipeline.  In spite of this, Rockwell continued to bring in new investors, including the Plaintiffs in mid to late 2018.

96.     Defendants knew that the TIC interests were not readily liquid but represented to investors that they could easily be sold to other investors, misrepresenting the existing market for the TIC interests.

97.     Defendants knew that Plaintiffs and other investors typically treated the TIC interests as long-term investments, and approximately 3% of investors divested.

98.     Defendants communicated regularly with investors after closing in attempts to induce additional sales.  As a result, approximately 50% of investors in the fraudulent Rockwell scheme own TIC interests in two or more Rockwell properties.

99.     In addition, Defendants knew, or were reckless in not knowing, that the "rent" paid to one investor was frequently funded through funds received from investors in other TIC interests.  Armed with this knowledge, Defendants systematically and deliberately made material misrepresentations and omitted material facts in an effort to sell Plaintiffs a vacant piece of land that was only worth a fraction of what they paid for it.  Ashby, Nelson, and Beynon made millions selling TIC investments that they knew would inevitably be worthless.  Ashby, Nelson, and Beynon also knew the investments did not qualify for 1031 treatment.  Ashby, Nelson, and Beynon lied to investors about the commissions they earned.

100.    Ashby, Beynon, and Nelson, developed an offering of up to $6,260,000 in TIC interests in the Carmel property which was advertised as "debt-free." Ashby, Nelson, Rutherford, Hamrick, Brown, Bowser, DeSalvo, and their respective entities, Rockwell, E&W, Noah's, Gabriel Construction, and Belle Isle Enterprises, each played a significant role and substantially participated in the drafting, preparation and distribution of marketing materials to Plaintiffs and in the execution of the sale of Noah's Carmel.

101.    According to the Rockwell Sales Package, the minimum purchase was a $150,000 for an undivided TIC interest in Noah's Carmel.

102.    Rockwell advertised the property with no closing costs, or represented that closing costs were de minimus at no more than $2,000.  Ashby, Beynon, and Nelson lied and did

not disclose any commissions or fees other than $700 in the Final Settlement Statement provided

by escrow agent and title insurance underwriter Kirsten Parkin ("Parkin") at First American Title

Company ("FATCO").

103.    The Rockwell sales materials, although not identical, included similar language

related to investor returns in the form of "rent."  The materials represented, falsely, that the

return was solely dependent on the performance of the specific event venue in which Plaintiffs

would invest.  The Rockwell materials further represented that other event venues have

demonstrated an ability to generate revenue with "less than 6% of their current sales as a

receivable."  In addition, the offering package stated that "Noah's anticipates revenues to well

exceed the debt service and operating cost with their breakeven well below their currently

operating occupancy levels."  These statements were false and were made by Rockwell

Defendants who knew or were reckless in not knowing that they were false.  Only by "stealing

from Peter to pay Paul"was Noah's able to conceal the poor performance of the event centers.

104.    Ashby, Beynon, Nelson, Rutherford, Hamrick, Brown, Bowser, and DeSalvo

communicated with investors on multiple occasions.  In these communications, Defendants

reinforced the misrepresentations contained in the sales materials and/or made by Defendants in

pitching the sale of the TIC securities.  When these representations were made, Defendants knew

or were reckless in not knowing that they were false.  In particular, Defendants knew or were

reckless in not knowing that profits or rent paid to investors did not come from the profits or

escrowed funds relating to the event facility in which the investment was made, but instead came

from other sources.  In addition, Defendants concealed from Plaintiffs that amounts between

$600,000 to $1,000,000 of the funds invested by Plaintiffs were skimmed off the top as

"commissions," and the bulk of the remaining funds were diverted to other operations.

105.    Rockwell sponsored at least 40 TIC investments in Noah's commercial properties located throughout the United States.

106.    All of the Rockwell TIC investment vehicles were essentially identical, as each relied upon a common investment structure and "cookie cutter" agreements that provided for the allocation of identical rights and responsibilities among the sponsor, the TIC investors, the property administrator companies, and others.

107.    Rockwell originated each TIC investment by:

a.    Forming a wholly owned subsidiary of Rockwell as a Utah limited liability company to acquire the property underlying the TIC investment – Rockwell Indianapolis in this case;

b.    Negotiating a purchase price for a suitable piece of commercial real estate;

c.    Having Parkin at FATCO serve as Escrow agent, underwrite the title insurance policy, complete all of the deed recording tasks, and serve as a contact to TIC investors after purchase;

d.    Leasing each of the properties from the TIC investor owners to Noah's, Fresenius, or KinderCare – Noah's in this case; and

e.    Causing the wholly owned subsidiary of Rockwell and subsequently the TIC investors to enter into property administrator agreements with Cadence or Sentinel to manage the collection and disbursement of rents to TIC owners – Cadence in this case.

108.    In some instances, including Noah's Carmel, Rockwell sold TIC investments in vacant land on which a building was to be built. Rockwell described these transactions as "Construction TIC Transactions."

109.    In Rockwell's Construction TIC Transactions, the capital to construct the building was collected from Plaintiffs and the other investors rather than obtaining a mortgage or loan.

110.    Under the terms of the Purchase and Sale Agreement, the 1031 funds were to be transferred to FATCO and applied toward the construction of improvements on Noah's Carmel on the basis of invoiced construction requisitions.

111.    Here, all of Plaintiffs' funds were disbursed to Rockwell, to Rockwell's selling partners Ashby, Beynon and Nelson, and to Bowser, Noah's, and Gabriel Construction shortly after closing.  This disbursement was directed by Rockwell even though Ashby, Nelson, and Beynon knew that no construction had taken place and that the funds would simply be spent by the co-conspirators for their own benefit..

112.    After the transaction closed, Rockwell made the first rent payment directly to each new owner.  Rockwell paid on behalf of Noah's to create the illusion that the venue could support rent payments from its own revenue.  Ashby, Beynon and Nelson knew that this was false.

113.    After the first rent payment, Cadence then distributed rents to Plaintiffs and provided monthly rent statements to TIC owners.

114.    Rockwell, rather than Noah's, continued paying the sham "rent" payments out of the investors' own funds for nine months between June 2018 and March 2019, when the Ponzi scheme collapsed.

115.    None of the monthly rent statements disclosed that Bowser and others were misappropriating money from the TIC investments, that Defendants had taken commissions, or that Rockwell was paying the rent instead of Noah's.

116.     In March 2019, Ashby admitted to Rutherford, s Rockwell employee and internal salesperson, that his representations to Rutherford and to TIC investors that FATCO would not disburse invested funds until proportionate construction was completed were false.  Ashby further admitted to Rutherford that all of the money invested in construction TIC projects was simply "gone," paid to Rockwell and its agents in enormous sales commissions, spent by Bowser to pay himself and his entire extended family, or simply to keep the fraudulent scheme afloat.

117.     Rutherford testified that Ashby, Nelson, and Beynon had lied to him and that he felt personally betrayed.  After Ashby's admissions in March 2019, Rutherford ceased to do business with Rockwell or to communicate with Ashby because he understood that the scheme was a fraud.

### *Purchase and Sale of Noah's Carmel*

118.     On or about May 10, 2018, Rockwell organized Rockwell Indianapolis, LLC in the State of Utah.

119.     On or about June 27, 2018, Rockwell Indianapolis purchased Noah's Carmel for $654,750.

120.     The Sales Disclosure Form indicates that Noah's Carmel was conveyed to Rockwell Indianapolis on June 27, 2018.

121.     Before June 27, 2018, Rockwell Indianapolis had already sold TIC interests in the property to Plaintiffs Edward A. Hennessey 2001 Revocable Living Trust on June 19, 2018; CAMAC, Inc. on June 21, 2018; and the Russell E. Hertrich Revocable Trust on June 22, 2018 for a total of over $2,219,000.

122.     The Sales Disclosure Forms for Plaintiffs Edward A. Hennessey 2001 Revocable Living Trust, Blush Property, and the Russell E. Hertrich Revocable Trust represent falsely that

the property interests were not conveyed until July 2, 2018; August 21, 2018; and February 15,
2019, respectively.

123.    Noah's Carmel was most recently valued at $294,000 on January 1, 2019 by
Hamilton County, Indiana Assessor.

124.    Prior to conveying each respective interest to Plaintiffs, Rockwell Indianapolis
entered into a lease with Noah's ("Lease").

125.    According to the Lease, Noah's was to begin paying rent on June 13, 2018.

126.    Plaintiffs purchased their respective interests in Noah's Carmel, which, according
to each deed and Defendants' marketing material, Plaintiffs believed was subject to the Noah's
Lease.

127.    Plaintiffs' deeds, however, state that each property interest is subject to a lease
between Rockwell Indianapolis (Landlord) and NOAH'S OPERATIONS CARMEL, LLC a
Utah limited liability company (Tenant), dated June 13, 2018.

128.    Upon a search of Utah's Division of Corporations, NOAH OPERATIONS
CARMEL, LLC does not exist.



### *Statements in Rockwell's Sales Package*

129.    Rockwell prepared a sales package for Noah's Carmel that included an Executive Summary, a Property Description, and a Lease Profile ("Sales Package").

130.    An exemplar Sales Package for Noah's Carmel is attached hereto as Exhibit A.

131.    All Plaintiffs received and reviewed the Sales Package.

132.    The TIC securities were sold through offering materials substantially created by Ashby, Beynon, Nelson, and Rockwell.

133.    The Sales Package advertised Noah's Carmel to investors for a purchase price of $6,260,000.

134.    The Sales Package included the following statements:

    a.    The "Tenant in Common (TIC) interests offered and sold by Rockwell Debt-Free Properties constitute interests in real property. They do not constitute securities. Consequently, federal and state laws regulating the sale of securities do not apply with respect to the sale of TIC interests, and purchasers of TIC interests will not be entitled to the protections afforded to purchasers of securities under federal and state securities laws. Nothing in the attached offering documents should be construed as an offer or a solicitation of an offer to buy or sell securities" (the "Securities Statement").

    b.    Noah's Carmel "satisfies IRS requirements for 1031 exchanges."

    c.    "Noah's pays directly all of the taxes, insurance premiums and all of the maintenance costs of the building. Therefore, the property co-owners have no active management duties, rendering this triple-net lease property a hassle-free, real estate investment."

     d.   "Noah's booking fees are approximately 25% less than its competition and each location hosts an average of 30,000 plus visitors at over 300 events annually."

     e.   Noah's business and operations were "recession-resistant."

135.    The Executive Summary of the Sales Package included a Risk Analysis section with only one "risk" noted.

136.    The Risk Analysis section stated that "Noah's anticipates revenues to well exceed the debt service and operating cost with their breakeven well below their currently operating occupancy levels."

137.    The Sales Package described the Lease as $438,000 for 2019 with 2.0% annual increases. The Lease description also included an average "Cap Rate" of 8.5% over the initial lease term of 20 years.

| AVERAGE RETURN: Initial Term: 8.50% | | |
| --- | --- | --- |
| YEAR | ANNUAL RENT | CAP RATE |
| CONSTRUCTION PERIOD | $438,000 | 7.00% |
| APRIL 2019 | $438,000 | 7.00% |
| APRIL 2020 | $446,760 | 7.14% |
| APRIL 2021 | $455,695 | 7.28% |
| APRIL 2022 | $464,809 | 7.43% |
| APRIL 2023 | $474,105 | 7.58% |
| APRIL 2024 | $483,587 | 7.73% |
| APRIL 2025 | $493,259 | 7.88% |
| APRIL 2026 | $503,124 | 8.04% |
| APRIL 2027 | $513,187 | 8.20% |
| APRIL 2028 | $523,451 | 8.37% |
| APRIL 2029 | $533,920 | 8.53% |
| APRIL 2030 | $544,598 | 8.70% |
| APRIL 2031 | $555,490 | 8.88% |
| APRIL 2032 | $566,600 | 9.06% |
| APRIL 2033 | $577,932 | 9.24% |
| APRIL 2034 | $589,490 | 9.42% |
| APRIL 2035 | $601,280 | 9.61% |
| APRIL 2036 | $613,306 | 9.80% |
| APRIL 2037 | $625,572 | 10.00% |
| APRIL 2038 | $638,083 | 10.20% |

138.    When these representations were made, Ashby, Beynon and Nelson knew they were false.  Defendants Hamrick, Brown, and E&W, at the time they recommended investment in the Carmel securities, knew, or in the exercise of reasonable care should have known, that the representations were false.  In addition, Hamrick and/or Brown represented to one or more of the Plaintiffs that for many years Noah's had not missed a rent or tax payment.  Defendants also knew that there was no reasonable basis upon which to offer returns of roughly 8.5% on the TIC securities, in part, because Defendants' ability to pay "rent" on other event center securities was contingent upon cash from other properties or infusions of money from new investors.

139.    The Lease profile lists a "Construction Period" prior to April 2019, but nowhere in the Sales Package is a "Construction Period" described.

140.    Construction costs were not in the Sales Package.

141.    The bottom of most pages of the Sales Package included a URL mynoahs.com, which is an inactive website.

142.    The Sales Package included 13 photographs of the interior and seven photographs of the exterior of an existing building.

143.    The photographs in the Sales Package were misleading in that the building appeared to be completed or near completion.

 

144.    As late as November 8, 2018, Defendants had not yet received site plan and design approval from the City of Carmel to begin construction on the building.

145.    Plaintiffs each individually or on behalf of an entity executed a purchase and sale agreement ("Purchase and Sale Agreement"), a Tenancy in Common Agreement, and a standard form management agreement ("Property Administrator Agreement") (collectively, "Contracts").

### *Sale to DiTucci*

146.    In January 2018, DiTucci contacted Hamrick looking for a no-debt investment that she could keep for two years and liquidate after the two-year period.

147.    Hamrick, acting as a commissioned sales agent for Rockwell, made the following representations to DiTucci:

    a.    Rockwell would meet her needs;

    b.    Rockwell had corporate tenants, Noah's and Fresenius, and triple-net leases, in which the tenant paid all expenses;

    c.    TICs are eligible for 1031 Exchanges;

    d.    Hamrick was an owner of Noah's;

    e.    Investing in Noah's was the best thing that he had ever done;

    f.    Noah's had low overhead, had a high profit-margin, was growing, and had never missed a rent payment in the time he had been involved with them;

    g.    A recent court case had qualified TICs as 1031 Exchange vehicles;

    h.    The true value of the properties offered by Rockwell is in the lease with the tenant and the cap rates; and

    i.    TICs are not securities.

148.    On January 19, 2018, Hamrick sent DiTucci the Rockwell marketing package and a rent calculator on Noah's Overland Park, KS properties.  The marketing package was obtained from Ashby and Beynon.

149.    On February 1, 2018, Ashby made the following representations to DiTucci:

    a.    Rockwell has a construction partner and a construction arm;

    b.    Rockwell oversees the construction of the buildings;

    c.    Rockwell disburses funds to the contractor during construction based on work orders, i.e., no money would be disbursed until an appropriate level of construction was completed;

d.   Standard commissions included the construction carrying costs;

e.   Rockwell serves as the facilitator to and partners with Noah's and other tenants in that Rockwell and the tenants work together to obtain investors and erect the buildings;

f.   Rockwell has an ownership interest in many of the properties that it sells;

g.   The relationship is between the property management company, the investor, and the tenant after the tenant moves in;

h.   A recent court case had qualified TICs as 1031 Exchange vehicles;

i.   The true value of the properties offered by Rockwell is in the lease with the tenant and the cap rates; and

j.   TICs are not securities.

150.   On March 14, 2018, DiTucci purchased a TIC interest in a Rockwell property leased by Fresenius.

151.   In June 2018, DiTucci contacted Hamrick again searching for another investment property. Hamrick, acting as a commissioned sales agent for Rockwell, then made the following representations to DiTucci:

a.   Noah's Carmel was sold out;

b.   The Noah's Carmel building was under construction and would be completed by the first of the year 2019;

c.   Noah's was growing 25% year over year;

d.   Noah's was the largest event venue in the country, which is echoed on Noah's website; and

    e.   Noah's had 27 Rockwell sites, and many of them were completely booked for weddings and corporate venues.

152.    In August and September 2018, DiTucci spoke with Ashby and Nelson on several occasions about Noah's Carmel. Ashby and Nelson made the following representations to DiTucci:

    a.   Noah's was financially stable, an excellent tenant, paid the rent on time, and was growing; and

    b.   Noah's paid the property taxes and insurance on a triple-net lease and had never missed a payment.

153.    DiTucci asked Ashby and Nelson for financials to verify their claims about Noah's.

154.    Ashby and Nelson told DiTucci that Noah's was a privately-held company, so it was not possible to get financials but that they had seen Noah's financials and could represent that Noah's was financially stable.  Ashby and Nelson knew that Noah's was hemorrhaging cash and was insolvent.  They withheld financial information to conceal that fact.

155.    Hamrick, Ashby, and Nelson told DiTucci that Bowser was trustworthy and a family man.

156.    Ashby and Nelson told DiTucci that they and Rockwell had a very close personal and financial relationship with Bowser and Noah's.

157.    Ashby and Nelson did not tell DiTucci that Noah's and Gabriel Construction were the construction contractor for Noah's Carmel.  Ashby and Nelson did not disclose that it was impossible for Noah's to construct the Carmel facility within the mandatory 180-day window for the completion of 1031 exchanges. They specifically told DiTucci that the 180 day construction

requirement was not applicable in this case, which was later determined to be false. Therefore they knew that the Carmel was not a valid 1031 Exchange property.

158.    Ashby and Nelson told DiTucci that owners of Rockwell properties must offer their TIC interests to existing TIC owners first before attempting to sell their TIC interests to third parties.

159.    Prior to closing, a Rockwell employee, probably Beynon, told DiTucci that building permits had been submitted to the City of Carmel, and construction on Noah's Carmel was scheduled to begin as soon as the City of Carmel approved the permits.  Ashby, Beynon, and Nelson knew that no requests for construction permits had been submitted.

160.    On September 14, 2018, DiTucci closed on Noah's Carmel.

161.    About a week after closing, DiTucci received an Indiana Sales Disclosure Form from Rockwell stating that it had been omitted by accident from the closing documents.  It appears that Ashby directed FATCO to withhold the sales disclosure forms until after the investments were closed.  Parkin of FATCO complied with these requests.

162.    Cadence paid rent in the amount of $4,509.25 to DiTucci each month beginning in October 2018, including March 2019.

163.    From October through December 2019, DiTucci contacted City of Carmel several times to inquire about construction progress.  Subsequently she spoke to LeFevre, Ashby and Nelson to ascertain when it would begin. Each time she was told that there was a small delay with permitting and that it would be soon.

164.     In January 2019, DiTucci confirmed that construction on Noah's Carmel had still not yet begun. A Rockwell employee represented to DiTucci that Bowser had already booked weddings at Noah's Carmel, so construction would be completed before the fall of 2019.

165.     In February 2019, DiTucci called Rockwell again and asked why permits had still not been issued.

166.     Beynon told DiTucci that the walls of the building were already built and that permits had been slowed down. Beynon knew these representations were false when made.

167.     Beynon assured DiTucci that Noah's was constructing the building, and it would be completed before the fall.

168.     DiTucci then asked Beynon to transfer her ownership to a property leased by Fresenius.

169.     Beynon told DiTucci that he could not transfer her ownership to a property leased by Fresenius, but that he could transfer her ownership interest to another Noah's property with a fully constructed building.

170.     At this time, Ashby, Nelson, Benyon, and Rockwell knew that Noah's was delinquent on rent and taxes on other Rockwell-sponsored properties.

171.     On or about March 6, 2019, LeFevre informed the other property owners that Noah's was delinquent on rent and taxes.

172.     After about March 6, 2019, Ashby told DiTucci that Rockwell had already disbursed all of the funds to Noah's and that those funds were disbursed according to Noah's construction requisitions.  DiTucci asked for copies of the construction requisitions. Ashby knew that funds were disbursed without regard to the validity of any construction requisition.  Ashby did not disclose that Ashby, Beynon, and Nelson knew the funds were being disbursed to Bowser to spend as he saw fit and not for the purpose of construction.

173.    Ashby then told DiTucci that Noah's had a separate construction entity, Gabriel Construction, and the money should be held in a separate account by that company.  Ashby knew this statement was false when made.

174.    On or about March 13, 2019, Ashby told DiTucci that Rockwell paid rents until Noah's completed construction of the building, at which point Noah's would take over paying the rents.

175.    Ashby told DiTucci that Rockwell was no longer going to pay rents in accordance with the construction schedule referenced in the Sales Package, which indicated that the building was supposed to be completed by April 2019.

176.    Plaintiffs were not told that Rockwell paid the rents.

177.    On or about March 13, 2019, Hamrick and Ashby told DiTucci that Noah's paid over $1 million for the Noah's Carmel land and that the building walls were already built offsite and waiting at the factory.

178.    Ashby told DiTucci that Noah's submitted requisitions for construction of Noah's Carmel to Rockwell, and that Rockwell had already disbursed the entire construction budget to Noah's for the Noah's Carmel building based on those requisitions.

179.    Disbursement schedules, however, show that Rockwell, after disbursing some $1.5 million to Ashby, Beynon and Nelson, disbursed the entirety of the funds, $6.26 million, to Noah's for the Noah's Carmel building prior to the LaRozas' and DiTucci's closing on the property in September 2018, and before any building permits were received from the City of Carmel. Funds were disbursed in full and paid towards fictitious projects. As an example, monies were paid to Noah's for exterior finishes, landscaping and computer equipment for scheduling before a building permit had ever been issued.

180.    Building permits have still not been issued by the City of Carmel.

181.    DiTucci's deed was not recorded until March 26, 2019 by Parkin and FATCO. An employee of FATCO, Felicia Saez ("Saez"), told DiTucci that the deed "had been lost in the mail."

### Sale to the LaRozas

182.    Mr. and Mrs. LaRoza (collectively, the "LaRozas") met Hamrick in November 2014.

183.    Hamrick represented to the LaRozas that TIC properties were a good investment because the LaRozas would not have to deal with tenants, pay property tax, pay insurance, or handle maintenance.

184.    Hamrick represented that each of these obligations was handled by the property management company.

185.    Hamrick, acting as a commissioned sales agent for Rockwell, made the following representations to the LaRozas:

    a.   Investors wishing to invest in Rockwell TICs must have no debt on their property used to fund for the 1031 exchange; and

    b.   Noah's was financially stable, a leader in the event venue industry, and had a projected growth plan.

186.    In addition to Rockwell properties leased by Noah's, Hamrick offered TIC investments in properties leased by Fresenius and KinderCare to the LaRozas.

187.    The Noah's properties offered to the LaRozas by Hamrick had larger returns, better rent, better leases, and better lease extensions than the properties leased by Fresenius and KinderCare.

188.    The LaRozas met with Hamrick several times at E&W's office in Franconia, New Hampshire over the years and eventually invested in five Rockwell Noah's properties, including Noah's Carmel.

189.    Hamrick did not tell the LaRozas that construction of the Noah's Carmel building was behind schedule.

190.    In July 2018, Hamrick told the LaRozas that the Noah's Carmel building was just being finished.

191.    On September 10, 2018, the LaRozas purchased a 4.64% TIC interest in Noah's Carmel.

192.    On January 10, 2019, the LaRozas invested another $88,875.00 in Noah's Carmel, increasing their TIC interest to 6.06%.

193.    The LaRozas invested in Noah's Carmel because

   a.   The amount they would receive monthly for the term of the lease was high;

   b.   The return on investment was high; and

   c.   They did not have to obtain insurance, pay property taxes, or provide
        maintenance for the property.

194.    At no time did Hamrick tell the LaRozas that the building was not complete, nor that the lot was vacant.

195.    Hamrick told the LaRozas that there were no commission fees and that E&W charged a flat fee of $700, which was accounted for on the closing documents.

196.    The LaRozas' deed was not recorded until March 29, 2019 by Parkin and FATCO. Saez at FATCO told Steve LaRoza that FATCO normally receives the deeds a couple

of weeks after the purchase closes. Saez told Steve LaRoza that when FATCO received the LaRozas' deeds, the deeds were erroneously filed instead of immediately recorded.

### *Sale to Edward A. Hennessey 2001 Revocable Living Trust*

197.    On or about June 1, 2018, Hennessey met with Hamrick at E&W's office in Franconia, New Hampshire.

198.    Hamrick, acting as a commissioned sales agent for Rockwell, made the following representations to Hennessey:

> a.   Noah's Carmel was under construction with a planned opening in early spring of 2019;
>
> b.   Hamrick had made several investments in Noah's over the years;
>
> c.   All of the investments had worked out great; and
>
> d.   Hamrick planned to make additional investments with Noah's in the future.

199.    On June 19, 2018, Hennessey purchased a 6.39% TIC interest in Noah's Carmel for $400,000 on behalf of the Edward A. Hennessey 2001 Revocable Living Trust.

200.    Hennessey received a letter dated June 26, 2018 signed by Ashby that indicated the first rent payment had been sent.

201.    Beginning in July 2018, Cadence paid $2,792.43 per month in rent to the Edward A. Hennessey 2001 Revocable Living Trust.

202.    On August 17, 2018, Rockwell asked Hennessey to sign an Indiana Sales Disclosure Form that indicated a checkbox for vacant land.

203.    Hennessey was puzzled that the sales disclosure form indicated vacant land, but he was not alarmed because three months of rent payments had already been received.

### *Sale to Sanford Roberts Revocable Trust and Helaine Roberts Revocable Trust*

204.    On April 25, 2018, Brown of E&W sent information regarding Rockwell and Noah's to Sanford Roberts and Helaine Roberts (collectively, "the Roberts").

205.    On July 18, 2018, Brown, acting as a commissioned sales agent for Rockwell, made the following representations to Sanford Roberts:

   a.   Noah's Carmel was under construction;

   b.   A lease with Noah's was in place;

   c.   One of the benefits of investing with Rockwell and having Cadence manage the properties was that TIC interests could easily be sold to existing investors, making Rockwell's TIC investments more liquid than a traditional property interest;

   d.   The lease is on the land now incorporating the building once complete;

   e.   Noah's had already booked events at Noah's Carmel; and

   f.   Noah's was making lease payments during construction.

206.    On July 19, 2018, Brown sent the Rockwell Sales Package to the Roberts.

207.    On or about July 27, 2018, the Roberts purchased a 3.57% TIC interest in Noah's Carmel for $223,216 on behalf of the Sanford Roberts Revocable Trust and Helaine Roberts Revocable Trust.

208.    The Sales Disclosure Form filed with Indiana did not disclose the percentage of ownership sold to the Roberts Trust.

### Sale to The Fred Jacob Living Trust

209.    Nelson told Fred Jacob ("Jacob") that Noah's Carmel was under construction and would be completed in early 2019.

210.    On or about July 10, 2018, Jacob, on behalf of the Jacob Trust, purchased a 3.29% TIC interest in Noah's Carmel for $206,000 on behalf of The Fred Jacob Living Trust.

211.    On July 25, 2018, Cadence sent Jacob an email sharing the Noah's Carmel closing package and executed Contracts with Jacob.

### Sale to Russell E. Hertrich Revocable Trust

212.    Hamrick met with Russel Hertrich ("Hertrich") approximately three times at the offices of E&W Franconia, NH, where Hamrick taught Hertrich about 1031 Exchanges.

213.    Hamrick told Hertrich that he had invested in one or more of the Noah's properties.

214.    Hamrick served as both a Rockwell representative and QI for Hertrich.

215.    On or about June 22, 2018, Hertrich purchased a 23.15% TIC interest in Noah's Carmel for $1,449,475.41 on behalf of the Russell E. Hertrich Revocable Trust.

216.    On June 26, 2018, Ashby sent a "welcome package" to Hertrich, which included:

    a.    A Settlement Statement showing an escrow disbursement date of June 25, 2018;

    b.    A Sales Disclosure Form showing a conveyance date of June 25, 2018; and

    c.    A Request and Authorization for Release of Escrow Funds on E&W letterhead authorizing E&W to disburse funds to FATCO signed by Hamrick and Timothy L. Burger on June 22, 2018.

217.    In June 2018, Hertrich began receiving rents from Cadence in the amount of $8,414.75 per month.

218.    Hertrich's deed was not recorded by Parkin and FATCO until February 13, 2019.

219.    Hertrich received a letter from Parkin and FATCO dated February 21, 2019. The letter references a property in Hamilton County, NC.

220.    The Limited Warranty Deed enclosed with the letter shows that Ashby executed the Limited Warranty Deed on behalf of Rockwell Indianapolis on July 2, 2018 with Nelson as Notary Public.

221.    The Sales Disclosure Form enclosed with the letter was signed by Ashby on August 29, 2018 and shows a hand-written conveyance date of July 2, 2018.

### *Sale to Bruce I. and Maureen A. Rose*

222.    In May 2016, the Bruce Rose and Maureen Rose (collectively, "the Roses") were introduced to Rockwell and exchanged multiple emails and some phone calls with Rutherford, a Rockwell employee.

223.    Rutherford made the following representations to the Roses:

a.  Investments in Rockwell properties provided a dependable, steady income based on rents made by established growing companies, including Noah's;

b.  Rockwell's TIC opportunities were different because Rockwell's properties did not have a mortgage;

c.  Almost all possible problems would be managed by and paid for by the renting company, Noah's;

d.  The TIC investment was analogous to an annuity with the benefit that the initial principal would be returned to the Roses' estate by sale of the property, given that the 20-year lease should last until the end of their lives;

e.  The Roses or their estate could sell the property to existing investors at a markup based on the current rent at the time the property was sold;

f.  Existing investors would purchase the property because they had experience with the building and the rents received;

    g.  If the existing building owners did not purchase the property, Rockwell would offer the property to other prior Rockwell buyers, but that this had not happened to date; and

    h.  When Bruce Rose asked for a list of other building owners in a property of interest, Rutherford told him that Rockwell could not supply this information until he purchased the property.

224.    In June 2018, the Roses decided to invest with Rockwell.

225.    Rutherford also sent the Sales Package to the Roses in April or May of 2018.

226.    When the Roses decided to invest with Rockwell, Rutherford told him that many locations that were of interest to him were sold out, so the Roses would have to wait until Rockwell had completed other properties. This statement led the Roses to believe that Rutherford meant that Rockwell had to finish building them.

227.    Rutherford told the Roses that Noah's Carmel was also sold out. Days later, however, Rutherford told the Roses that one investor decided to split his investment between properties, and there was an available investment for the amount that he wished to invest.

228.    Prior to the Roses' purchase, Rockwell Indianapolis still owned at least 62.77% of Noah's Carmel.

229.    After the Roses decided to invest in Noah's Carmel, the Roses began to work with Nelson over email and by phone.

230.    Neither Rutherford nor Nelson told the Roses that there was no building at Noah's Carmel.

231.    Based on Rockwell's Sales Package, the Roses believed that the pictures showed the interior of Noah's Carmel.

232.     Based on the Sales Package and the information Rutherford and Nelson had given them, the Roses believed that the building was completed or near completion.

233.     Prior to purchasing their TIC interest in Noah's Carmel, the Roses reviewed the Lease between Rockwell Indianapolis and Noah's. They believed that a building was already constructed on the property because the Lease was dated June 13, 2018.

234.     On or about July 17, 2018, the Roses purchased a 5.59% TIC interest in Noah's Carmel for $350,000.

235.     On or about July 19, 2018, the Roses received a "welcome package" from Ashby that contained the documents that Bruce Rose had signed online, a closing statement, a copy of the Lease, and a copy of the Purchase and Sale Agreement. This package also included the first rent payment of $870.47. The cover letter stated that all subsequent payments would be received from the property manager. At the end of the package was a list of the annual rents with 2% increases each year. That listing of the rents also contained a picture that the Roses believed to be of the interior of the Noah's Carmel building.

236.     Approximately a month later, Nelson told the Roses that one more paper needed to be signed to get the deed from Indiana.

237.     Nelson told the Roses that Rockwell had just been told that this additional paper was needed, which the Roses presumed to be an idiosyncrasy of Indiana. Bruce Rose signed the paper and quickly sent it back.

238.     Bruce Rose signed the paper because he felt that the investment had already been made and that he needed to sign this paper in order to obtain a deed for it.

239.     The Roses received monthly rent payments of $2,005.35 from Cadence covering the period from August 1, 2018 to March 31, 2019.

240.     In March 2019, Bruce Rose was shocked to learn that there was no building on the Noah's Carmel property.

### Sale to CAMAC, Inc.

241.     On or about June 25, 2018, CAMAC, Inc. purchased a 13.36% TIC interest in Noah's Carmel for $836,142.

242.     At the time of sale, James M. Caplinger, Jr. purchased the TIC interest on behalf of CAMAC as President of CAMAC.

### Sale to Blush Property, LLC

243.     In or around June 2018, Camp and Merklin, the principals of Blush Property, discovered Rockwell through a website called 1031 Placement, which is a division of Defendant Belle Isle.

244.     Defendant DeSalvo communicated directly with Camp, Merklin, and Blush Property regarding the offer and sale of Noah's Carmel.

245.     On or around June 21, 2018, DeSalvo, acting as a commissioned sales agent for Rockwell, sent Camp, Merklin, and Blush Property the Sales Package for Noah's Carmel.

246.     After reviewing the Sales Package and communicating with Nelson about Noah's and Noah's Carmel, Camp and Merklin researched Carmel, Indiana, including property values, crime rates, and population growth.

247.     On or about August 13, 2018, Blush Property purchased a 5.9% TIC interest in Noah's Carmel for $369,300.

248.     Nelson facilitated this purchase during this time period through email exchanges and sending closing documents to Camp and Merklin.

249.    Blush Property received $2,118.50 per month in rent from Cadence after purchase. DeSalvo failed to disclose that he was to be paid commissions on the sale

### *All Plaintiffs*

250.    In total, Plaintiffs invested approximately $4.9 million in principal to purchase Noah's Carmel.

251.    Plaintiffs represent approximately 78% ownership in Noah's Carmel.

252.    Ashby signed the deed on behalf of Rockwell Indianapolis for each transaction.

253.    Ashby, Nelson, Beynon, Rutherford, Hamrick, Brown, and DeSalvo are not registered or licensed as security brokers or investment advisers.

254.    Parkin at FATCO was the escrow agent for each transaction, underwrote the title insurance policy, completed all of the deed recording tasks, and served as a contact to Plaintiffs after purchase.

255.    Each FATCO final settlement statement indicated that fees of only $700 were charged to Plaintiffs for each transaction, as follows:

   a.   $150 Closing-Escrow Fee to First American Title Insurance Company National Commercial Services;

   b.   $50 Recording Fees to First American Title Insurance Company National Commercial Services;

   c.   $150 Title endorsement fee to First American Title; and

   d.   $350 Property Administration setup fee to Cadence Property Administrators.

256.    The Hamilton County Recorder's Office charges $25 to record deeds and all other instruments.

257.    Rockwell made the first rent payment to investors after each respective purchase, and Cadence made all rent payments thereafter.  According to LeFevre as represented to Plaintiffs, the money was disbursed from Rockwell to Cadence, who then distributed it as "rent" monthly to the Plaintiffs.

258.    Rockwell and Cadence both issued 1099's to all Plaintiffs and characterized the income as rent.

259.    From October 3, 2018 to February 27, 2019, the Plaintiffs received fourteen emails from LeFevre and Cadence indicating that existing TIC owners of Noah's properties intended to sell their interests and offering those TIC interests for sale.

260.    The number of TIC interests for sale by existing owners caused alarm, as Plaintiffs had been told that Rockwell's investors in Noah's rarely wished to sell their interests.

261.    Beginning in April 2019, Noah's ceased making payments to Cadence, and Plaintiffs have not received rent payments for Noah's Carmel since then.

262.    In another Rockwell investment package, Rockwell represented that "If the property does not perform as promised during your first six months of ownership, we will buy it back!"



263.    It was therefore in Rockwell's best interest to pay the rents to investors for Noah's at least six months after each purchase.

### *Purchase and Sale Agreement*

264.    Plaintiffs each entered into the Purchase and Sale Agreement with Rockwell Indianapolis, wherein each Plaintiff was the Buyer and Rockwell Indianapolis was the Seller.

265.    "[Construction TIC Transaction]" appeared at the top of each Purchase and Sale Agreement.

266.    Pursuant to Section 3.2, Rockwell Indianapolis "shall periodically provide statements to First American Title Company detailing the construction costs that Seller has incurred and seeking reimbursement of such costs via transfer(s) of 1031 Funds."

267.    Pursuant to Section 4, Rockwell Indianapolis agreed "to pay for an endorsement to the standard coverage owner's policy of title insurance insuring Buyer in the amount of the Purchase Price."

268.    Ashby signed the Purchase and Sale Agreement on behalf of Rockwell Indianapolis as its Manager.

### *Tenancy in Common Agreement*

269.    Plaintiffs each entered into the Tenancy in Common Agreement ("TIC Agreement").

270.    The TIC Agreement represented that Rockwell Indianapolis' ownership interest was 100%. Rockwell Indianapolis' ownership interest was less than 100% after each of Plaintiffs' purchases.

271.    Pursuant to Paragraph 6.4, "All leases must be bona fide leases for federal tax purposes. Rents paid by a lessee must reflect the fair market value for the Property." Ashby knew that this statement was false when made.

272.    The Lease for the 2019 and 2020 time periods of $438,000 is not fair market value. This invalidates the 1031 Exchange.

273.    Pursuant to Section 8.3, "An Owner may not sell, convey, or transfer the Owner's undivided interest in the Property, or seek a partition of the Owner's undivided interest in the Property, unless the Owner (the "Selling Owner") first offers to sell the Selling Owner's undivided interest to the other Owners."

274.    Pursuant to Paragraph 8.4, "The Selling Owner must, in writing, offer the Selling Owner's undivided interest in the Property to each of the other Owners. The means of communicating the offer to the other Owners shall be via written communication from the property manager by email or similar means."

275.    Rockwell Indianapolis never offered to sell any part of its interest to Plaintiffs prior to selling the interests to new owners.

276.    Pursuant to Paragraph 8.5, "The accepted interests of the Selling Owner in the Property must be purchased for the entire Property's fair market value multiplied by the Ownership Percentage being purchased."

277.    When Rockwell Indianapolis sold each of the interests to Plaintiffs, the respective interests were not purchased for the entire Property's fair market value multiplied by the Ownership Percentage being purchased.

278.    Pursuant to Paragraph 18, "Neither this Agreement, nor any right or interest herein, may be assigned by a party hereto."

***Property Administrator Agreement***

46

279.    In their capacity as owners of the real estate, all Plaintiffs except Hertrich entered into the Property Administrator Agreement, wherein each Plaintiff was Co-owner and Cadence was the Property Administrator ("Property Administrator" or "PA").

280.    The Property Administrator Agreement served a critical function – it removed and insulated Plaintiffs from any and all management functions, thereby protecting the passive nature of the TIC investment for tax purposes. At the same time, this left Plaintiffs entirely dependent upon LeFevre and Cadence to duly carry out their performance and payment obligations under the Property Administrator Agreement and documents incorporated into the Property Administrator Agreement that are described below.

281.    The Property Administrator Agreement and Cadence's payment of rents helped perpetuate and conceal the fraud by concealing Bowser's and Noah's' unprofitability and inability to pay the rents as represented in the Sales Package. By paying rents timely to Plaintiffs, Plaintiffs either continued to believe that construction for the building was on schedule, the building was already constructed, Noah's was operating the event venue and realizing a profit, and/or Noah's was performing well enough to pay rent.

282.    Pursuant to Paragraph 6, "Property Administrator shall … act as Co-owners' agent."

283.    Pursuant to Paragraph 7a., Plaintiffs paid Cadence a fee of $35 per month.

284.    Pursuant to Paragraph 8, Cadence was obligated to, among other things:

a.    "[C]ollect monthly rent either directly from the tenant of the Property or from the property manager hired under separate agreement to manage the Property."

b.    "[P]rovide 1099 forms to the Co-Owners."

    c.    "[B]e the representative of the Co-owners to the Tenant and/or the Tenant's property manager for all matters related to herein."

    d.    "[N]otice and conduct any vote of the Co-owners required under the TIC Agreement."

    e.    "[A]ssist any Co-owner desiring to sell its undivided interest in the Property by providing written notice of the offer to sell to the other Co-owners as required by section 8.3 and 8.4 of the TIC Agreement."

285.    Pursuant to Paragraph 14, "All co-owners will be listed on the Landlord policy as additional insureds. The PA will keep the Insurance Agent (Landlord's policy) updated regarding any changes in property ownership through the life of the lease."

286.    LeFevre signed the Property Administrator Agreement on behalf of Cadence as its Principal.

287.    Each Plaintiff provided Cadence a completed direct deposit form.

288.    Cadence deposited $36,500 collectively into Plaintiffs' accounts each month.

289.    Cadence knew that Plaintiffs were highly dependent on Cadence to safeguard their investments because as TIC investors, Plaintiffs were prohibited from actively managing Noah's Carmel or becoming involved in its affairs due to IRS rules governing TIC investments.

290.    Plaintiffs, as the actual owners of Noah's Carmel underlying the TIC investments, had the ultimate right to control Noah's Carmel's actions and decisions.

291.    The Property Administrator Agreement was not a property management agreement.

292.    LeFevre and Cadence did not manage day-to-day operations at Noah's Carmel.

293.    Plaintiffs were under the impression, however, that LeFevre and Cadence performed property management services for their property.

***Defendants Knew or Were Reckless in not Knowing That Funds Were Misappropriated***

294.    On or about March 13, 2019, the construction manager for Gabriel Construction, Brandon Jensen ("Jensen"), told DiTucci that the walls of Noah's Carmel were not built and that there was never a plan to complete construction of the building by the spring of 2019.

295.    Jensen told DiTucci that construction for the building was scheduled to begin in April 2019.

296.    On March 20 and 22, 2019, Bowser told DiTucci that Rockwell had given him a $6 million loan in February of 2017. Ashby, Beynon, and Nelson knew that a $6 million unsecured loan was given to Noah's because it was insolvent.  None of these facts were disclosed to Plaintiffs.

297.    Bowser also told DiTucci that Rockwell had paid taxes on two of his buildings in early 2017 because Noah's could not meet its tax obligations.

298.    In August 2018, Bowser told Ashby and Nelson that he would not be building any more projects and that he was "under water" on several properties. Ashby and Nelson therefore knew that Noah's and the event centers were not profitable enough to make the rent payments as represented to Plaintiffs in the Sales Package.

299.    Ashby told Bowser not to change anything because it would "kill the golden goose" and ruin their business.

300.    On March 22, 2019, Bowser admitted to Plaintiffs that he was "robbing Peter to pay Paul" and had used 85-90% of the funds from Noah's Carmel investors to perform work on other buildings, and the remaining 10% was used for operations.

301.    Bowser told Plaintiffs that Rockwell had full visibility and knew exactly how he spent the funds. Ashby, Beynon, Nelson, and others at Rockwell knew, for example, that funds invested by Plaintiffs were not spent on construction of Noah's Carmel. Bowser said that notwithstanding the sham construction requisitions he had been clear with Rockwell about where the funds were going.

302.    Bowser told Plaintiffs that Rockwell knew at least a year ago that the disbursements were not going to construct the building on Noah's Carmel.  That is Ashby, Beynon, and Nelson knew by March of 2018 that none of the investment money was going to be used to construct the Carmel venue.

303.    Funds wired to FATCO should have been disbursed to Rockwell Indianapolis to purchase and construct real property.

304.    Further, pursuant to the Purchase and Sale Agreement, Rockwell Indianapolis should have periodically provided statements to FATCO detailing the construction costs that it incurred. Rockwell Indianapolis then should have sought reimbursement of such costs via transfers of 1031 Funds.

305.    Instead, funds far exceeding the purchase price and construction costs of Noah's Carmel were disbursed to Defendants and were not used for construction.

306.    Ashby, Nelson, Beynon and Bowser perpetrated the misappropriation by diverting funds that should have been used to pay construction costs, funds that should have been used to pay base rents to Plaintiffs, funds that should have been used to pay operating expenses for Noah's Carmel, and funds that should have been used to pay taxes.

307.    The building remains unbuilt, and the land is currently vacant.

308.    Plaintiffs were unaware they were being defrauded. Plaintiffs exercised due care

and diligence in seeking to discover the facts that form the basis for this Complaint but were

thwarted by Defendants' fraudulent conduct and omissions. Defendants, through a series of

affirmative acts and/or omissions described herein, suppressed the dissemination of truthful

information regarding their illegal conduct and actively prevented Plaintiffs from learning of

their illegal and/or tortious acts. Defendants' conduct was, by its nature, self-concealing and

carried out in a manner that precluded detection.

309.    Ashby, Nelson, Rutherford, Hamrick, Brown, and DeSalvo knew or should have

known that 1031 Exchange funds must be used to purchase real property at fair market value in

order to comply with the IRS Code.

310.    Ashby, Nelson, Rutherford, Hamrick, Brown, and DeSalvo knew or should have

known that properties under construction must be completed within 180 days of closing the

original exchange property in order to comply with the IRS Code.

311.    Ashby, Nelson, Rutherford, Hamrick, Brown, and DeSalvo knew or should have

known that rental properties purchased with Exchange Funds must have market rate rents in

order to comply with the IRS Code.

312.    Ashby, Nelson, Beynon, Rutherford, Hamrick, and Brown knew that TIC

investors were purchasing interests in Noah's Carmel for amounts that far exceeded the fair

market value of the property.

313.    Ashby, Nelson, Beynon, Rutherford, Hamrick, and Brown knew or were reckless

in not knowing that funds from TIC investors would be used for things other than the event

center or its operations.

314.     Ashby, Nelson, Beynon, Rutherford, Hamrick, and Brown knew that substantial commissions were taken from the invested amounts and concealed from investors.

315.     Ashby, Beynon, and Nelson knew that Noah's was experiencing financial difficulties and that there was no reasonable basis upon which to project the returns Noah's offered in Rockwell's sales documents.  Indeed, Ashby, Beynon, Nelson and Hamrick knew definitively from financial information provided to them by Noah's that Noah's was insolvent and could not meets its obligations as they became due.

316.     Under the Property Administrator Agreement, LeFevre and Cadence were responsible for collecting rents from Noah's Carmel and disbursing rents to Plaintiffs. Cadence specifically undertook to perform those duties including payment of the rents due to the TIC investors.

317.     In addition to an administrative role, Cadence listed Rockwell TIC properties for sale and facilitated the transfer and sale of TIC interests in several properties leased by Noah's, including Noah's Carmel.

318.     Under the Property Administrator Agreement, LeFevre and Cadence were responsible for assisting co-owners desiring to sell their TIC interests.

319.     Noah's Carmel is vacant and has no building under construction, yet LeFevre and Cadence paid rents to Noah's Carmel TIC owners.

320.     Despite knowing or being reckless in not knowing that Bowser and Noah's had misappropriated funds, LeFevre and Cadence continued collecting management fees and disbursing rents to owners.

321.     LeFevre and Cadence knew or should have known that rents were not being paid from revenue generated on Noah's Carmel.

322.    LeFevre and Cadence knew or should have known that rents were being paid with funds collected by new investors.

323.    At all relevant times, Ashby, Nelson, Beynon, and Rutherford were agents of and officers of Rockwell, and by committing the acts described in this Complaint and by failing to act when required to do so, Ashby, Nelson, Beynon, and Rutherford were acting in the course and within the scope of their authority as agents and officers, and in the transaction of the business of the employment or agency.

324.    At all relevant times, Hamrick and Brown were agents of and officers of E&W, and by committing the acts described in this Complaint and by failing to act when required to do so, Hamrick and Brown were acting in the course and within the scope of their authority as agents and officers, and in the transaction of the business of the employment or agency.

325.    At all relevant times, Bowser was an agent of and officer of Noah's and Gabriel Construction, and by committing the acts described in this Complaint and by failing to act when required to do so, Bowser was acting in the course and within the scope of his authority as an agent and officer, and in the transaction of the business of the employment or agency.

326.    At all relevant times, DeSalvo was an agent and officer of Belle Isle, and by committing the acts described in this Complaint and by failing to act when required to do so, DeSalvo was acting in the course and within the scope of his authority as an agent and officer, and in the transaction of the business of the employment or agency.

327.    Defendants' tortious conduct from July 2018 to March 2019, as described in this Complaint, was committed within the scope of their employment and in furtherance of their employers' interests.

328.    Defendants' employers are therefore also liable to Plaintiffs for Defendants' acts and omissions as alleged in this Complaint.

## FIRST CAUSE OF ACTION
### (Negligent Misrepresentation Against All Defendants)

329.    By this reference, Plaintiffs incorporate all other allegations in this Complaint.

330.    Defendants had a duty to inspect and to disclose fully and fairly all facts that materially affect or relate to the condition of the real property and to disclose truthful and complete, rather than misleading, information.

331.    Including the foregoing false representations, Defendants made the following non-exhaustive negligent representations to Plaintiffs:

a.   Rockwell TICs are not securities;

b.   Noah's Carmel was secured by Noah's, an excellent corporate tenant;

c.   Plaintiffs' investment was safe and secure with reliable income from Noah's as tenant;

d.   The TIC investment in Noah's Carmel qualified as a 1031 Exchange;

e.   Noah's paid the property tax;

f.   "All of the companies that are the tenants in [Rockwell] properties are thriving despite the down economy;"

g.   "The worst-case scenario would be if the tenant went out of business and there was an interruption in the lease payments;"

h.   "[B]ecause there is no debt to service you would not be in danger of losing the property and thereby your original investment;"

i.   "Rockwell properties are smaller, freestanding buildings which are typically much easier to lease than a larger facility;" and

j.   Rockwell's "track record is literally perfect as not a single Rockwell client has ever missed a monthly lease payment."

332.   Defendants owed a duty of reasonable care to Plaintiffs independent of any contractual obligation.

333.   Defendants knew such representations were false or were negligent in making such representations.

334.   Defendants were negligent in inspecting the condition of the real property.

335.   Defendants knew or should have known the misrepresentations were false and knew about the omissions based on their years of experience doing business with Noah's and selling TIC interests. Based on that experience, they knew Noah's Carmel was not capable of generating the level of revenue needed in order to pay Plaintiffs rents and that Noah's would not be able to complete construction on time.

336.   These Defendants made the misrepresentations in an effort to induce the Plaintiffs into purchasing Noah's Carmel for a grossly inflated price.

337.   The foregoing misrepresentations and omissions were not only material, but the information was critical to the Plaintiffs' evaluation of whether to purchase Noah's Carmel. Plaintiffs would not have invested in the TIC interests had they known the true facts.

338.   Plaintiffs justifiably relied on the foregoing misrepresentations and on the expectation that information necessary to render representations not misleading would not be omitted from the Noah's Carmel Sales Package. The Noah's Carmel Sales Package was presented as an accurate and complete disclosure of facts relating to investment in the TIC interests and of the risk factors associated with the investment.

339.    Plaintiffs' reliance was justified in light of the knowledge and experience these Defendants had with respect to Noah's Carmel, Noah's' potential to generate revenue, Noah's' previous construction schedules, and their experience selling TIC interests.

340.    As a result of Defendants' negligence, Plaintiffs have been damaged in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### (Fraud/Constructive Fraud Against All Defendants)

341.    By this reference, Plaintiffs incorporate all other allegations in this Complaint.

342.    In addition to the foregoing, Defendants made false statements about important facts regarding Noah's Carmel, including:

a.    The representations within the Sales Package;

b.    The representations made to each individual Plaintiff, as described above;

c.    Selling TIC interests in Noah's Carmel to Plaintiffs Edward A. Hennessey 2001 Revocable Living Trust on June 19, 2018; CAMAC on June 21, 2018; and the Russell E. Hertrich Revocable Trust on June 22, 2018 for a total of over $2,219,000 before Noah's Carmel had been conveyed to Rockwell Indianapolis on June 27, 2018;

d.    Noah's Carmel was secured by the Lease with NOAH'S OPERATIONS CARMEL, LLC, a Utah limited liability company that did not exist; and

e.    The Lease began on June 13, 2018 before Noah's Carmel had been conveyed to Rockwell Indianapolis on June 27, 2018.

343.    Defendants made the statements knowing that they were false.

344.    Alternatively, Defendants made the statements recklessly and without regard for their truth.

345.    Defendants intended that Plaintiffs would rely on the statements.

346.    Plaintiffs reasonably relied on the statements.

347.    As a result of Defendants' conduct, Plaintiffs suffered damages as a result of relying on the statements.

### THIRD CAUSE OF ACTION
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder Against Ashby, Beynon, Nelson, Rockwell, and Rockwell Indianapolis)**

348.    By this reference, Plaintiffs incorporate all other allegations in this Complaint.

349.    Defendants made untrue statements of material fact and omitted material facts necessary in order to make the statements not misleading, as alleged above, in violation of Rule 10b-5 and subsections a, b and c thereunder.

350.    The material misrepresentations and omissions were made in connection with the offer to sell a security. Many of the material misrepresentations and omissions were made in the Sales Package.

351.    The Sales Package was distributed by Ashby, Beynon, and Nelson in furtherance of a fraudulent scheme.  The Sale Package contained numerous misrepresentations and omissions.

352.    In addition to the above, such untrue statements include

    a.   The Risk Analysis of Noah's;

    b.   The Average Cap Rate of 8.50% over the initial lease term;

    c.   That Noah's Carmel was a single, independent financial entity;

    d.   That Rockwell's TIC offerings did not constitute securities; and

    e.   That federal and state laws regulating the sale of securities do not apply with
         respect to the sale of TIC interests.

353.    Such omissions include, without limitation;

    a.    The financial health of Noah's and Noah's other properties;

    b.    The extent to which Noah's Carmel's revenue was dependent on Noah's;

    c.    The status of construction on the proposed building;

    d.    The costs of constructing the building; and

    e.    Defendants' commissions.

354.    Defendants all made the material misrepresentations and omissions because they all actively contributed to the drafting of the Noah's Carmel Package, Indiana Sales Disclosure Form, Purchase Agreement Property, TIC Agreement, and/or Administrator Agreement or distributed those materials for the purpose of recommending or selling the Carmel securities.

355.    Ashby and Nelson knew the misrepresentations were false and knew about the omissions because they regularly received financials from Bowser and Noah's showing that Noah's was insolvent.  In addition, Ashby and Nelson authorized the unsecured loan of $6 million to Noah's in February of 2017 because they knew Noah's could not continue as a going concern without substantial outside financial assistance.  Moreover, Ashby, and Nelson were told by Bowser that he could not build and lease the new event centers sold to the Plaintiffs without losing money.  Ashby and Nelson, in August of 2018, told Bowser to keep this information to himself and not to change the business.  Ashby, Beynon, and Nelson knew Bowser was only keeping Noah's afloat by paying older investors with funds misappropriated from new investors including the Plaintiffs.  Finally, Rockwell and Rockwell Indianapolis knew the misrepresentations were false and knew about the omissions because they are imputed with the knowledge of their principals. These Defendants intended to deceive the Plaintiffs by making these misrepresentations and omissions.

356.     The foregoing misrepresentations and omissions were not only material, but the information was critical to the Plaintiffs' evaluation of whether to purchase Noah's Carmel. The investors would not have invested in the TIC interests had they known the true facts.

357.     Plaintiffs justifiably relied on the foregoing misrepresentations and on the expectation that information necessary to render representations not misleading would not be omitted from the Noah's Carmel Package and Rockwell's commissioned agents' sales pitches. The Noah's Carmel Package and Ashby, Rutherford, Hamrick, and Brown's sales pitches were presented as an accurate and complete disclosure of facts relating to investment in the TIC interests and of the risk factors associated with the investment.

358.     The statutory safe harbor and bespeaks caution doctrine that apply to forward looking statements under certain circumstances do not apply to the Noah's Carmel Package because no meaningful cautionary statements were made regarding material risks and facts known by Defendants, including:

a.   The financial health of Noah's and Noah's other properties;

b.   The extent to which Noah's Carmel's revenue was dependent on Noah's;

c.   That Plaintiff's money would be used to pay themselves rent and would be used to run Noah's Operations

d.   The Plaintiffs' monies would be handed over to the tenant Noah's without control or oversight,

e.   The status of construction on the proposed building;

f.   The costs of constructing the building; and

g.   Defendants' commissions.

359.     The foregoing misrepresentations and omissions caused the owners to suffer

extensive damages in an amount to be proven at trial but in excess of $4.9 million.

## FOURTH CAUSE OF ACTION
**(Violations of Section 12(a)(1) of the Securities Act, 15 U.S.C. § 77l, and Section 5
thereunder Against All Defendants)**

360.     By this reference, Plaintiffs incorporate all other allegations in this Complaint.

361.     From approximately June 26, 2018 through the present, Defendants unlawfully

made use of means or instruments of communication in interstate commerce or of the mails for

the purpose of offering, selling, or delivering unregistered securities in direct violation Section

5(a) and 5(c) of the Securities Act.

362.     The sale of TIC interests in Noah's Carmel was the sale of unregistered securities

in that an investment of money was required in order to receive the TIC interest, the investment

of money was made into the common enterprise that is Noah's Carmel and the Lease with

Noah's, and the success of the investment and any potential returns on such was entirely reliant

on Defendants' ability to pay the promised rents and so-called "CAP rate."

363.      Defendants sold or offered for sale the securities at issue without filing a

registration statement.

364.     As such, Defendants have participated in an unregistered sale of securities in

violation of the Securities Act and are liable to Plaintiffs for rescission and/or compensatory

damages.

## SIXTH CAUSE OF ACTION
**(Sale of Securities by an Unlicensed Broker or Investment Adviser: Cal. Corp. Code §§
25210 and 25501.5; Florida Statutes 517.301, K.S. Stat. § 17-12a509; Maine Rev. Stat.
§16509; Mass. Gen. Laws ch. 110A et seq.; and N.H. Rev. Stat. § 421 Against Ashby,
Nelson, Rockwell, and Rockwell Indianapolis)**

365.     By this reference, Plaintiffs incorporate all other allegations in this Complaint.

366.     Defendants offered and sold securities to investors in, at least, Massachusetts, California, New Hampshire, Florida, Maine, and Kansas.

367.     At the time of Defendants' sales, they were not licensed under any relevant state statute, and the sales were therefore illegal and in violation of the relevant securities laws of each state in which each Plaintiff resides.

368.     Defendants sold securities knowing or recklessly not knowing that the TIC interests were securities, and that they were not licensed to sell securities.

369.     As a result, Defendants are liable to Plaintiffs for the consideration paid for the security, interest at the legal rate of interest from the date of payment, costs, and reasonable attorney's fees.

### SIXTH CAUSE OF ACTION
**(Violations of Plaintiff States Blue Sky Laws: Mass. Gen. Laws ch. 110A, § 410; Cal. Corp. Code §§ 25401, 25501, and 25504; N.H. Rev. Stat. Ann. § 421-B:5-501; Florida Statutes 517.301; K.S. Stat. § 17-12a509; and 32 Maine Rev. Stat. § 16509 Against Ashby, Beynon, Nelson, Rockwell, and Rockwell Indianapolis)**

370.     By this reference, Plaintiffs incorporate all other allegations in this Complaint.

371.     Defendants offered to sell the Security in, at least, Massachusetts, California, New Hampshire, Florida, Maine, and Kansas.

372.     Under these state securities laws, Defendants had a duty to fully and accurately disclose all material facts that a reasonable investor would consider important in making the decision to invest in securities. Instead, Defendants made untrue statements of a material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading in connection with the offer and sale of securities.

373.    Each of the Defendants personally participated in the preparation of the Securities

Offerings, by either drafting substantial portions of them, reviewing and commenting on them, or

personally publishing them, as described more fully above.

374.    Alternatively, Defendants materially aided in the sale of the securities.

375.    Each of the Securities Offerings failed to disclose all material facts that a

reasonable investor would consider important in making the decision to invest in the securities,

and contained untrue statements of a material fact in violation of Mass. Gen. Laws ch. 110A, §

410; California Corporations Code §§ 25401, 25501, and 25504; N.H. Rev. Stat. Ann. § 421-

B:5-501, Florida Statues 517.301, K.S. Stat. 17-12a509 and 32 Maine Rev. Stat. § 16509.

376.    The investors in the Securities Offerings did not know of these material

misstatements or omissions.

377.    Defendants knew, or in the exercise of reasonable care, could have learned of

these misstatements or omissions.

378.    As the result of the material misrepresentations and omissions in the above

offerings, the investors in such offerings have been damaged.

379.    Each of the Defendants is a partner, officer, or director of the Entities, or occupies

a similar status.

380.    In addition, each of the Defendants was employed by the Entities and materially

aided the Entities in the sale of the Securities Offerings.

381.    By the nature of their executive positions with each of the Entities, and their

active participation in the management of the Entities, Defendants directly or indirectly

controlled the Entities.

382.   As such, Defendants are jointly and severally liable for the damages sustained by investors, for the Entities' sale of the Securities Offerings in violation of Mass. Gen. Laws ch. 110A, § 410; California Corporations Code §§ 25401, 25501, and 25504; N.H. Rev. Stat. Ann. § 421-B:5-501, Florida Statutes 517.301, K. S. Stat 17-12a509 and 32 Maine Rev. Stat. § 16509.

383.   In addition, as a result of their materially aiding the Debtors in the sale of the Securities Offerings, the Defendants are jointly and severally liable for the damages sustained by the Entities' investors in connection with these sales.

384.   Accordingly, Plaintiffs are entitled to an award of damages against the Defendants in the amount of the consideration the investors paid for the security, together with interest, costs, and reasonable attorney fees.

385.   Defendants acted with an actual intent to defraud or in reckless disregard of the truth or falsity of the statements in the above offerings.

386.   Because Defendants' conduct was sufficiently willful and malicious, Plaintiffs are further entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
### (Fraudulent Inducement Against Ashby, Beynon, Nelson, Rockwell, and Rockwell Indianapolis)

387.   By this reference, Plaintiffs incorporate all other allegations in this Complaint.

388.   A confidential or fiduciary relationship existed between

   a.   Ashby, Nelson, Rockwell, Rockwell Indianapolis, and all Plaintiffs;

   b.   Rutherford, Nelson, and Bruce Rose;

   c.   Hamrick, E&W, and DiTucci;

   d.   Hamrick, E&W, and the LaRozas;

   e.   Hamrick, Brown, E&W, and the Roberts;

f. Hamrick, E&W, and Hennessey;

g. Hamrick, E&W, and Hertrich;

h. Nelson and Jacob.

389. Defendants, or commissioned sales agents acting on their behalf, made the representations as described for each Plaintiff, above.

390. The representations were about presently existing facts that were important.

391. The representations were false and Defendants either knew that the representations were false or made the representation recklessly without sufficient knowledge upon which to base the representations.

392. Defendants made the representations to induce Plaintiffs to agree to the Contracts.

393. Plaintiffs reasonably relied on these representations without knowledge of their falsity.

394. Plaintiffs entered into the Contracts.

395. Plaintiffs would not have entered into the Contracts if they had known that the representations were not true.

396. As a result of Defendants' acts to induce Plaintiffs to enter into the Contracts, the Contracts are void.

397. As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial.

398. Defendants' conduct was and is willful or malicious, or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and disregard of Plaintiffs' rights; thus, Plaintiffs are entitled to an award of punitive damages against Defendants under Utah Code § 78B-8-201.

## EIGHTH CAUSE OF ACTION
### (Unjust Enrichment Against All Rockwell Defendants)

399.    By this reference, Plaintiffs incorporate all other allegations in this Complaint.

400.    Plaintiffs conferred a benefit on Defendants by, among other things, providing funds to Defendants for payment of enormous undisclosed commissions in an amount of up to 20 percent of the total invested or about $1.5 million dollars.  This money went directly to Ashby, Beynon and Nelson as commissions or commissions in the form of "distributions."

401.    Defendants appreciated or had the knowledge of the benefit by, among other things, accepting funds from Plaintiffs for land that was not worth the amount Plaintiffs paid, and for the payment of undisclosed commissions.  Plaintiffs received this money as a result of their operation of an illegal Ponzi scheme.

402.    Plaintiffs have not been paid rents and the Noah's Carmel land sits vacant without a building.  The Noah's lease was rejected in Noah's bankruptcy.  Because of the fraudulent conduct of Ashby, Beynon, and Nelson, Plaintiffs will lose nearly all of the money invested in Noah's Carmel.

403.    It is inequitable for Defendants to retain the benefit of the funds and other benefits conferred on them by Plaintiffs.

404.    Defendants have been unjustly enriched by retaining the benefit without reimbursing Plaintiffs.

405.    As a result of Defendants' unjust enrichment, Plaintiffs are entitled to an amount to be proven at trial.

## NINTH CAUSE OF ACTION
### (Civil Conspiracy Against All Defendants)

406.    By this reference, Plaintiffs incorporate all other allegations in this Complaint.

407.    Defendants and others known and unknown, knowingly and willfully conspired and agreed among themselves to misappropriate millions of dollars from Noah's Carmel, conceal the misappropriation, and/or not inform Plaintiffs about the misappropriation.

408.    The conspiracy's objectives were to convert Plaintiffs' property; breach fiduciary duties of honesty, loyalty, and care owed to Plaintiffs; to defraud Plaintiffs; and continue to collect fees for services rendered by the Defendants.

409.    The structure of the TIC investments, combined with limitations imposed by the IRS on managing TIC investments, gave Defendants undue economic influence and power over Plaintiffs, including the power to exclude and coerce Plaintiffs. Defendants' concerted action and force of numbers also served to unduly coerce and injure Plaintiffs. The conspiracy gave Defendants powers that an individual acting alone would not possess. The civil conspiracy thus constitutes an independent, actionable tort.

410.    Defendants acted wantonly and maliciously towards Plaintiffs by conspiring to steal from Plaintiffs, conspiring to conceal the theft, and/or conspiring to keep silent about the misappropriation so as to keep Plaintiffs from learning about the misappropriation.

411.    The following overt acts, among others, were taken in furtherance of the conspiracy:

a.    Ashby, Hamrick, Bowser, Nelson, Brown, Rockwell, Rockwell Indianapolis, E&W, Noah's, and Gabriel Construction misappropriated at least $4.9 million from Noah's Carmel;

b.    Parkin, while employed by FATCO, sent Plaintiffs and the Hamilton County Recorder's Office false and misleading documents regarding Noah's Carmel; and

c.    LeFevre sent false and misleading rent payments to Plaintiffs.

412.    Defendants' conduct, as perpetrated through the conspiracy, directly caused injury and damage to Plaintiffs.

413.    As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request relief as follows:

A.  An award of actual and punitive damages, attorney fees and costs in an amount to be proven at trial, plus interest as set forth in the applicable statutes.

B.  The imposition of a constructive trust on the transfers made to Defendants.  Plaintiffs hereby tender their TIC securities in exchange for rescission of their purchase and return by the Defendants of the full amount of the purchase price plus interest and attorney fees.

C.  A judgment for unjust enrichment and a judgment ordering disgorgement of the purchase amounts.

D.  For pre-judgment interest, attorneys' fees, and costs of suit to the extent allowed by applicable law.

E.  In the event that the 1031 exchanges are deemed to be invalid, for all taxes, interest, fines, and accountancy fees caused by Defendants' malfeasance.

F.  Such other relief as may be just and equitable.

Dated: May 15, 2020

FELIX WEINBERG PLLC

s/  Wesley D. Felix
*Attorneys for Plaintiffs*

# Exhibit B

# Exhibit B

# Exhibit B

George M. Haley
HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, UT 84101-2194
Telephone: 801.799.5800
Fax: 801.799.5700
*gmh@hollandhart.com*

*Arbitrator*

---

### PRIVATE ARBITRATION PROCEEDING

| | |
|---|---|
| ROSA DITUCCI, et al., | |
| Claimants, | **INTERIM PROCEDURAL ORDER** |
| v. | |
| CHRISTOPHER J. ASHBY, et al., | George M. Haley, Arbitrator |
| Respondents. | |

This matter has come before me to determine the effect on this proceeding as a result of the filing for bankruptcy by the debtor Respondents Rockwell Debt Free Properties, Inc.; Rockwell Indianapolis, LLC; and Rockwell TIC, Inc. (hereinafter, the "Debtors"). Specifically, I am tasked with determining whether the automatic stay provision of the Bankruptcy Code found at 11 U.S.C. § 362(a)(1) applies to the entire proceeding or solely to the Debtors, and whether the matter should proceed against the individual non-debtor Respondents Christopher Ashby, Jordan Nelson, and Scott Benyon (the "Non-Debtor Respondents"). For the reasons stated below, I find that the automatic stay of Section 362(a)(1) applies only to the Debtors, not to the individual Non-Debtor Respondents, and that this matter shall proceed pursuant to the terms of

the April 10, 2020 Scheduling Order.  Specifically, discovery against the individual Non-Debtor

Respondents shall proceed as scheduled.

## **PROCEDURAL BACKGROUND**

Claimants Rosa DiTucci, *et al*., ("Claimants") and Respondents Christopher Ashby, *et al*.

("Respondents") (collectively, the "Parties") stipulated that this matter be arbitrated by a single

arbitrator and pursuant to Section 5 of the Federal Arbitration Act.  The Parties selected me to act

as a single arbitrator to preside over this matter.  On April 10, 2020, a Preliminary hearing was

held and a Scheduling Order was issued that established the scope of discovery, a discovery

cutoff date of September 30, 2020, and an Evidentiary Hearing date beginning on December 7,

2020.

On September 2, 2020, at 2:55 p.m., I received an email from counsel for the

Respondents that reads as follows:

"Arbitrator Haley and Counsel,

Please find attached a Notice of Bankruptcy Filing and Automatic Stay as well as a
Notice of Bankruptcy Case Filing.  These notices apply to the following parties in this
arbitration: Rockwell Debt Free Properties, Inc.; Rockwell Indianapolis, LLC; and
Rockwell TIC, Inc."

As part of its Rules of Practice, the United States District Court for the District of Utah

adopted the Alternative Dispute Resolution Plan ("ADR Plan").  Section 5(d) of the ADR Plan,

*Interim Procedural Order; Rescheduling* provides:  "The arbitrator has the authority to make

such interim procedural orders in furtherance of the purposes of the arbitration proceeding and

this plan as are deemed necessary and appropriate . . . ."

Finding that it was necessary and appropriate to determine the impact of the Debtors'

bankruptcy filing and the resulting automatic stay on this proceeding I sent an email to the

Parties on September 2, 2020, at 4:51 p.m., asking for their respective positions of whether the bankruptcy filing had the effect of staying the entire proceeding.

On September 2, 2020, at 5:12 p.m., I received an email from counsel for the Claimants, which was copied to counsel for the Respondents, that stated: "Our position is that the proceeding is stayed only as to the entities filing bankruptcy." I did not receive an immediate response from counsel for the Respondents.

On Friday September 4, 2020, at 9:06 a.m., I received the following email from counsel for the Claimants  which was copied to counsel for the Respondents    "George, Rockwell Debt Free Properties and I believe Rockwell TIC declared bankruptcy Thursday.  None of the individual defendants have declared bankruptcy.  We had scheduled the depositions of defendants, Nelson and Ashby for next week.  Our position is that the case goes forward as to the individuals.  Counsel for defendants have told us they believe the entire case is stayed.  We request a quick resolution of this impasse.  I suggest 500 words or less submitted by each side on or before Tuesday September 7, 2020.  We will keep the deposition of Chris Ashby scheduled for September 11, 2020 on calendar pending your decision."

Being mindful of the September 30, 2020 discovery cutoff and that depositions had been scheduled the next Friday, September 11, 2020, on September 4, 2020, at 9:58 a.m., I asked the Parties for expedited briefs to be filed on the issue of whether the entire case was stayed due to the Debtors' bankruptcy filing.  I set a page limitation and a due date of close of business on September 8, 2020.

On September 8, 2020, I received memoranda from the Parties, which I reviewed on September 8, 2020 and September 9, 2020.  My intention was to issue a decision that day.

Unfortunately, due to a medical emergency, I could not draft a formal ruling, and instead, on September 9, 2020, at 3:44 p.m., I issued what I would deem to be a minute entry that advised the Parties that I determined that the stay did not apply to the individual Non-Debtor Respondents, that this matter would proceed against the individual Non-Debtor Respondents, and that the scheduled depositions should proceed.  Counsel for the Claimants submitted a memorandum providing pertinent case law on the issue of whether Section 362(a)(1) of the Bankruptcy Code applies to the individual Non-Debtor Respondents.  Counsel for the Respondents' position was that the Claimants must first dismiss the action against the Debtors before proceeding against the individual Non-Debtor Respondents and that the issue of whether the automatic stay applies to the individual Non-Debtor Respondents is not ripe.  I disagree.

## **RULING**

I find that as a matter of law that Section 362(a)(1) of the Bankruptcy Code applies only to the Debtors in bankruptcy and not to the individual Non-Debtor Respondents Christopher Ashby, Jordan Nelson, and Scott Benyon.  It is clear from the plain language of Section 362(a)(1) that it applies only to proceeding against the Debtor.

As the Tenth Circuit Court of Appeals held in *Fortier v. Dona Anna Plaza Partners,* 747 F.2d 1324 (10th Cir. 1984):

> It would make no sense to extend the automatic stay protections to solvent co-defendants. They don't need it, and at the same time it would work a hardship on plaintiffs, by giving an unwarranted immunity from suit to solvent co-defendants. Extending the stay to protect solvent co-defendants would not advance either of the purposes underlying the automatic stay.  Accordingly, we join other circuit courts in concluding that 11 U.S.C. § 362 stays litigation only against the debtor and affords no protection to solvent co-defendants.

*Id.* at 1330.  I find this holding to be persuasive and controlling.  I have not pre-judged the merits

of the claims against the Non-Debtor Respondents to this action.  The claim is that the Claimants

were defrauded out of $6,500,000 by the Respondents.  It seems to me that it would be unjust to

deny the Claimants the opportunity to prove their case against the Non-Debtor Respondents.

I also find Judge Mosier's decision in *Lee v. McCardle (In re Peeples),* 553 B.R. 892

(2016), 2016 Bankr. Lexis 2590, instructive:

> Another example of actions against non-debtors that are not stayed under Section
> 362(a)(1) are actions against co-defendants.  'It is clearly established that the automatic
> stay does not apply to non-bankrupt co-defendants of a debtor even if they are in a similar
> legal or factual nexus with the debtor.'  This principle has been followed even when the
> action taken was against a former manager of the debtor who argued that 'the real party
> in interest is the Debtor, and that the proceeding would adversely affect the
> administrations of the estate.'

*Id.* at 899 (internal citations omitted).  Judge Mosier goes on to cite the Tenth Circuit language in

*Fortier* quoted above as delineating the limits of the automatic stay.

The current state of the law is that Section 362(a)(1)'s automatic stay does not apply to

non-debtor co-defendants.  *See, e.g.*, *Paulson v. Two Rivers Water & Farming Co.,* 2020 U.S.

Dist. Lexis 39120, 2020 WL 1078859.  The Claimants will have to prove their fraud claims

against the individual Non-Debtor Respondents independent of their claims against the Debtors

in any event.

Respondents have taken the position that, as of September 9, 2020, it was unclear to them

whether the Claimants in this case were going to proceed against the Debtors.  I do not find this

statement consistent with the clear email exchange between the Parties, quoted above.  It was

crystal clear to me that the Claimants had no intention of proceeding against the Debtors and that

they were only going to pursue their claims against the individual Non-Debtor Respondents.  If

there are some ministerial acts that the Claimants need to take do in order to clarify the

pleadings, they are instructed to do so within five (5) business days of this Order.  I certainly

understand that no claims can be advanced in this arbitration proceeding.  If there is some

pleading requirement of which I am unaware, I find that the individual Non-Debtor Respondents

are not prejudiced by a five-day period to clarify the pleadings.  On the other hand, I do find that

the Claimants would be prejudiced by the continued delay in discovery against the Non-Debtor

Respondents.

Unless and until the Bankruptcy Judge issues an order extending the automatic stay to the

Non-Debtor Respondents, then I expect the April 10, 2020, Scheduling Order to be followed and,

absent good cause, that the depositions will proceed as scheduled.  Absent good cause, I am not

inclined to extend any of the established dates that are currently scheduled and expect that the

Evidentiary Hearing will proceed against the individual Non-Debtor Respondents on December

7, 2020.

I will reserve the ruling on costs and fees until I issue a final award in this matter.

Dated this 10th day of September, 2020.

*/s/ George M. Haley*
George M. Haley
Arbitrator

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 10th day of September, 2020, I caused a true and correct copy

of the foregoing **INTERIM PROCEDURAL ORDER** to be served via email to the following:

Sara Nielson
*snielson@parrbrown.com*

Brenda Weinberg
*bweinberg@felixweinberg.com*

Wes Felix
*wfelix@felixweinberg.com*

Jonathan O. Hafen
*jhafen@parrbrown.com*

Chad S. Pehrson
*cpehrson@parrbrown.com*

Royce Covington
*rcovington@parrbrown.com*

*/s/ George M. Haley*

15370076_v1

7

# Exhibit C

# Exhibit C

# Exhibit C

# Bylaws of Rockwell, TIC, Inc.

## Article I.  OFFICES

**§ 1.1 Business Office.** The principal office of the corporation shall be located at 8494 S. 700 East, Sandy, Utah, 84070, or any place either within or outside the state of Utah as designated in the company's most current Annual Report filed with the Division of Corporations and Commercial Code of the Utah Department of Commerce.    The corporation may have such other offices, either within or without the State of Utah, as the board of directors may designate or as the business of the corporation may require from time to time.  The corporation shall maintain at its principal office a copy of certain records, as specified in § 2.14 of Article II.

**§ 1.2 Registered Office.** The registered office of the corporation shall be located within Utah and may be, but need not be, identical with the principal office (if located within Utah).  The address of the registered office may be changed from time to time.

## Article II.  SHAREHOLDERS

**§ 2.1 Annual Shareholder Meeting.** The annual meeting of the shareholders shall be held on the Ann mtg--"first", "second", etc weekday _1ˢᵗ Monday 4PM_ Ann mtg -- Day of week of _____Ann mtg -- Month, in each year, beginning with the year ____2006_____ Ann mtg -- Year of 1st mtg, or at such other time on such other day within such month as shall be fixed by the board of directors, for the purpose of electing directors and for the transaction of such other business as may come before the meeting.  If the day fixed for the annual meeting shall be a legal holiday in the State of Utah such meeting shall be held on the next succeeding business day.

**§ 2.2  Special Shareholder Meetings.**  Special meetings of the shareholders, for any purpose or purposes described in the meeting notice, may be called by the president or by the board of directors, and shall be called by the president at the request of the holders of not less than one-tenth of all outstanding votes of the corporation entitled to be cast on any issue at the meeting.

**§ 2.3  Place of Shareholder Meeting.**  The board of directors may designate any place within or without the State of Utah as the place of meeting for any annual or special meeting of shareholders.  If no designation is made, the place of meeting shall be the principal office of the corporation in the State of Utah.

## § 2.4  Notice of Shareholder Meeting.

(a) *Required notice.*  Written notice stating the place, day and hour of any annual or special shareholder meeting shall be delivered not less than 10 nor more than 60 days before the date of the meeting, either personally or by mail to each shareholder of record entitled to vote at such meeting and to any other shareholder entitled by the Utah Revised Business Corporation Act (sometimes referred to in these bylaws as "the Act") or the

articles of incorporation to receive notice of the meeting. Notice shall be deemed to be effective at the earlier of: (1) when deposited in the United States mail, addressed to the shareholder at his address as it appears on the stock transfer books of the corporation, with postage thereon prepaid; (2) on the date shown on the return receipt if sent by registered or certified mail, return receipt requested, and the receipt is signed by or on behalf of the addressee; (3) when received; or (4) five days after deposit in the United States mail, if mailed postpaid and correctly addressed to an address other than that shown in the corporation's current record of shareholders.

(b) *Adjourned Meeting.* If any shareholder meeting is adjourned to a different date, time, or place, notice need not be given of the new date, time, and place, if the new date, time, and place is announced at the meeting before adjournment. But if the adjournment is for more than 30 days, or if a new record date for the adjourned meeting is or must be fixed (*see* § 2.5 of this Article II), then notice must be given pursuant to the requirements of paragraph (a) of this § 2.4, to those persons who are shareholders as of the new record date.

(c) *Waiver of Notice.* A shareholder may waive notice of the meeting (or any notice required by the Act, articles of incorporation, or bylaws), by a writing signed by the shareholder entitled to the notice, which is delivered to the corporation (either before or after the date and time stated in the notice) for inclusion in the minutes or filing with the corporate records.

A shareholder's attendance at a meeting:

(1)     waives objection to lack of notice or defective notice of the meeting, unless the shareholder at the beginning of the meeting objects to holding the meeting or transacting business at the meeting because of lack of notice or defective notice; and

(2)     waives objection to consideration of a particular matter at the meeting that is not within the purpose or purposes described in the meeting notice, unless the shareholder objects to considering the matter when it is presented.

(d)     *Contents of Notice.* The notice of each special shareholder meeting shall include a description of the purpose or purposes for which the meeting is called. Except as provided in this § 2.4(d), or as provided in the corporation's articles or otherwise in the Utah Revised Business Corporation Act, the notice of an annual shareholder meeting need not include a description of the purpose or purposes for which the meeting is called.

**§ 2.5 Fixing of Record Date.** For the purpose of determining shareholders entitled to notice of or to vote at any meeting of shareholders, or shareholders entitled to receive payment of any distribution or dividend, or in order to make a determination of shareholders for any other proper purpose, the board of directors may fix in advance a date as the record date. Such record date shall not be more than 70 days prior to the date on which the particular action, requiring such determination of shareholders, is to be taken. If no record

If no record date is so fixed by the board for the determination of shareholders entitled to notice of, or to vote at a meeting of shareholders, or shareholders entitled to receive a share dividend or distribution, the record date for determination of such shareholders shall be at the close of business on:

(a)  With respect to an annual shareholder meeting or any special shareholder meeting called by the board or any person specifically authorized by the board or these bylaws to call a meeting, the day before the first notice is delivered to shareholders;

(b)  With respect to a special shareholder's meeting demanded by the shareholders, the date the first shareholder signs the demand;

(c)  With respect to the payment of a share dividend, the date the board authorizes the share dividend;

(d)  With respect to actions taken in writing without a meeting (pursuant to Article II, § 2.12), the date the first shareholder signs a consent;

(e)  And with respect to a distribution to shareholders (other than one involving a repurchase or reacquisition of shares), the date the board authorizes the distribution.

When a determination of shareholders entitled to vote at any meeting of shareholders has been made as provided in this section, such determination shall apply to any adjournment thereof unless the board of directors fixes a new record date which it must do if the meeting is adjourned to a date more than 120 days after the date fixed for the original meeting.

**§ 2.6  Shareholder List.**  The officer or agent having charge of the stock transfer books for shares of the corporation shall prepare a written list of the shareholders entitled to vote at each meeting of shareholders thereof, arranged in alphabetical order, with the address of and the number of shares held by each.  The list must be arranged by shareholder voting group (if such exists, see Art. II § 2.7) and within each voting group by class or series of shares.  The shareholder list must be available for inspection by any shareholder, beginning two business days after notice of the meeting is given for which the list was prepared and continuing through the meeting.  The list shall be available at the corporation's principal office or at a place identified in the meeting notice in the city where the meeting is to be held.  A shareholder, his agent, or attorney is entitled on written demand to inspect and, subject to the requirements of § 2.14 of this Article II, to copy the list during regular business hours and at his expense, during the period it is available for inspection.

**§ 2.7  Shareholder Quorum and Voting Requirements.**  There shall be only one voting group, namely, the holders of the corporation's common stock, who shall have one vote for each share of stock owned.

This voting group may take action at a shareholders meeting on a matter only if a quorum exists. Unless the Utah Revised Business Corporation Act, the articles of incorporation, or these bylaws provide otherwise, a quorum exists if and only if a majority of votes entitled to be cast on a matter is present in person or by proxy.

Once a share is represented for any purpose at a meeting, it is deemed present for quorum purposes for the remainder of the meeting and for any adjournment of that meeting unless a new record date is or must be set for that adjourned meeting.

If a quorum exists, action on a matter (other than election of directors) is approved if the votes cast favoring the action exceed the votes cast opposing the action, unless the articles of incorporation or the Act require a greater number of affirmative votes.

**§ 2.8  Increasing Either Quorum or Voting Requirements.** Unless authorized by the Utah Revised Business Corporation Act or the articles of incorporation, the shareholders are not authorized to require that more than a majority of the votes be present at a meeting to constitute a quorum, or that more than a majority of the votes present at a meeting be cast in favor of an action in order to approve that action.

**§ 2.9  Proxies**. At all meetings of shareholders, a shareholder may vote in person, or vote by proxy which is executed in writing by the shareholder or which is executed by his duly authorized attorney-in-fact. Such proxy shall be filed with the secretary of the corporation or other person authorized to tabulate votes before or at the time of the meeting. No proxy shall be valid after 11 months from the date of its execution unless otherwise provided in the proxy.

**§ 2.10  Voting of Shares**. Unless otherwise provided in the articles of incorporation, each outstanding share entitled to vote shall be entitled to one vote upon each matter submitted to a vote at a meeting of shareholders.

**§ 2.11  Corporation's Acceptance of Votes.** If the name signed on a vote, consent, waiver, or proxy appointment corresponds to the name of a shareholder, the corporation, if acting in good faith, is entitled to accept the vote, consent, waiver, or proxy appointment and give it effect as the act of the shareholders. The corporation is entitled to reject a vote, consent, waiver, or proxy appointment if the secretary or other officer or agent authorized to tabulate votes, acting in good faith, has reasonable basis for doubt about the validity of the signature on it or about the signatory's authority to sign for the shareholder.

**§ 2.12  Informal Action by Shareholders.** Any action required or permitted to be taken at a meeting of the shareholders may be taken without a meeting if one or more consents in writing, setting forth the action so taken, shall be signed by all of the shareholders entitled to vote with respect to the subject matter thereof and are delivered to the corporation for inclusion in the minute book. A consent signed under this section has the effect of a meeting vote and may be described as such in any document.

**§ 2.13 Voting for Directors.** Unless otherwise provided in the articles of incorporation, directors are elected by a plurality of the votes cast by the shares entitled to vote in the election at a meeting at which a quorum is present. Shareholders do not have the right to cumulate their votes for the election of directors unless the articles of incorporation so provide.

## § 2.14 Shareholder's Rights to Inspect Corporate Records.

(a) *Minutes and Accounting Records.* The corporation shall keep as permanent records minutes of all meetings of its shareholders and board of directors, a record of all actions taken by the shareholders or board of directors without a meeting, and a record of all actions taken on behalf of the corporation by a committee of the board of directors in place of the board of directors. The corporation shall maintain appropriate accounting records.

(b) *Absolute Inspection Rights of Records Required at Principal Office.* If a shareholder gives the corporation written notice of his demand at least five business days before the date on which he wishes to inspect and copy, the shareholder (or his agent or attorney) has the right to inspect and copy, during regular business hours, any of the following records, all of which the corporation is required to keep at its principal office:

(1)     its articles or restated articles of incorporation and all amendments to them currently in effect;

(2)     its bylaws or restated bylaws and all amendments to them currently in effect;

(3)     the minutes of all shareholders' meetings and records of all action taken by shareholders without a meeting, for the past three years;

(4)     all written communications to shareholders generally within the past three years, including the financial statement furnished for the past three years to the shareholders;

(5)     a list of the names and business addresses of its current directors and officers; and,

(6)     its most recent annual report delivered to the Division of Corporations and Commercial Code of the Utah Department of Commerce.

(c) *Conditional Inspection Right.* In addition, if a shareholder gives the corporation a written demand made in good faith and for a proper purpose at least five business days before the date on which he wishes to inspect and copy, he describes with reasonable particularity his purpose and the records he desires to inspect, and the records are directly connected with his purpose, the shareholder (or his agent or attorney) is entitled to inspect

5

and copy, during regular business hours at a reasonable location specified by the corporation, any of the following records of the corporation:

(1)     excerpts from minutes of any meeting of the shareholders or board of directors, or from the records of any action taken, with or without a meeting, by the shareholders, the board of directors, or a committee of the board of directors acting on behalf of the board of directors;

(2)     accounting records of the corporation; and

(3)     the record of shareholders (compiled no earlier than the date of the shareholder's demand).

(d) *Copy Costs.* The right to copy records includes, if reasonable, the right to receive copies made by photographic, xerographic, or other means. The corporation may impose a reasonable charge, covering their costs of labor and material, for copies of any documents provided to the shareholder. The charge may not exceed the estimated cost of production or reproduction of the records.

(e) *Shareholder Includes Beneficial Owner.* For purposes of this § 2.14, the term "shareholder" shall include a beneficial owner whose shares are held in a voting trust or by a nominee on his behalf.

**§ 2.15 Financial Statements Shall Be Furnished to the Shareholders.** Upon the written request of any shareholder, the corporation shall mail to him its most recent annual or quarterly financial statements showing in reasonable detail its assets and liabilities and the results of its operations.

**§ 2.16 Dissenters' Rights**. Each shareholder shall have the right to dissent from and obtain payment for his shares when so authorized by the Utah Revised Business Corporation Act, articles of incorporation, these bylaws, or in a resolution of the board of directors.

## Article III. BOARD OF DIRECTORS

**§ 3.1 General Powers.** All corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation shall be managed under the direction, of the board of directors.

**§ 3.2 Number, Tenure, and Qualifications of Directors.** The number of directors of the corporation shall be _____ No. of directors (word). Each director shall hold office until the next annual meeting of shareholders or until removed. However, if his term expires, he shall continue to serve until his successor shall have been elected and qualified or until there is a decrease in the number of directors. Directors need not be residents of

6

the State of Utah or shareholders of the corporation unless so required by the articles of incorporation.

**§ 3.3  Regular Meetings of the Board of Directors.**  The board of directors may provide, by resolution, the time and place, either within or without the State of Utah, for the holding of regular meetings, which shall be held without other notice than such resolution. (If so permitted by § 3.7, any such regular meeting may be held by telephone.)

**§ 3.4  Special Meetings of the Board of Directors.**  Special meetings of the board of directors may be called by or at the request of the president or any one director. The person authorized to call special meetings of the board of directors may fix any place, only within the county where this corporation has its principal office, as the place for holding any special meeting of the board of directors, or if permitted by § 3.7, such meeting may be held by telephone.

**§ 3.5  Notice of Special Director Meetings; Waiver of Notice.**

(a)  *Notice of Special Director Meetings.*  Notice of any special director meeting shall be given at least two days previously thereto either orally or in writing. If mailed, notice of any director meeting shall be deemed to be effective at the earlier of: (1) when received; (2) five days after deposited in the United States mail, addressed to the director's business office, with postage thereon prepaid; or (3) the date shown on their return receipt if sent by registered or certified mail, return receipt requested, and the receipt is signed by or on behalf of the director. The notice need not describe the purpose of the special meeting unless required by the Utah Revised Business Corporation Act.

(b)  *Waiver of Notice.*  Any director may waive notice of any meeting. The waiver must be in writing and signed by the director entitled to the notice. The waiver shall be delivered to the corporation for filing with the corporate records, but delivery and filing are not conditions to its effectiveness.

(c)  *Attendance Waives Notice.*  Notwithstanding the previous two subsections, a director's attendance at or participation in a meeting waives any required notice to the director of the meeting unless at the beginning of the meeting (or promptly upon his arrival) he objects to holding the meeting or transacting business at the meeting because of the lack of notice or defective notice, and does not thereafter vote for or assent to action taken at the meeting.

**§ 3.6  Director Quorum.**  A majority of the number of directors shall constitute a quorum for the transaction of business at any meeting of the board of directors.

**§ 3.7  Directors, Manner of Acting.**  If a quorum is present when a vote is taken, the affirmative vote of a majority of directors present is the act of the board of directors unless

the articles of incorporation, these bylaws, or the Utah Revised Business Corporation Act require the vote of a greater number of directors.

Any or all directors may participate in a regular or special meeting by, or conduct the meeting through the use of, any means of communication by which all directors participating may simultaneously hear each other during the meeting.   A director participating in a meeting by this means is deemed to be present in person at the meeting.

A director who is present at a meeting of the board of directors or a committee of the board of directors when corporate action is taken is deemed to have assented to the action taken unless:  (1) he objects at the beginning of the meeting (or promptly upon his arrival) to holding it or transacting business at the meeting and does not thereafter vote for or assent to any action taken at the meeting; or (2) he contemporaneously requests his dissent or abstention as to any specific action be entered into the minutes of the meeting; or (3) he delivers written notice of his dissent or abstention to the presiding officer of the meeting before its adjournment or to the corporation immediately after adjournment of the meeting.  The right of dissent or abstention is not available to a director who votes in favor of the action taken.

**§ 3.8  Increasing Either Quorum or Voting Requirement for the Board of Directors.** Unless authorized by the Utah Revised Business Corporation Act or the articles of incorporation, neither the shareholders nor the directors are authorized to require more than a majority of the directors in office be present at a meeting to constitute a quorum, or that more than a majority of the directors present at a meeting vote affirmatively to constitute an act of the directors.

**§ 3.9  Director Action Without a Meeting.**   Any action required or permitted to be taken by the board of directors at a meeting may be taken without a meeting if all the directors sign a written consent describing the action taken.  Action taken by consents is effective when the last director signs the consent, unless the consent specifies a different effective date.  A signed consent has the effect of a meeting vote and may be described as such in any document, and should be filed with the records of the corporation.

**§ 3.10  Removal of Directors.**  The shareholders may remove one or more directors at a meeting called for that purpose if notice has been given that a purpose of the meeting is such removal.    The removal may be with or without cause unless the articles of incorporation provide that directors may only be removed for cause.  If cumulative voting is authorized, a director may not be removed if the number of votes sufficient to elect him under cumulative voting is voted against his removal.  If cumulative voting is not authorized, a director may be removed only if the number of votes cast to remove him exceeds the number of votes cast not to remove him.

**§ 3.11  Board of Director Vacancies.**  If a vacancy occurs on the board of directors, including a vacancy resulting from an increase in the number of directors, the shareholders

may fill the vacancy. During such time that the shareholders fail or are unable to fill such vacancies, then and until the shareholders act:

    (1)    the board of directors may fill the vacancy; or

    (2)    if the directors remaining in office constitute fewer than a quorum of the board, they may fill the vacancy by the affirmative vote or a majority of all the directors remaining in office.

A vacancy that will occur at a specific later date (by reason of a resignation effective at a later date) may be filled before the vacancy occurs but the new director may not take office until the vacancy occurs.

The term of a director elected to fill a vacancy expires at the next shareholder's meeting at which directors are elected. However, if his term expires, he shall continue to serve until his successor is elected and qualifies or until there is a decrease in the number of directors.

**§ 3.12 Director Compensation.** The board of directors may fix the compensation of directors, subject to approval by the shareholders.

**§ 3.13 Director Committees.** The board of directors may create one or more committees in accordance with the provisions of the Utah Revised Business Corporation Act; provided, however, that before creating a committee, the board of directors shall specify in writing the limits of the committee's authority, including a specific enumeration of powers the committee may not exercise.

## Article IV. OFFICERS

**§ 4.1 Number of Officers.** The officers of the corporation shall be a president and a secretary, each of whom shall be appointed by the board of directors. Such other officers and assistant officers as may be deemed necessary, including a treasurer and any vice-presidents, may be appointed by the board of directors. If specifically authorized by the board of directors, an officer may appoint one or more officers or assistant officers. The same individual may simultaneously hold more than one office in the corporation.

**§ 4.2 Appointment and Term of Office.** The officers of the corporation shall be appointed by the board of directors for a term as determined by the board of directors. (The designation of a specified term grants to the officer no contract rights, and the board can remove the officer at any time prior to the termination of such term.) If no term is specified, they shall hold office until they resign, die, or until they are removed in the manner provided in § 4.3 of this Article IV.

9

**§ 4.3   Removal of Officers**.   Any officer or agent may be removed by the board of directors at any time, with or without cause.  Such removal shall be without prejudice to the contract rights, if any, of the person so removed.  Appointment of an officer or agent shall not of itself create contract rights.

**§ 4.4   Powers and Duties of Officers—Generally.**   In general, the officers of the corporation shall have such powers and duties in the management of the corporation as my be prescribed by the board of directors and, to the extent not so provided by the board of directors or by these bylaws, as generally pertain to their respective offices, subject to the control of the board of directors.

**§ 4.5   President.**  The president shall be the principal executive officer of the corporation and, subject to the control of the board of directors, shall in general supervise and control all of the business and affairs of the corporation.  He shall, when present, preside at all meetings of the shareholders and of the board of directors.  He may sign, with the secretary or any other proper officer of the corporation thereunto authorized by the board of directors, certificates for shares of the corporation and deeds, mortgages, bonds, contracts, or other instruments which the board of directors has authorized to be executed, except in cases where the signing and execution thereof shall be expressly delegated by the board of directors or by these bylaws to some other officer or agent of the corporation, or shall be required by all to be otherwise signed or executed; and in general shall perform all duties incident to the office of president and such other duties as may be prescribed by the board of directors from time to time.

**§ 4.6   The Vice-President.**  If appointed, the vice president shall perform such duties as from time to time may be assigned to him by the president or by the board of directors.

**§ 4.7   The Secretary.**  The secretary shall:  (a) keep the minutes of the proceedings of the shareholders and of the board of directors in one or more books provided for that purpose; (b) see that all notices are duly given in accordance with the provisions of these bylaws or as required by law; (c) be custodian of the corporate records and of any seal of the corporation and if there is a seal of the corporation, see that it is affixed to all documents the execution of which on behalf of the corporation under its seal is duly authorized; (d) when requested or required, authenticate any records of the corporation; (e) keep a register of the post office address of each shareholder which shall be furnished to the secretary by such shareholder; (f) sign with the president, or a vice-president, certificates for shares of the corporation, the issuance of which shall have been authorized by resolution of the board of directors; (g) have general charge of the stock transfer books of the corporation; and (h) in general perform all duties incident to the office of secretary and such other duties as from time to time may be assigned to him by the president or by the board of directors.

**§ 4.8   The Treasurer.**  If appointed, the treasurer shall:  (a) have charge and custody of and be responsible for all funds and securities of the corporation; (b) receive and give

receipts for moneys due and payable to the corporation from any source whatsoever, and deposit all such moneys in the name of the corporation in such banks, trust companies, or other depositaries as shall be selected by the board of directors; and (c) in general perform all of the duties incident to the office of treasurer and such other duties as from time to time may be assigned to him by the president or by the board of directors. If required by the board of directors, the treasurer shall give a bond for the faithful discharge of his duties in such sum and with such surety or sureties as the board of directors shall determine.

**§ 4.9 Salaries.** The salaries of the officers shall be fixed from time to time by the board of directors.

## Article V.  INDEMNIFICATION

**§ 5.1    Indemnification of Directors.**    Unless otherwise provided in the articles of incorporation, the corporation shall indemnify any individual made a party to a proceeding because he is or was a director of the corporation against liability incurred in the proceeding in accordance with and to the extent permitted by the Utah Revised Business Corporation Act.

**§ 5.2 Advance Expenses for Directors.** The corporation may pay for or reimburse the reasonable expenses incurred by a director who is a party to a proceeding in advance of final disposition in accordance with and to the extent permitted by the Utah Revised Business Corporation Act.

**§ 5.3 Indemnification of Officers, Agents, and Employees Who Are Not Directors.** Unless otherwise provided in the articles of incorporation, the board of directors may indemnify and advance expenses to any officer, employee, or agent of the corporation, who is not a director of the corporation, to any extent consistent with public policy, as determined by the general or specific action of the board of directors.

## Article VI.  CERTIFICATES FOR SHARES AND THEIR TRANSFER

**§ 6.1  Certificates for Shares.**

(a) *Content.*  Certificates representing shares of the corporation shall at minimum, state on their face the name of the issuing corporation and that it is organized under the laws of Utah; the name of the person to whom issued; and the number and class of shares and the designation of the series, if any, the certificate represents.  Such certificates shall be signed  (either manually or by facsimile) by the president and the secretary and may be sealed with a corporate seal or a facsimile thereof.  Each certificate for shares shall be consecutively numbered or otherwise identified.

(b) *Legend as to Class or Series.*  If the corporation is authorized to issue different classes of shares or different series within a class, the  designations,  relative  rights,

preferences, and limitations applicable to each class and the variations in rights, preferences, and limitations determined for each series (and the authority of the board of directors to determine variations for future series) must be summarized on the front or back of each certificate. Alternatively, each certificate may state conspicuously on its front or back that the corporation will furnish the shareholder this information on request in writing and without charge.

(c) *Shareholder List*.  The name and address of the person to whom the shares represented thereby are issued, with the number of shares and date of issue, shall be entered on the stock transfer books of the corporation.

(d) *Transferring Shares*.  All certificates surrendered to the corporation for transfer shall be canceled and no new certificate shall be issued until the former certificate for a like number of shares shall have been surrendered and canceled, except that in case of a lost, destroyed, or mutilated certificate a new one may be issued therefor upon such terms and indemnity to the corporation as the board of directors may prescribe.

**§ 6.2  Registration of the Transfer of Shares**.  Registration of the transfer of shares of the corporation shall be made only on the stock transfer books of the corporation.  In order to register a transfer, the record owner shall surrender the shares to the corporation for cancellation, properly endorsed by the appropriate person or persons with reasonable assurances that the endorsements are genuine and effective.  Unless the corporation has established a procedure by which a beneficial owner of shares held by a nominee is to be recognized by the corporation as the owner, the person in whose name shares stand on the books of the corporation shall be deemed by the corporation to be the owner thereof for all purposes.

**§ 6.3  Restrictions on Transfer of Shares Permitted.**  The shareholders, by agreement between themselves or with the corporation, may impose restrictions on the transfer or registration of transfer of shares (including any security convertible into, or carrying a right to subscribe for or acquire shares).

**§ 6.4  Acquisition of Shares.**  The corporation may acquire its own shares and unless otherwise provided in the articles of incorporation, the shares so acquired constitute authorized but unissued shares.

## Article VII.  DISTRIBUTIONS

**§ 7.1  Distributions.**  The board of directors may authorize, and the corporation may make, distributions (including dividends on its outstanding shares) in the manner and upon the terms and conditions provided by law and in the corporation's articles of incorporation.

## Article VIII. AMENDMENTS

**§ 8.1  Amendments.**  The corporation's board of directors may amend or repeal the corporation's bylaws unless:

(1) the articles of incorporation or the Utah Revised Business Corporation Act reserve this power exclusively to the shareholders in whole or in part; or

(2) the shareholders in adopting, amending, or repealing a particular bylaw provide expressly that the board of directors may not amend or repeal that bylaw; or

(3) the bylaw either establishes, amends, or deletes, a supermajority shareholder quorum or voting requirement (as defined in § 2.8 of Article II).

Any amendment which changes the voting or quorum requirement for the board must comply with Article III, § 3.8 and for the shareholders, must comply with Article II § 2.8.

The corporation's shareholders may amend or repeal the corporation's bylaws even though the bylaws may also be amended or repealed by its board of directors.

## Article IX. MISCELLANEOUS

**§ 9.1  References to the Utah Revised Business Corporation Act.**  All references in these bylaws to the Utah Revised Business Corporation Act shall be construed to include any comparable successor statute or act.

**§ 9.2  Conformity with the Utah Revised Business Corporation Act.**  To the extent any of these bylaws is inconsistent with the Utah Revised Business Corporation Act, the Act takes precedence and the bylaw should be deemed to be supplemented or modified so as to be in conformity with the Act.

DATED this _____ day of _____, 2005.

_____
Name of secretary, Secretary
Jordan S Nelson

13