# **Exhibit A**

Filed: 8/30/2019 6:35 PM
Lynne Finley
District Clerk
Collin County, Texas
By LeAnne Brazeal Deputy
Envelope ID: 36451144

CAUSE NO. 401-04983-2019

| | |
|---|---|
| ANNE D. KERN, J&J REAL ESTATE INVESTMENTS, LLC, TOWN AND CAMPUS, INC., CRAIG A. COUSINS, TRUSTEE OF THE CRAIG A. COUSINS TRUST, KENT SEYMOUR, TRUSTEE OF THE KENT S. SEYMOUR AND DONNA G. SEYMOUR FAMILY TRUST, BRUCE ROSE, TRUSTEE OF THE ROSE FAMILY TRUST, JOHN T. BARNETT, PATRICIA A. BARNETT, CYNTHIA A. WOLZ, ELDRIDGE HOLDINGS TOO, LLC, AND XENOCORP, LLC; | IN THE DISTRICT COURT |
| PLAINTIFFS, | OF COLLIN COUNTY, TEXAS |
| V. | |
| BRIAN K. TAYLOR, CHRISTOPHER J. ASHBY, PAULA PETERSON, SCOTT W. BEYNON, SCOTT RUTHERFORD, JORDAN S. NELSON, ROCKWELL DEBT FREE PROPERTIES, INC. F/K/A INVESTMENT PROPERTY SOLUTIONS, INC., ROCKWELL TIC, INC., WILLIAM "BIL" BOWSER, DUO CONSTRUCTION, LLC, DUO VENUES, LLC, EDMUND AND WHEELER, INC., FIRST AMERICAN TITLE INSURANCE COMPANY, JOHN DOES I-X AND ROE CORPORATIONS I-X; | ____ JUDICIAL DISTRICT |
| DEFENDANTS. | |

# PLAINTIFFS' ORIGINAL PETITION AND REQUEST FOR DISCLOSURE

Plaintiffs Anne D. Kern ("Ms. Kern"), J&J Real Estate Investments, LLC ("J&J"), Town and Campus, Inc. ("T&C"), Craig A. Cousins, Trustee of The Craig A. Cousins Trust (the "Cousins Trust"), Kent Seymour, Trustee of the Kent S. Seymour and Donna G.

Seymour Family Trust (the "Seymour Trust"), Bruce Rose, Trustee of the Rose Family Trust (the "Rose Trust"), John T. Barnett and Patricia A. Barnett (together, the "Barnetts"), Cynthia A. Wolz ("Ms. Wolz"), Eldridge Holdings TOO, LLC ("Eldridge Holdings"), and Xenocorp, LLC ("Xenocorp") (collectively, the "Plaintiffs") file this Original Petition and Request for Disclosure against Defendants Brian K. Taylor ("Taylor"), Christopher J. Ashby ("Ashby"), Paula Peterson ("Peterson"), Scott W. Beynon ("Beynon"), Scott Rutherford ("Rutherford"), Jordan S. Nelson ("Nelson"), Rockwell Debt Free Properties, Inc. f/k/a Investment Property Solutions, Inc. ("Rockwell Debt Free Properties") and Rockwell TIC, Inc. ("Rockwell TIC") (together, "Rockwell"), William "Bil" Bowser ("Bowser"), DUO Construction, LLC ("DUO Construction"), DUO Venues, LLC ("DUO Venues") (together, "DUO"), Edmund and Wheeler, Inc. ("Edmund and Wheeler"), First American Title Insurance Company ("FATCO"), John Does I-X ("Does I-X"), and Roe Corporations I-X (collectively, "Defendants"), and allege as follows:

## SUMMARY OF CASE

For over a decade, Defendants perpetuated a nation-wide scheme to fraudulently induce investors into purchasing unregistered securities in real property. Defendants perpetrated this scheme dozens of times across the country, including by defrauding Plaintiffs of more than $5 million in this case.

The scheme employed a simple pattern. First, Rockwell would buy a commercial property. Next, Rockwell would lease that property to a company in which it held a substantial undisclosed financial interest, Noah Corporation. Noah Corporation would then execute a new lease promising to pay rents on the property at rates well above-market and above the rental rate contained in the prior lease. Rockwell would then pay DUO (a Noah Corporation sister company wholly-owned by Bowser that was really his alter ego) or some

Noah Corporation affiliate a kickback and Bowser would obtain personal benefits (such as hundreds of thousands in consulting fees and a personal loan from Rockwell and/or Ashby) for entering into the new inflated lease. With this new lease to prop up a fanciful valuation, Defendants would market fractional interests in the property to investors. To entice investors, Defendants offered a series of false promises, including: (a) the investment is risk-free as the tenant has a "perfect" track record and has been subjected to Rockwell's intensive diligence, (b) the investment property is unencumbered by any debt, (c) the investment is not a security and is a qualifying exchange property under section 1031 of the Internal Revenue Code, and (d) the property will be operated independently so investor funds are safe. In this way, Defendants bought and flipped properties to TIC investors on dozens of occasions, keeping for themselves massive windfalls each time. All told, Plaintiffs believe Defendants' scheme resulted in proceeds far in excess of $100 million.

Less than six months after Plaintiffs invested in a Plano property leased by Noah Corporation, Rockwell's scheme came crashing down. Not only was the investment property saddled with undisclosed and delinquent tax debt, it is now clear that Rockwell marketed the investment to Plaintiffs despite knowing Noah Corporation was severely financially distressed. As Noah Corporation's largest unsecured creditor *and* a large warrant holder, Rockwell and its principals knew Noah Corporation was behind on property taxes (which was also known and undisclosed by FATCO)[1] and unable to service the inflated lease payments when Rockwell and its principals offered Plaintiffs unregistered lease-backed

---

[1] On information and belief, Rockwell utilized FATCO and FATCO title insurance underwriter Kirsten Parkin to effectuate the sale of each one of these unregistered securities throughout the nation. Specifically, in the case at hand, FATCO and Parkin failed to disclose the Plano property was encumbered by over $67,000 of unpaid 2018 property taxes and failed to collect the same from Rockwell at settlement.

securities to Plaintiffs. And indeed, Noah Corporation defaulted on the lease in less than three months, and recently filed for bankruptcy protection.

Plaintiffs now own unregistered securities with "collateral" saddled with tax debt and worth millions less than Rockwell represented, and Plaintiffs will not receive the "risk free" passive income Rockwell promised. Meanwhile, Rockwell and its principals have absconded with over $5.4 million from Plaintiffs. For some of the Plaintiffs, this amount includes their entire life savings.

## CLAIM FOR RELIEF

The Plaintiffs seek rescission or monetary relief over $1,000,000 and reasonable attorneys' fees, expenses, court costs, pre- and post-judgment interest, and punitive damages.

## DISCOVERY CONTROL PLAN

Pursuant to Tex. R. Civ. P. 190.4, the Plaintiffs hereby designate that discovery will be conducted under Level 3 and further plead that this suit is not governed by the expedited actions process pursuant to Tex. R. Civ. P. 169, because this is an action that seeks monetary relief in excess of $100,000.

## PARTIES

### I.   The Plaintiffs

Plaintiff Anne D. Kern is an individual and resident of Oklahoma. Ms. Kern owns approximately 4.85% of the Plano Venue.

Plaintiff J&J Real Estate Investments, LLC is a limited liability corporation. J&J owns approximately 2.76% of the Plano Venue.

Plaintiff Town and Campus, Inc. is a corporation. T&C owns approximately 9.72% of the Plano Venue.

PLAINTIFFS' ORIGINAL PETITION AND REQUEST FOR DISCLOSURE        4

Plaintiff Craig A. Cousins, Trustee of the Craig A. Cousins Trust. The Cousins Trust owns approximately 7.54% of the Plano Venue. Craig A. Cousins is a beneficiary of the Cousins Trust.

Plaintiff Kent Seymour, Trustee of The Kent S. Seymour and Donna G. Seymour Family Trust. The Seymour Trust owns approximately 8.10% of the Plano Venue. Kent S. Seymour and Donna G. Seymour are beneficiaries of the Seymour Trust.

Plaintiff Bruce Rose, Trustee of the Rose Family Trust. The Rose Trust owns approximately 6.32% of the Plano Venue. Bruce Rose is a Rose Family Trust beneficiary.

Plaintiffs John T. Barnett and Patricia A. Barnett are individuals and residents of Florida. The Barnetts own approximately 35.22% of the Plano Venue.

Plaintiff Cynthia A. Wolz is an individual and resident of Texas. Ms. Wolz owns approximately 2.92% of the Plano Venue.

Plaintiff Eldridge Holdings TOO LLC is a limited liability corporation. Eldridge Holdings owns approximately 7.49% of the Plano Venue.

Plaintiff Xenocorp, LLC is a limited liability corporation. Xenocorp owns approximately 2.92% of the Plano Venue.

## II.    The Defendants

Defendant Brian K. Taylor is an individual and resident of Utah. He can be served with process at 1963 Ridgehill Drive, Bountiful, Utah 84010 or wherever he may be found.

Defendant Christopher J. Ashby is an individual and resident of Utah. He can be served with process at 183 East 8135 South, Sandy, Utah 84070 or wherever he may be found.

Defendant Paula Peterson is an individual and resident of Utah. She can be served with process at 1318 Hidden Quail Cove, Farmington, Utah 84025 or wherever she may be found.

Defendant Scott W. Beynon is an individual and resident of Utah. He can be served with process at 1767 South Sunset Pointe Circle, Sandy, Utah 84070 or wherever he may be found.

Defendant Scott Rutherford is an individual and resident of Utah. He can be served with process at 10397 North Oak Circle, Highland, Utah 84003, or wherever he may be found.

Defendant Jordan S. Nelson is an individual and resident of Utah. He can be served with process at 193 East 8135 South, Sandy Utah 84070, or wherever he may be found.

Defendant Rockwell Debt Free Properties f/k/a Investment Property Solutions, Inc. is a corporation organized and existing under the laws of Utah and has its principal place of business at 8494 South 700 East, Suite 200, Sandy, Utah 84070. Rockwell Debt Free Properties is not registered to transact business in the state of Texas as a foreign limited liability company. Rockwell Debt Free Properties can be served with process by servicing its Registered Agent Christopher J. Ashby at 848 South 700 East, Suite 200, Sandy, Utah 84070.

Defendant Rockwell TIC, Inc. is a corporation organized and existing under the laws of Utah and has its principal place of business at 8494 South 700 East, Suite 200, Sandy, Utah 84070. Rockwell TIC is not registered to transact business in the state of Texas as a foreign limited liability company. Rockwell TIC can be served with process by servicing its Registered Agent Jordan S. Nelson at 848 South 700 East, Suite 200, Sandy, Utah 84070.

Defendant William "Bil" Bowser is an individual and resident of Utah. Bowser can be served with process at 7970 Glenwild Drive, Park City, Utah 84098, wherever he may be found.

Defendant DUO Construction, LLC is a Utah limited liability company. DUO Construction can be served with process by serving its registered agent BTJD Corporate Services, LLC at 3165 East Millrock Drive, Suite 500, Salt Lake City, Utah 84121.  DUO Construction is an alter ego of Bowser.[2]

Defendant DUO Venues, LLC is a Utah limited liability company. DUO Venues can be served with process by serving its registered agent BTJD Corporate Services, LLC at 3165 East Millrock Drive, Suite 500, Salt Lake City, Utah 84121.  DUO Venues is an alter ego of Bowser.[3]

Defendant Edmund and Wheeler, Inc. is a New Hampshire corporation. Edmund and Wheeler can be served with process through its registered agent John D. Hamrick, 2103 Saint Johnsbury Road, Littleton, New Hampshire 03561.

Defendant First American Title Insurance Company is a Nebraska corporation with its principal place of business at 1 First American Way, Santa Ana, California 92707. FATCO can be served with process by serving its registered agent Corporation Service Company at 211 East 7th, Suite 620, Austin, Texas 78701.

The true names of Defendants Does I-X and Roe Corporations I-X (collectively,

---

[2] Bowser's other corporations, such as Gabriel Management Corporation, have already been found to be his alter egos.  *DiTucci v. Ashby*, No. 2:16-CV-002277 (D. Utah June 24, 2019) (Order Granting Prejudgment Writ of Attachment, Doc. 46 at 11).

[3] *Id.*

PLAINTIFFS' ORIGINAL PETITION AND REQUEST FOR DISCLOSURE        7

"Unknown Defendants") are unknown to Plaintiffs and have been sued under fictitious names and will be named as discovery reveals their true identity.

# JURISDICTION AND VENUE

This Court has jurisdiction over this case as the amount in controversy is within the jurisdictional limits of this Court.

This Court has personal jurisdiction over Rockwell Debt Free Properties, Rockwell TIC, Taylor, Ashby, Peterson, Beynon, Rutherford, Nelson, Edmund and Wheeler, DUO Construction, DOU Ventures, and FATCO because they have each purposefully availed themselves of the benefits and protections of Texas law through the offer of sales of securities involving real property located in Texas, contracting with a Texas resident, and committing torts directed at the state of Texas. As a result, this Court has specific jurisdiction over the allegations and claims concerning these individuals and entities.

This Court has personal jurisdiction over Bowser because he has purposefully availed himself of the benefits and protections of Texas law through the sale of securities involving real property and owning and operating a business located in Texas, contracting with a Texas resident, and committing torts directed at the state of Texas. As a result, this Court has specific jurisdiction over the allegations and claims concerning these individuals and entities.

Upon information and belief, and as detailed by the allegations below, this Court has personal jurisdiction over Unknown Defendants because they have each purposefully availed themselves of the benefits and protections of Texas law through conspiring to offer of sales of securities involving real property located in Texas, contracting with a Texas resident, and committing torts directed at the state of Texas. As a result, this Court has specific jurisdiction over the allegations and claims concerning these individuals and entities.

Venue is proper in Collin County, Texas pursuant to Texas Civil Practices and Remedies Code § 15.011 because this is a suit that concerns a dispute over real property interests located in Collin County, Texas. Additionally, venue is proper in Collin County, Texas pursuant to Texas Civil Practices & Remedies Code § 15.002(a)(1) because a substantial part of the events giving rise to the Plaintiffs' claims occurred here.

Because there are multiple defendants in this suit and venue is proper as to one defendant, venue is proper for all Defendants pursuant to Texas Civil Practices & Remedies Code § 15.005.

# FACTUAL BACKGROUND

**I.  Defendants cooperate to devise and implement a coordinated tax, real estate, and securities scheme to defraud investors across the nation of tens of millions of dollars.**

### A. The Players.

Defendants' scheme relied on the coordinated efforts of a group of seemingly independent actors. By holding themselves out to investors as independent, self-governed, business-minded decision makers (as opposed to a single enterprise of insiders with control and overlapping memberships) the Defendants fabricated a layer of legitimacy for their transactions. To understand how the scheme worked, we must first review each of the key participants.

### 1.  Rockwell: The "Deal Promoter and Clearinghouse"

The bedrock of Defendants' scheme involves two related entities: Rockwell TIC and Rockwell Debt Free Properties (collectively, "Rockwell"). Rockwell TIC was incorporated in 2006 and began offering real estate investments to third parties, including those seeking to own property as tenants-in-common for tax reasons. In 2009, Rockwell Debt Free Properties was formed and began operating in a similar fashion. As explained in a company promotional video, its founders "made a conscious decision to incorporate 'debt free' into [the] company name."[4] Since their beginnings, Rockwell TIC and Rockwell Debt Free Properties have shared common officers and directors, domain names, business addresses, business purposes, and operations. Neither entity is licensed as a broker-dealer. According to their website, Rockwell offers properties using a TIC ownership structure that allows investors to purchase direct ownership of an undivided, fractional interest in commercial real estate—a structure

---

[4] *See* Rockwell Could Be Your Ideal Investment, https://vimeo.com/72762439.

they advertise for its tax benefits.[5] As shown in more detail below, Rockwell TIC and Rockwell Debt Free Properties operate as a single enterprise that is the principal promoter, transaction clearinghouse, and foundation for the Defendants' scheme. Upon information and belief, Rockwell have pocketed millions of dollars in each of the 45+ transactions (i.e., over $100 million) it has closed over the last decade, including over $5 million from Plaintiffs.

### 2.  *The Rockwell Control Group: Scheme Masterminds*

A small group of overlapping officers and directors managed and controlled Rockwell Debt Free Properties and Rockwell TIC during the relevant period. The members of this group are Defendants Taylor, Ashby, Beynon, Nelson, Rutherford, and Peterson (collectively, the "Rockwell Control Group").[6] Presumably in an attempt to hide their identities and conceal incriminating information, Rockwell has since removed nearly all content from its website after Plaintiffs provided Rockwell with a draft of this petition. In any event, Rockwell's website contained much of the information described below at one time:



Brian K. Taylor was a founding director, officer, and Chairman of the Board of Rockwell Debt Free Properties. Taylor was also a director of Rockwell TIC. Taylor's public affiliation with Rockwell was discretely withdrawn in February 2019.

**TAYLOR**

---

[5] *See* "About," Rockwell Debt-Free Properties, https://www.rockwelltic.com/about (last visited May 29, 2019).

[6] Perhaps a harbinger of what was to come, a shakeup of the Rockwell Control Group occurred in mid-February 2019. Taylor and Peterson quietly exited the board and were removed from the company website. Rutherford also left his employment at Rockwell during this period. Rutherford has since offered to talk to investors about what he knows in exchange for a release.



**Christopher J. Ashby**

*President & CEO*

Christopher Ashby is the incorporator, registered agent, and director of Rockwell Debt Free Properties, positions he has held since its formation. Ashby also serves as the President and Chief Executive Officer of Rockwell Debt Free Properties.[7] Ashby is also an initial director of Rockwell TIC and serves as its current President. Ashby's role is described as: "primarily responsible for creating and managing all relations with clients, and potential clients, as well as establishing strategic relationships with referral partners and other industry professionals."[8] Ashby reportedly "participates in all decisions related to property acquisitions."[9] Ashby personally solicited the investments of many of the Plaintiffs in this case.



**Jordan S. Nelson**

*Director of Operations*

Jordan Nelson is the Director of Operations for Rockwell Debt Free Properties. He is one of the company's founding partners, and has served in his current role since the company's formation.[10] Nelson is also the current registered agent for and a director of Rockwell TIC. According to the Rockwell's website, Nelson "leads all aspects of customer service and support and business support within the company."[11] Nelson also "coordinates all the logistical elements involved in the purchase and sale of Rockwell Debit-Free properties."[12]

---

[7] *See* "Team: Christopher J. Ashby," Rockwell Debt-Free Properties, https://www.rockwelltic.com/team (last visited May 29, 2019).

[8] *Id.*

[9] *Id.*

[10] *See* "Team: Jordan S. Nelson," Rockwell Debt-Free Properties, https://http://www.rockwelltic.com/team (last visited May 29, 2019).

[11] *Id.*

[12] *Id.*



**Scott W. Beynon**
*EVP of Real Estate*

Scott W. Beynon is the Executive Vice President of Real Estate for Rockwell Debt Free Properties, is a founding partner, and has been since the company's formation.[13] Beynon is also a current director of Rockwell TIC. Beynon "is responsible for overseeing the process of research and analysis conducted in conjunction with the acquisition of new properties."[14] Beynon "gathers and packages all pertinent due diligence information relative to each property offering so that potential buyers can conduct a thorough review of all important aspects of the real estate purchase."[15]



**RUTHERFORD**

Scott Rutherford (purportedly through a trust) was an initial director and officer of Rockwell Debt Free Properties. Rutherford was also a former officer of Rockwell TIC. Until February 2019, Rutherford was the Executive Vice President of Marketing for Rockwell Debt Free Properties and a primary point of contact for the Plaintiffs. Rutherford personally solicited the investments of many of the Plaintiffs in this case.

**PETERSON**

Paula Peterson served as director of Rockwell TIC since its formation. Like Taylor, Peterson's profile was removed from the Rockwell TIC board of directors in February 2019.

---

13 *See* "Team: Scott W. Beynon," Rockwell Debt-Free Properties, https://www.rockwelltic.com/team (last visited May 29, 2019).

14 *Id.*

15 *Id.*

As officers and directors of Rockwell, each member of the Rockwell Control Group was intimately familiar with Rockwell's operations, its representations to investors, and relationships with the other Defendants. Indeed, the Rockwell Control Group knowingly developed, implemented, and oversaw Rockwell's strategic objective: maximize profits from the fraudulent sale of unregistered real estate and lease-backed securities to investors. Members of the Rockwell Control Group made misrepresentations on which investors, including Plaintiffs, detrimentally relied.

### 3. Bil Bowser and Noah Corporation Event Venues: The "Perfect Tenant"

Noah Corporation (and its many affiliates) was founded by Defendant William "Bil" Bowser in 2003. Noah Corporation purports to be a nationwide industry leader in operating venues for "all of life's events."[16] Noah Corporation's venue facilities host weddings, corporate events, and other special occasions.[17] Noah Corporation (or an affiliate) is the commercial tenant that leased the buildings Rockwell marketed and sold to investors. Noah Corporation (and its network of subsidiaries) was presented to investors by Defendants as an independent, "well-managed" operation, with sound financials and a "flawless" record of performance.

### 4. Bowser's Other Companies: The "Kickback Recipient"

DUO Construction and DUO Venues were also founded by Bowser and are his alter egos. Bowser had a consistent practice of setting up entities that did not follow corporate formalities and treating all his entities' assets as one big slush fund. *See supra* n.2. DUO Construction and DUO Venues were no different. According to Bowser's testimony in the

---

[16] *See* Noah's Event Venue website, https://www.noahseventvenue.com/ (last visited June 2, 2019).

[17] *Id.*

Noah Corporation bankruptcy proceeding, DUO ended up being "quite [an] expensive sister venture" that was "designed to leverage" Noah Corporation's national brand. Besides Bowser receiving personal benefits from Rockwell for being the "Perfect Tenant" and agreeing to untenable leases above market rent, Rockwell paid a kickback to DUO for going through with the sale of the Plano property to the Plaintiffs. Upon information and belief, Rockwell made kickback payments to DUO, Bowser, and/or Noah Corporation for each sale of unregistered securities involving Rockwell and Noah Corporation in exchange for their participation in the scheme and assistance with marketing the transaction to investors.

### 5.  FATCO and Parkin: The "Stamp of Legitimacy"

To give the fraudulent scheme a stamp of legitimacy and to prevent unwary TIC investors from digging too hard into the financial situation of Noah Corporation, Rockwell exclusively used FATCO and Parkin to issue an assembly line of title insurance opinions and commitments that, as detailed below, failed to disclose accrued and unpaid property taxes for the Plano property and other Noah venues nationwide. These title opinions were intended by Rockwell and FATCO to be a "security blanket" to TIC investors.

### 6.  Scott LeFevre and Cadence: The "Independent Property Manager"

Defendant LeFevre Management, Inc. d/b/a Cadence Property Administrators, founded by Defendant Scott B. LeFevre (a former Rockwell principal), is a property management company that contracted to provide investors in Rockwell's properties management services independent from Rockwell and Noah Corporation. For example, Cadence committed to managing the property on behalf of investors by, among other things, collecting and distributing rents to investors and providing information and reports to investors about the property's status and operations. Cadence and LeFevre were presented to investors as an independent third party operator whose job was to look out for investors. As

detailed below, many Noah's venues were delinquent on 2016 and 2017 property taxes. Cadence and LeFevre managed these properties and never disclosed that material fact.

### 7. Edmund & Wheeler: Rockwell's Source of Section 1031 Investors

Defendant Edmund & Wheeler, Inc. is an intermediary that specializes in facilitating Internal Revenue Service Section 1031 exchanges (discussed more below). In doing so, the intermediary acquires the relinquished property from the taxpayer, transfers the relinquished property to the buyer, acquires replacement property from the seller, and transfer the replacement property to the taxpayer. Edmund & Wheeler operated a website domain www.section1031.com and was identified as a "Professional Partner" by Rockwell. Edmund & Wheeler, in particular through Vice President John Hamrick, funneled the Barnetts and countless other investors to Rockwell and received significant undisclosed compensation in return. This sourcing allowed Defendants a constant supply of new capital to perpetrate their scheme.

### 8. The Unknown Defendants: The "Financiers and Co-Conspirators"

Defendants engaged in a fraudulent scheme that involve the sale of unregistered securities for approximately 39 Noah Corporation venues nationwide. Those transactions equate into sales proceeds far in excess of $100 million dollars. In order to do engage in such an endeavor requires financing. Upon information and belief, Rockwell obtained financing from the Unknown Defendants to perpetrate the fraudulent scheme, including here. Moreover, upon information and belief, Rockwell took the proceeds derived from its fraudulent scheme, and unlawfully distributed these proceeds to Unknown Defendants for purported safe keeping, remuneration for perpetrating the scheme, or some other unlawful purpose.

### B. Rockwell's Ideal Investor: The Victims

The final and unwitting participant in Defendants' scheme was the investor. Defendants targeted a certain type of investor. Rockwell described "ideal candidate" as follows:

Practically speaking, Defendants drew to the table investors that were mostly older, retired, and seeking a low-risk, stable, and passive income stream. Defendants also targeted investors looking to complete a transaction often referred to as a "1031 Exchange."

A 1031 Exchange allows an individual who has earned capital gains from the sale of real estate to defer paying federal income taxes on that property sale so long as the sale proceeds are re-invested in a qualifying property within a short period of time.[18] For example, assume a couple bought a building in 1980 and operated it as the local town grocery until

---

[18] Generally, under Section 1031 of the Internal Revenue Code, if an individual makes a like-kind exchange, that individual may defer recognizing an otherwise taxable gain or loss (*See* "Like-Kind Exchanges – Real Estate Tax Tips," IRS, https://www.irs.gov/businesses/small-businesses-self-employed/like-kind-exchanges-real-estate-tax-tips (last visited May 26, 2019); *see also* 26 U.S.C. § 1031). A like-kind exchange occurs when an individual exchanges real property held for productive use in a trade or business or for investment for other real property of "like-kind" (i.e., of similar nature or character).

retiring in 2018. Upon retirement, the couple sells the grocery store. Perhaps because the property was held by the couple for so long and is in a developing area, the couple's tax basis in the property is low and the sale results in a significant taxable gain. In these circumstances, instead of immediately paying taxes on the gain, section 1031 of the Internal Revenue Code permits the couple to defer the taxable gain by reinvesting the sale proceeds into a new piece of property—a "replacement property"—so long as the new purchase is completed within approximately 180 days.[19] The couple, which no longer receives income from operating the grocery store is likely to seek an investment that will generate a stream of income they can live from during retirement.

Only certain types of investments qualify as a replacement property in a 1031 Exchange. It would not suffice for the couple to buy stock or invest in a partnership that operated a piece of real property. Instead, the law requires that the person making the exchange buy a direct interest in real property. A tenancy-in-common, or "TIC" interest in real property, qualifies as a "like-kind" exchange under section 1031. The central characteristic of a TIC "is that each owner is deemed to own individually a physically undivided part of the entire parcel of property."[20] A practical benefit of a TIC investment in real property is ownership of a large property may be shared among multiple owners. In other words, the couple could invest their grocery store proceeds with a group into an income generating property worth more than the couple could purchase on their own. To qualify for a 1031 Exchange, a TIC investment must also strictly adhere to a number of IRS guidelines,

---

[19] 26 U.S.C. § 1031 (a)(3).

[20] Rev. Proc. 2002-22, 2002-1 C.B. 733 (IRS RPR 2002), modified by Rev. Proc. 2003-3, 2003-1 C.B. 113 (IRS RPR 2003).

including that the total number of TIC members be limited to 35, and that the TIC members abide by restrictions on their management activities.

Rockwell, under the direction of the Rockwell Control Group, capitalized on this by offering turnkey TIC investments they promised were compliant with IRS guidelines to investors they knew were under the pressure of a deadline to complete a 1031 Exchange and otherwise susceptible to high pressure sales tactics and by targeting elderly and unqualified investors with offers of a no risk, high interest, guaranteed income stream.

## II.   Defendants' Scheme.

### A. Defendants combined to sell investors "pizza by the slice."

Defendants' scheme employed a simple pattern, which was repeated dozens of times around the country. As Rockwell President and CEO Ashby describes it, Defendants take a whole pizza pie (a commercial building) and then sell it to investors "by the slice"[21] at an exorbitant mark-up supported by untenable and inflated lease rents. Here is how it worked:

First, Rockwell would buy a commercial building, typically whereby the tenant had already entered into a lease. Next, Rockwell and Noah Corporation (or its subsidiary) would enter into a *new* 20-year lease calling for rent payments well-above market rates, increasing each year, and well-above the rental rates contained in the prior lease. Third, Rockwell would make kickback payments to DUO, Noah Corporation, and/or Bowser. Fourth, Rockwell would market undivided fractional interests (the pizza slices) in the newly leased property at above-market prices. To entice investors, Rockwell made a series of promises including that the investment property was (a) debt-free, (b) leased by a tenant that had been subjected to extensive diligence and found to be financially sound with a "flawless" track record, (c)

---

[21] *Supra* at n.4.

operated independently, (d) managed independently, (e) not a security, (f) qualifying for a 1031 Exchange, (g) and certain to generate risk-free, dependable, and passive returns at a high rate, including because it was (h) guaranteed by multiple parties. Bundled with the real estate sale were ancillary agreements: the Noah Corporation lease agreement, a tenant-in-common agreement, a property management agreement with Cadence, and the FATCO title policy. All of the various parties to the transaction held themselves out as independent, making the deal appear legitimate. In this way, and without making any real improvements to the property, Rockwell bought a single property and re-sold it, in slices, 40+ times, each time pocketing millions of dollars in as few as 30-60 days.

**B. Rockwell's remarkable marketing to investors.**

## Proven. Trusted. Reliable.

At Rockwell our purpose is to provide you with a fundamentally sound real estate purchase. Our properties use a tenants-in-common (TIC) ownership structure that allows you to purchase direct ownership in top-quality commercial real estate.

Rockwell made incredible, unqualified representations and promises to induce investors. These representations, described in more detail below, included that: (1) the investment properties are debt free, (2) Rockwell had already conducted extensive diligence and deemed the tenant (Noah Corporation) not just financially sound, but "perfect," (3) each investment property operated independently, (4) the investment is not a security, (5) the investment qualifies as a 1031 exchange, and (6) Rockwell guarantees the investment's performance and will return investor money within the first six months.

*1.  The investment properties are debt free*

Central to every sale is Rockwell's promise that its properties are unencumbered by a

mortgage and are otherwise "debt free." Rockwell's marketing materials tout: "We are different from other TIC companies for many reasons, the most important being that our properties are completely debt free." In a company promotional video, Rockwell President and CEO Ashby explained: "We made a conscious decision to incorporate 'debt free' into [the] company name. We kind of wear it like a badge of honor." And further, "[w]ith no debt to service, all of the income will be deposited directly into [investors] bank account."[22]

### 2. Investors can rely on Rockwell's extensive diligence to invest in triple net leases with a perfect tenant

Rockwell promises investors it subjects its lease partners to an unparalleled diligence process. Throughout its marketing materials, Rockwell boasts it only enters into leases with "excellent corporate tenants" that are "financially strong, national compan[ies] who pay[] all of the taxes, insurance and maintenance for the property." For example:

**Excellent corporate tenants**

One of the most important aspects of owning a Rockwell property is that we only deal with very strong national or international companies as tenants.

As such, we don't work with any franchises or small businesses. We conduct a thorough analysis of each company's business model, credit worthiness, industry position, profitability and staying power.

---

[22] Id.

Indeed, Ashby marketed Rockwell with bold promises to investors, claiming each of Rockwell's leasing partners "*is performing perfectly*" and "*no Rockwell client has ever missed a monthly payment.*"[23] Rockwell described all of its tenants' historical performance as "flawless" and even suggested that its investments are insulated from macro-economic pressures since all of its tenants "are thriving despite the down economy."[24] Further, its promotional materials state "Rockwell properties provide access to high quality real estate in excellent locations with strong corporate tenants. The NNN lease structure, combined with professional third party property management frees the buyer from the headaches and hassles of day-to-day management."[25] According to Rockwell, this diligence, coupled with exemplary leasing partners, "translates into reliable passive income for you as an owner without any active property management responsibilities" that offers investors "greater safety and dependability than they could achieve in any other way."[26]

### 3. *Each location operates independently without TIC investor involvement and promises an excellent return*

Rockwell also promised investors that although Noah Corporation (and its affiliates) operated one of the largest and most successful event companies in the nation, each investment property, and in turn each lease, was financially separate, backed by a guarantee, and operated independently from the others. This promise gave investors the peace of mind they understood where their money was going and that it would not be impacted by broader considerations. Rockwell advertised large returns, averaging 8.5% over a 20-year term. All

---

[23] *Id.*

[24] *Quality Real Estate for Quality of Life*, Rockwell Debt-Free Properties marketing brochure.

[25] *Id.*

[26] About, Rockwell Debt-Free Properties (May 30, 2017), http://www.rockwelltic.com/about [https://web.archive.org/web/20170530232213/https://www.rockwelltic.com/about].

PLAINTIFFS' ORIGINAL PETITION AND REQUEST FOR DISCLOSURE          22

while the TIC investors avoid active management and are promised they need to make "very few decisions."

### 4.  The investment is not a sale of securities

Rockwell also promised the investment transaction did not involve the sale of securities. Indeed, many of Rockwell's brochures open with the following statement: "The Tenant in Common (TIC) interests offered and sold by Rockwell Debt-Free Properties constitute interests in real property. They do not constitute securities. Consequently, federal and state laws regulating the sale of securities do not apply to the sale of TIC interests, and purchasers of TIC interests will not be entitled to the protections afforded to purchasers of securities under federal and state securities law."[27] Indeed, Rockwell proclaimed that "[y]ou do not have to be an accredited investor to purchase a Rockwell Debt-Free Property" on its website.[28]

### 5.  The investment qualifies for 1031 exchange tax benefits

As explained above, Rockwell marketed its investment as compliant with Section 1031 of the Internal Revenue Code and promised each investor in its properties "benefits from all of the income, tax shelters and appreciation" and that the sale of its properties "satisfies the IRS requirements under 1031 exchanges."[29] In this way, Rockwell targeted investors it knew were under the gun to reinvest otherwise taxable gains.

---

[27] *E.g.*, Rockwell Debt-Free Properties marketing brochure for Noah's Plano, Texas venue.

[28] *Benefits of Working with Rockwell*, Rockwell Debt-Free Properties (May 31, 2017), http://rockwelltic.com/benefits-of-working-with-rockwell/ [https://web.archive.org/web/20170531003049/http://www.rockwelltic.com/benefits-of-working-with-rockwell/]

[29] Rockwell Debt-Free Properties information sheet on Plano, Texas property.

*6. The investment is guaranteed by Rockwell for the first six months, so there is no risk*

Although it is hard to imagine why any investor would ever wish to reconsider the transaction given the forgoing promises, Rockwell, for a time in its promotional materials, nonetheless offered a no-risk proposition by way of money back guarantee:

*Our promise to our clients …*
**THE ROCKWELL GUARANTEE**
*If the property does not perform as promised during your first six months of ownership, we will buy it back!*

## III.   Defendants entice Plaintiffs' investment in the Plano Venue.

Using each of the representations above (except for the "Rockwell Guarantee"), Defendants induced Plaintiffs to invest in the Plano Venue.

### A. The Plano Venue.

The Plano Venue was built in 2014. Concurrent with the Plano Venue's construction, Noah Corporation leased it from its then-owner, Wooten Village, LLC. That lease had an initial rent of $30,222.33 per month, stepping up 10% every five years for the next 20 years. Noah Corporation was responsible for paying the property taxes during the lease period.

On or around December 6, 2018, Rockwell acquired the Plano Venue from Wooten Village, LLC for $4,400,000. FATCO and Parkin handled the escrow and settlement of the purchase. The lien for ad valorem taxes and assessments for the year 2018—which were due and payable on October 1, 2018—was identified as a "permitted exception" in the purchase agreement between Wooten Village and Rockwell. Contemporaneous with Rockwell's purchase of the Plano Venue, Rockwell negotiated a new lease with Noah Corporation. The

new lease—executed by Ashby, as President of Rockwell Debt Free Properties, and Bowser, as President of Noah Corporation, became effective on December 1, 2018 ("Lease").[30] Under the terms of the Lease, Noah Corporation substantially increased its lease obligations by agreeing to pay $36,000 per month in base rent (stepping up 2% each year) for a period of 20 years. (Ex. 1 at § 3.3). Additionally, Noah Corporation committed to paying all property taxes incurred during the Lease's term. (Ex. 1 at § 4).

As such, and assuming the prior lease was renewed for the entire duration of the Lease, Noah Corporation was now obligated to pay an additional $1.3 million+ under the terms of the Lease. Likely in exchange for this increase in rent, Rockwell paid DUO more than $750,000 in kickbacks on or around December 5, 2018 and December 6, 2018.

## B. Examples of Rockwell's specific representations to Plaintiffs.

True to its practice, Rockwell immediately began marketing the Plano Venue, by the slice, to investors at a total list price of approximately $6,170,000—a $1,770,00 mark-up from Rockwell's purchase price just days before. Of course, the increased valuation was purportedly supported by the terms of the Lease—which were also now substantially higher the prior lease with Noah Corporation.

From November 2018 through January 2019, Rockwell sent an investment package about the Plano Venue to Plaintiffs, touting:

---

[30] A copy of the Lease is attached as **Exhibit 1**. Oddly, Noah Corporation is both the tenant and the guarantor under the Lease.

Noah Corporation has demonstrated their ability to examine and modify their business to achieve maximum profitability. They have demonstrated their ability to build, market and pre-book events. Their business is also absent traditional inventory. Noah's anticipates revenues to well exceed the debt service and operating cost with their breakeven well below their currently operating occupancy levels.

Rockwell provided the Plaintiffs with annual rent amounts the investors would receive under the new lease with Noah Corporation:

**Lease Term: 20 years base term - 2.0% annual increases**

| YEAR | ANNUAL RENT | CAP RATE | YEAR | ANNUAL RATE | CAP RATE |
|------|-------------|----------|------|-------------|----------|
| DEC 2018 | $432,000 | 7.00% | DEC 2028 | $526,606 | 8.53% |
| DEC 2019 | $440,640 | 7.14% | DEC 2029 | $537,138 | 8.70% |
| DEC 2020 | $449,453 | 7.28% | DEC 2030 | $547,880 | 8.88% |
| DEC 2021 | $458,442 | 7.43% | DEC 2031 | $558,838 | 9.06% |
| DEC 2022 | $467,611 | 7.58% | DEC 2032 | $570,015 | 9.24% |
| DEC 2023 | $476,963 | 7.73% | DEC 2033 | $581,415 | 9.42% |
| DEC 2024 | $486,502 | 7.88% | DEC 2034 | $593,043 | 9.61% |
| DEC 2025 | $496,232 | 8.04% | DEC 2035 | $604,904 | 9.80% |
| DEC 2026 | $506,157 | 8.20% | DEC 2036 | $617,002 | 10.00% |
| DEC 2027 | $516,280 | 8.37% | DEC 2037 | $629,342 | 10.20% |

Rockwell's principals also targeted Plaintiffs individually with oral and written communications. For example, Rockwell, through Rutherford and Ashby, represented to Mr. Rose, Trustee of Plaintiff The Rose Family Trust, that the TIC interests were the equivalent of an "annuity," except better, because the "initial principal would be returned to the estate upon the sale of the property."

Similarly, Rockwell, through Rutherford, corresponded by email with Dr. Wolz of

Plaintiff Xenocorp. In his communications, Rutherford emphasized Rockwell's tenants'

"100% flawless track record" was certain to achieve "passive, reliable monthly income."

---

Subject: Rockwell Properties

From: "Scott Rutherford" socttr@rockwelltic.com

Date: Tue, Septmber 25, 2018 11:08 am

To: johnwolz@funnhogg.com

Cc: "Patrick Wolf" patrick@rockwelltic.com

Hi John,

Thank you for your time on the phone yesterday. It was a pleasure speaking with you, and I'm glad Tim Marshall introduced us. Based on the information we discussed on the phone, Rockwell's offerings are a perfect fit to meet your goals of passive, reliable monthly income with a 100% flawless track record. I am sure you will find an investment with Rockwell to be one of the finest real estate investment experiences you will ever have.

Over the last 15 years since meeting Tim, I have assisted hundreds of his clients to complete hundreds of millions of dollars in successful real estate acquisitions with flawless precision. In fact, as I mentioned during our call, <u>every property my company has ever sold has performed exactly as presented, without exception</u>, so you can enjoy the greatest peace-of-mind knowing that you have the best team in the industry working with you.

As promised, I have attached some more detailed information about Rockwell and a couple of our current offerings. Please note that our offerings are in VERY high demand and are provided on a "first come, first served" basis, so inventory changes quickly. That said, these properties are representative of our typical offerings, so we are poised to provide a perfect solution for your 1031 exchange.

As you can see, we focus on providing properties that safeguard your initial investment and provide a reliable monthly cash flow and long-term return on investment. Due to the flawless performance we have provided over the years,

---

our clients tend to come back and invest with us again and again, so you can enjoy the same peace of mind they have experienced over the decades.

Sincerely,

Scott Rutherford, MBA

8949 South 700 East, Suite 200

Sandy, Utah 84070

801.949.1100 Direct

877.568.1030 Toll-Free

www.RockwellTic.com

Notwithstanding these bountiful assurances, Dr. Wolz requested a copy of the appraisal for the Plano Venue. Rockwell, through Rutherford, explained to Dr. Wolz that an appraisal was an "unnecessary expense" because the extensive due diligence Rockwell's internal team conducted was "exponentially" more thorough and reliable than what an appraiser would do:

Subject: RE: Rockwell Properties

From: Scott Rutherford scottr@rockwelltic.com

Date: Wed, November 28, 2018 2:44 pm

To: johnwolz@funhogg.com

Hi John,

Thank you for your text and question regarding appraisals and surveys.

We don't submit for formal appraisals as we view it as an unnecessary expense, which in the end would be passed along to the investors. Our acquisitions team does exponentially more research and due diligence than any appraiser would do and are intimately familiar with the valuations on the properties we offer. That's one of the benefits of the fact that we work with select tenants with locations all around the country.

Moreover, we provide the properties at the best CAP rate possible, so we feel our offerings are typically not only fairly priced, but a good deal. Considering

we've never had a client sell at a loss, and most sell at a profit, if and when they sell, the evidence supports that assertion.

We do typically have environmental reports, site plans, etc., that we can forward along to you, along with the executed lease, corporate guaranty, etc.

Thank you again, and please let me know what else I can do to help.

Sincerely,

Scott Rutherford, MBA

8949 South 700 East, Suite 200

Sandy, Utah 84070

801.949.1100 Direct

877.568.1030 Toll-Free

www.RockwellTic.com

Rockwell also specifically represented to Plaintiffs that Noah Corporation, and in turn their investment in the Plano Venue and others, was "recession proof." Indeed, Rutherford represented to J&J that Noah Corporation was worthy of a much lower capitalization rate than 7%, but that rate was applied because Noah Corporation was a new company. Rutherford's implication, of course, was that Noah Corporation was likely to appreciate. He even stated that Noah Corporation might go public and that he hoped they would so he could buy shares.

### C. Plaintiffs invest in the Plano Venue.

Relying on Defendants' representations, and between December 2018 and January 2019, the Plaintiffs purchased TIC Interests in the Plano Venue from Rockwell. Collectively, the Plaintiffs paid approximately $5.4 million for 87.84% of the TIC Interests for the Plano

Venue.[31] Most of Plaintiffs participated in a 1031 Exchange. The following reflects the parties'

respective interests. [32]



### 1. *The Purchase Agreement.*

In connection with the sale, each of the Plaintiffs executed an identical Purchase and

Sale Agreement ("Purchase Agreement") with Rockwell.[33] Ashby executed each Purchase

Agreement as President of Rockwell Debt Free Properties. The Purchase Agreement

contained the following material terms:

- o "All real property taxes and assessments accrued for the current year shall be prorated between the parties as of the Closing." (Ex. 2 at § 8.2).

- o The Plano Venue was "debt free"; no taxes or other debt was disclosed. (*See* Ex. 2)

- o Plaintiffs assumed Rockwell's rights under the Lease. (Ex. 2 at § 1)

The accompanying title insurance commitment from FATCO and Parkin failed to

disclose the more than $67,000 in unpaid and accrued property taxes for the year 2018 that

---

[31] Several of Plaintiffs, including the Rose Trust, the Cousins Trust, Xenocorp, the Seymour Trust, and Ms. Kern were induced by Defendants into additional investments in other properties around the country.

[32] As far as Plaintiffs know, and despite Rockwell's representations that the Plano Venue TIC Interests were in high demand, the Plano Venue sale was undersubscribed and Rockwell retained title to approximately 12.16% of the Plano Venue.

[33] Attached as **Exhibit 2** is a true and correct copy of the Purchase Agreement with J&J, and an exemplar of the Purchase Agreements entered by the other Plaintiffs.

were due and payable on October 1, 2018.

### 2.   *The Management Agreement with Cadence.*

As part of the deal bundle, each Plaintiff also entered a purportedly independent management agreement with Cadence ("Management Agreement").[34] LeFevre executed each Property Administrator Agreement as Principal of Cadence and acted as the principal employee and agent for Cadence. Among other things, the Management Agreement provided:

- o   The Property Administrator would provide a number of management services, including collecting monthly rent from the tenant, providing certain notices, and paying taxes. (Ex. 3 at § 8).

- o   The Property Administrator would act as agent and perform work "in the name of and on behalf of" the property owners. (Ex. 3 at §§ 6, 8(c)).

In short, the TIC investors did not need to actively manage the property and need only make "very few decisions." Everything would be handled by Cadence.

### 3.   *The TIC Agreement.*

Finally, each of the investors executed a Tenancy in Common Agreement (the "TIC Agreement") in connection with the transaction.[35] The TIC Agreement provides, in relevant part:

- o   "Each Owner shall pay its share of expenses in the amount proportionate to the Owner's Ownership Percentage." (Ex. 4 at § 3.1).

- o   "Failure of any Owner to pay such Owner's proportionate share of any amount due within 91 days of the date that the Owner is notified (verbally, electronically, or by registered mail) it is due under this Agreement shall constitute a Default . . ." (Ex. 4 at § 4).

---

[34] Attached as **Exhibit 3** is a true and correct copy of the Property Administrator Agreement executed by J&J and Cadence, which is an exemplar of the Management Agreements signed by the other Plaintiffs.

[35] Attached as **Exhibit 4** is a true and correct copy of the TIC Agreement executed by J&J, which is an exemplar of the TIC Agreements signed by the other Plaintiffs.

## IV.   The "perfect" tenant defaults nationwide, triggering collapse of the scheme and revealing Defendants' elaborate fraud.

### A. Defendants' scheme worked.

Plaintiffs are Defendants' "ideal investors." Many of Plaintiffs are retired or older individuals that relied on Defendants' promises of passive income to cover necessary living expenses. In some instances, the money the Plaintiffs invested with Rockwell represented the investor's entire life savings. Put simply, Plaintiffs were drawn to the opportunity by Defendants' misrepresentations that the failsafe investment would qualify as replacement property for tax purposes and would generate significant, safe, and reliable income.

### B. Until it didn't.

Noah Corporation performed under the Lease and paid investors rent as it became due in December 2018, January 2019, and February 2019. By March 2019, Noah Corporation defaulted on its rent payment. That default, which also occurred in Noah Corporation's properties around the country, triggered a total collapse of Defendants' scheme and lifted the veil on an unbelievable history of deception. Noah Corporation failed to pay monthly rental payments on all of its 42 leases; failed to pay 2017 property taxes for 12 buildings, including buildings that Cadence manages; and failed to pay 2018 property taxes for 32 buildings. Indeed, Noah Corporation failed to pay its 2017 property taxes for the Plano property and did not do so until government authorities filed suit in August 2018. In the short months since the initial payment default, Plaintiffs have uncovered volumes of information laying bare Defendants' elaborate scheme.

### C. Defendants' Fraud Revealed.

#### 1. Defendants are not independent; they are insiders of one another

Plaintiffs are informed that Rockwell, including members of the Rockwell Control Group, Bowser, and Noah Corporation have enjoyed a "very close relationship" since at least

2015. Evidence of this cozy relationship is abundant. Noah Corporation filed for bankruptcy protection on May 28, 2019. *See In re Noah Corporation*, No. 19-23840, (Bankr. D. Utah). First, the proceeding revealed that Rockwell held an unspecified number of warrants to purchase shares in Noah's. Second, Bowser testified that he received more than $300,000 from Rockwell for "consulting fees" in 2016-2018 and was the beneficiary of a $250,000 personal loan from Rockwell and/or Ashby to build his house. What's more, Noah Corporation disclosed Rockwell Debt Free Properties as its largest unsecured creditor. According to Noah Corporation's bankruptcy disclosures, Noah Corporation owes Rockwell Debt Free Properties $6,616,000 for an unsecured loan relating to the Plano property specifically. On information and belief, Rockwell made this enormous loan to Noah Corporation prior to the summer of 2017 and also subsequently paid property taxes for several properties when Noah Corporation had grown delinquent.[36] According to testimony given by Bowser under penalty of perjury, Rockwell purchased *all* of Noah Corporation's available property locations over the past four years.

Cadence and LaFevre are likewise insiders. On information and belief, the first properties Rockwell sold to investors as TIC Investments were managed by a company called Sentinel Sales and Management ("Sentinel"). Sentinel's relationship with Rockwell soured, however, when Sentinel reportedly discovered that Rockwell was concealing environmental concerns about a property from that property's owners. It is Plaintiffs' understanding that since the time that Sentinel reported the environmental concerns to the property owners, Rockwell ceased engaging Sentinel's services; and instead, diverted all management services to Cadence and LaFevre. Upon information and belief, LaFevre is a former employee of

---

[36] According to a recent filing in a related case, Bowser personally accepted more than $5 million from Rockwell in August 2018. *See DiTucci v. Ashby*, No. 2:16-CV-002277 (D. Utah June 3, 2019) (Declaration of Rosa DiTucci, Doc. 26-2 at ¶ 9).

Rockwell, and Cadence only manages properties sourced by Rockwell. In other words, it has no management business save for properties sourced by Rockwell and was established by Rockwell (*i.e.*, staffed with a "former" employee of Rockwell so that Rockwell could give investors the appearance of independence meanwhile maintaining control). Upon information and belief, Edmund & Wheeler also has an unnaturally close relationship with Rockwell and has placed its own pecuniary interests ahead of the interests of the Barnetts and other investors when making referrals to Rockwell and failing to disclose its true commissions for these sales.

### 2. The Plano Venue was not "debt free," it was encumbered by significant delinquent tax debt—facts Defendants knew and concealed from Plaintiffs.

Shortly after Noah Corporation defaulted on its March payment, Plaintiffs discovered that property taxes were delinquent on the Plano Venue and countless other Rockwell/Noah Corporation properties across the country. Unbeknownst to Plaintiffs, the 2018 property taxes for the Plano Venue were due as of October 1, 2018, which means they were owed on the property *prior to* Plaintiffs' Purchase Agreements with Rockwell. In June 2018, the amount ballooned to $71,095.84 due to accrued interest and penalties.[37] The delinquent property taxes carries significant consequence. To begin, it shows Rockwell's material promises of "debt free" property were patently false. It also means, at once, that both Rockwell and Noah Corporation defaulted on their contractual obligations to pay taxes under the Purchase Agreements and Lease. (*See* Ex. 1 at § 4, Ex. 2 at § 8.2). Further, it demonstrates a breach by Cadence and LaFevre of their obligation to collect and pay taxes on behalf of the owners and to report the delinquency as Plaintiffs' agent. Further still, FATCO and Parkin knowingly

---

[37] *See* **Exhibit 5**, Mar. 18, 2019, Tax Statement. The delinquent property taxes were paid off in June 2018, primarily by Plaintiffs.

failed to disclose this material fact. Finally, on April 24, 2019, Plaintiffs demanded Rockwell pay the delinquent taxes. Although Rockwell eventually paid its pro rata share of the delinquent taxes, it has refused to pay all taxes outstanding at the time of the sale thereby breaching its obligations under the Purchase Agreement and TIC Agreement.[38] (*See* Ex. 2 at § 8; Ex. 4 at § 3.1).

### 3.   *The TIC Interests are in fact securities that Rockwell has wrongly refused to rescind*

In marketing the TIC Interests to Plaintiffs, Rockwell specifically and repeatedly represented that the TIC Interests "are not securities." Contrary to Rockwell's disclaimer, the TIC Interests *are* securities under federal securities law and the securities laws of states outside of Utah, including Texas, and each of the states in which Plaintiffs reside.[39] Thus, On April 24, 2019, the Plaintiffs requested rescission for the sale of their purchased unregistered securities. (Ex. 6). However, Rockwell improperly rejected this offer. (Ex. 7).

### 4.   *Defendants' due diligence representations were lies; Defendants knew Noah Corporation was in a financial nosedive before it solicited the transaction with Plaintiffs*

Defendants knew, long before they made the false promises to Plaintiffs that they had conducted extensive diligence on Noah Corporation and concluded it was financially strong with a "perfect" and "flawless" record that Noah Corporation was, in fact, in severe financial

---

[38] Attached as **Exhibit 6** hereto is a true and correct copy of Plaintiffs' demand letter to Rockwell. Attached as **Exhibit 7** is a true and correct copy of Rockwell's written response.

[39] *See e.g.*, *Omni Brokerage, Inc. Argus Realty Inv'rs, L.P. Passco Companies, LLC*, 2009 WL 153818, at *1 (Jan. 14, 2009) (SEC stating in no action letter that it disagreed with position that that tenant in common interests were not securities within the meaning of Section 2(a)(1) of the Securities Act and that it was unable to assure that an enforcement action would not be pursued in the absence of registration or applicable registration exemption); State of Utah Department of Commerce Division of Securities, *Sales of Real Estate Investments in Utah*, https://securities.utah.gov/docs/TIC.pdf ("Under the federal securities laws, and the laws of most states, investments in undivided interests of real estate are treated as securities."); NASD Notice to Members No. 05-18,    March    2005,    *Private    Placements    of    Tenants-in-Common    Interests*, https://www.finra.org/sites/default/files/NoticeDocument/p013455.pdf ("In a TIC exchange, interests in real property are exchanged for instruments that generally are securities for purposes of the federal securities laws and NASD rules.").

distress. After all, Bowser has recently testified that Noah Corporation felt operational stress in the first quarter of 2017.[40] As he explained, "[t]he ratio of newer facilities to more established facilities began to have an ever eroding effect on cash flows to support those ratios." Moreover, Noah Corporation apparently experimented with DUO—a "quite expensive" sister company that was "an unmitigated failure which deepened the already brewing financial distress of the core business." (Ex. 8 at ¶ 11). Adding to this "financial stress," Bowser explains, were price reductions, additional market competition, operational inefficiencies, significant overhead, "[e]ver-rising lease and property tax rates" and broader market trends. (*Id.*). Noah Corporation reportedly lost $5,678,355.12 and was insolvent by nearly $27 million in fiscal year 2017. On information and belief, Bowser told Rockwell that Noah Corporation "was under water." This could not have been "news" to Rockwell. Rockwell, as a warrant holder of Noah Corporation and its largest unsecured lender, was already in-the-know and by Noah Corporation's side all along.

Plaintiffs recently learned that in 2018, Noah Corporation failed to pay $62,425.66 in property taxes, interest, and late fees for the year 2017 for the Plano Venue. The Frisco Independent School District, the City of Plano, Collin County, and Collin County CAD initiated a lawsuit against the original owner—Wooten Village—on August 8, 2018 for the 2017 tax delinquency. In the face of the lawsuit, Noah Corporation eventually paid. Upon information and belief, Noah Corporation then attempted to renegotiate its initial lease with Wooten Village in mid-2018. When the original owner refused, upon information and belief, Bowser proposed that the original owner sell the Plano Venue to Rockwell. Rockwell and

---

[40] Declaration of William J. Bowser, attached hereto as **Exhibit 8**.

FATCO thus knew about the back taxes and the struggling performance in the Plano Venue prior to its purchase of the property.

Indeed, upon information and belief, Rockwell took affirmative steps to actively *conceal* the dire financial status from investors. For example, upon information and belief, Rockwell, through Ashby, requested local taxing authorities send tax statements directly to Rockwell instead of to the TIC owners so that the tax statements would not be discovered. This strategy only worked for so long. Plaintiffs now know that in addition to their own delinquent property taxes, taxes are owed in excess of approximately $137,161 in 2016 property taxes for one property, approximately $592,343 in 2017 property taxes on 12 properties, and at least $1,557,166 in 2018 property taxes on at least 32 properties nationwide. Put simply, Defendants profited by propping up the value of the Plano Venue with a lease with an affiliated, insider tenant they knew was doomed to failure.

### 5.  *Funds from one property have been comingled with others in a classic Ponzi scheme*

There is no denying Defendants promised the investments would operate independently and managed separately. As described by Bowser, "[i]nitially, it was intended that each subsidiary would have its own bank account and enter into its own contracts with clients for events venue it leased." (Ex. 8 at ¶ 9). Apparently, however, this changed without notice to investors when Defendants determined that "this structure was inefficient and costly." (*Id.*). Bowser disclosed in March of 2019 that he had been "robbing Peter to pay Paul" and had, with Rockwell's knowledge and approval, been using money invested and earmarked for one property for expenses related to another. Specifically, on a call with investors on May 11, 2019, Bowser explained that he told Rockwell and received Rockwell's approval to use funds from one property on another property and that he was "a bit flip" with

the money meant to pay taxes on leases, using that money as a "slush fund." A fund which,
by the way, Rockwell continued to replenish from new investors.

## V.    Harm to Plaintiffs.

As a result of Defendants' conduct, Plaintiffs have suffered and will suffer more than
$5.9 million in monetary damages in loss of principal and unpaid rent. [41] Plaintiffs have and
will continue to suffer additional losses from taxes, and may face additional tax-related losses.

# CAUSES OF ACTION

## I.    Count I – Violation of Section 5(a) of the Securities Act

The Plaintiffs incorporate and re-allege in full the preceding paragraphs.

The TIC Interests for the Plano Venue that were sold to the Plaintiffs by Rockwell
TIC, Rockwell Debt Free Properties, the Rockwell Control Group, Does I-X, Roe
Corporations I-X, and Edmund & Wheeler (as to Barnetts only) are securities under Section
2(a)(1) of the Securities Act.

Section 5(a) of the Securities Act prohibits the sale of unregistered securities to any
person or entity through the direct or indirect use of any means of transportation or
communication in interstate commerce or the use of mails.

The TIC Interests at issue were never registered as securities with any federal or state
authority. No federal or state registration exists or has been filed. Rockwell TIC, Rockwell
Debt Free Properties, the Rockwell Control Group, Does I-X, and Roe Corporations I-X

---

[41] Independent appraisals for the Plano property obtained by Plaintiffs evidence the property is worth
approximately $3.24 million. Additionally, Plaintiffs are owed approximately $2.7 million for missed Lease
payments and the present value of the difference between the Lease rent and market rent for the remaining term
of the Lease.

utilized the internet, email, phone, and mail across state lines to effectuate the sale of these unregistered securities in violation of Section 5(a) of the Securities Act.

Thus, the Plaintiffs have an absolute right of rescission under Section 12(1) of the Securities Act. The Plaintiffs seek rescission of their purchase of the TIC Interests for the Plano Venue, a return of their TIC Interests to Rockwell TIC and Rockwell Debt Free Properties, and a return of the consideration paid to Rockwell plus applicable interest less any income received by the Plaintiffs. Alternatively, Plaintiffs seek damages, costs, and pre- and post-judgment interest in the event the Plano Venue is sold.

## II.   Count II – Control Liability under Section 15 of the Securities Act

The Plaintiffs incorporate and re-allege in full the preceding paragraphs.

Taylor, Ashby, Peterson, Beynon, Rutherford, and Nelson qualify as control persons under Section 15 of the Securities Act. Through their positions as Rockwell TIC and Rockwell Debt Free Properties Directors, Officers, and employees, they had the power to directly or indirectly influence and control the activities Rockwell TIC and Rockwell Debt Free Properties.

While they were in their positions of control, Taylor, Ashby, Peterson, Beynon, Rutherford, and Nelson caused Rockwell TIC and Rockwell Debt Free Properties and others to commit a primary violation of the Securities Act by engaging in the Defendants' scheme and selling Plaintiffs unregistered securities in violation of Section 5(a) of the Securities Act.

Therefore, Taylor, Ashby, Peterson, Beynon, Rutherford, and Nelson are jointly and severally liable to the Plaintiffs for rescission of the TIC Interests associated with the Plano Venue that were sold to the Plaintiffs. Alternatively, Plaintiffs seek damages, costs, and pre- and post-judgment interest in the event the Plano Venue is sold.

## III.   Count III – Violation of Section 7(A) of the Texas Securities Act

The Plaintiffs incorporate and re-allege in full the preceding paragraphs.

The TIC Interests for the Plano Venue that were sold to the Plaintiffs by Rockwell TIC, Rockwell Debt Free Properties, Bowser, DUO Construction, DUO Venues, FATCO, Does I-X, Roe Corporations I-X, and Edmund & Wheeler (as to Barnetts only) are securities under Section 4(A) of the Texas Securities Act.   Alternatively, Rockwell TIC directly or indirectly controlled Rockwell Debt Free Properties' sale of unregistered securities and Rockwell TIC, Bowser, DUO Construction, DUO Venues, FATCO, Does I-X, Roe Corporations I-X, and Edmund & Wheeler aided Rockwell Debt Free Properties in the sale of these unregistered securities.

The sale of the TIC Interests for the Plano Venue that were sold to the Plaintiffs are not an exempt transaction under Section 5 of the Texas Securities Act and the TIC Interests do not qualify as Exempt Securities under Section 6 of the Texas Securities Act.

Accordingly, Rockwell TIC, Rockwell Debt Free Properties, Bowser, DUO Construction, DUO Venues, FATCO, Does I-X, and Roe Corporations I-X, and Edmund & Wheeler violated Section 7(A) of the Texas Securities Act by not registering the TIC Interests for the Plano Venue that were sold to Plaintiffs.

Pursuant to Sections 33(A)(1) and 33(F)(1-2), these Defendants are jointly and severally liable for rescission to the Plaintiffs. As a consequence, the Plaintiffs seek rescission of their purchase of the TIC Interests for the Plano Venue, a return of their TIC Interests to Rockwell TIC and Rockwell Debt Free Properties, and a return of the consideration paid to Rockwell TIC and Rockwell Debt Free Properties plus applicable interest less any income received by the Plaintiffs. Alternatively, Plaintiffs seek damages, costs, and pre- and post-

judgment interest in the event the Plano Venue is sold. The Plaintiffs also seek recovery of costs and reasonable attorneys' fees pursuant to Section 33(D)(6-7).

## IV.    Count IV – Control Liability under Section 33(F) of the Texas Securities Act

The Plaintiffs incorporate and re-allege in full the preceding paragraphs.

Taylor, Ashby, Peterson, Beynon, Rutherford, and Nelson qualify as control persons under Section 33(F) of the Texas Securities Act. Through their positions as Rockwell TIC and Rockwell Debt Free Properties Directors, Officers, and employees, they had the power to directly or indirectly influence and control the activities of Rockwell TIC and Rockwell Debt Free Properties.

While they were in their positions of control, Taylor, Ashby, Peterson, Beynon, Rutherford, and Nelson caused Rockwell TIC and Rockwell Debt Free Properties to violate Section 7(A) of the Texas Securities Act by engaging in the Rockwell Scheme and selling the Plaintiffs unregistered securities.

Therefore, Taylor, Ashby, Peterson, Beynon, Rutherford, and Nelson are jointly and severally liable to Plaintiffs for rescission of the TIC Interests associated with the Plano Venue that were sold to the Plaintiffs. Alternatively, Plaintiffs seek damages, costs, and pre- and post-judgment interest in the event the Plano Venue is sold. Plaintiffs also seek an award of attorneys' fees.

## V.    Count V – Statutory Fraud under Section 27.01 of the Texas Business and Commerce Code

The Plaintiffs incorporate and re-allege in full the preceding paragraphs.

The TIC Interests for the Plano Venue involve a transaction involving real estate.

PLAINTIFFS' ORIGINAL PETITION AND REQUEST FOR DISCLOSURE          41

As detailed herein, Rockwell TIC, Rockwell Debt Free Properties, Bowser, DUO Construction, DUO Venues, Ashby, Rutherford, and FATCO made material misrepresentations and made material omissions of past or existing facts to the Plaintiffs to induce each Plano TIC Owner into executing the PSAs, Settlement Agreements, and to purchase the TIC Interests for the Plano Venue.

These Defendants were aware of the existence of these misrepresentations of material fact, failed to disclose the falsity of these misrepresentations to the Plaintiffs, or benefitted from these misrepresentations.

Each of Plaintiffs relied upon these misrepresentations of material fact and were thereby induced into executing the PSAs, Settlement Agreements, and to purchase the TIC Interests for the Plano Venue.

As a result, the Plaintiffs purchased a property worth millions of dollars less than what was represented. The Plaintiffs seek recovery of actual damages, exemplary damages, reasonable and necessary attorneys' fees, expert witness, fees, costs for depositions, court costs, and pre- and post-judgment interest.

## VI.   Count VI – Fraudulent Inducement

The Plaintiffs incorporate and re-allege in full the preceding paragraphs.

Rockwell TIC, Rockwell Debt Free Properties, FATCO, and Edmund & Wheeler (as to the Barnetts only) made misrepresentations of material fact and concealed material facts from or failed to disclose material facts from the Plaintiffs in breach of their duty to disclose.

At the time of these misrepresentations, Rockwell TIC, Rockwell Debt Free Properties, FATCO, and Edmund & Wheeler knew the representations were false or made the representations as a positive assertion and without knowledge of its truth. At the time of

these omissions, Rockwell TIC, Rockwell Debt Free Properties, FATCO, and Edmund & Wheeler knew the Plaintiffs were ignorant of the facts and did not have an equal opportunity to discover the fact and each remained deliberately silent when they had a duty to speak.

Rockwell TIC, Rockwell Debt Free Properties, FATCO, and Edmund & Wheeler made this misrepresentations and/or omissions with the intent to induce Plaintiffs to purchase the at issue TIC Interests. Each Plaintiff relied on these misrepresentations and/or omissions and were damaged as a result. This conduct was willful, fraudulent, or one of gross negligence.

As a result, the Plaintiffs a property worth millions of dollars less than what was represented and inherited a tenant now in bankruptcy. Plaintiffs seek recovery of actual damages, including but not limited to out-of-pocket damages and benefit-of-the-bargain damages, exemplary damages, pre- and post-judgment interest, and court costs.

## VII.    Count VII – Breach of Contract

The Plaintiffs incorporate and re-allege in full the preceding paragraphs.

Rockwell Debt Free Properties entered into a Purchase Agreement with each Plaintiff. Pursuant to the Purchase Agreement, Rockwell Debt Free Properties was to pay "all real property taxes and assessments accrued for the current year shall be prorated between the parties as of the Closing." (Ex. 2 at § 8.2).

Despite demand for it do so, Rockwell Debt Free Properties initially refused to pay the 2018 property taxes. As a result, Plaintiffs were injured because they had to pay the 2018 property taxes themselves. Plaintiffs seek recovery of actual damages, reasonable attorneys' fees, court costs, and pre- and post-judgment interest.

## VIII.   Count VIII – Fraudulent Transfer under Sections 24.005(a)(1-2) and 24.006(a) of the Texas Business and Commerce Code

The Plaintiffs incorporate and re-allege in full the preceding paragraphs.

As evidenced by Rockwell's website, Rockwell appears to be a going concern. Moreover, Noah Corporation is in bankruptcy, so the financial assets of DUO Construction, DUO Ventures, and Bowser are unlikely to satisfy Plaintiffs' claims.

Upon information and belief, Rockwell Debt Free Properties, Rockwell TIC, the Rockwell Control Group, Bowser, DUO Construction, DUO Ventures, Does I-X, and Roe Corporations I-X (collectively, the "Debtors"), have transferred assets to affiliates and/or third parties ("Transferees") with either: (1) the actual intent to hinder, delay, or defraud Plaintiffs; or (2) without receiving reasonably equivalent value in exchange for the transfer of property and (a) the Debtors' remaining assets are unreasonably small in relation to the business or transaction, or (b) Debtors intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Additionally, upon information and belief, Debtors transferred assets to Transferees without receiving reasonably equivalent value in exchange for the assets and Debtors were insolvent at the time of the transfer for became insolvent as a result of the transfer.

Plaintiffs' claims accrued before or within a reasonable period of time after Debtors transferred the assets at-issue to Transferees.

Accordingly, Plaintiffs have been damaged by Debtors' actions. Plaintiffs seek the avoidance of the transfer or obligation to the extent necessary to satisfy Plaintiffs' claim, attachment or other provisional remedy against the asset transferred or other property of Transferees, an injunction against further disposition by the Debtor or Transferees,

appointment of a receiver to take charge of the assets transferred or of other property of the Transferees; or any other relief the circumstances require. Additionally, Plaintiffs seek recovery of attorneys' fees, costs, pre- and post-judgment interest, and punitive damages.

## IX.    Count IX – Aiding and Abetting

The Plaintiffs incorporate and re-allege in full the preceding paragraphs.

Rockwell Debt Free Properties committed statutory fraud under Section 27.01 of the Texas Business and Commerce Code and sold unregistered securities in violation of federal and Texas securities laws.

All Defendants had a general awareness that Rockwell Debt Free Properties' conduct was unlawful and that each particular Defendant had a role in this violation.

All Defendants intentionally gave Rockwell Debt Free Properties assistance or encouragement and that assistance or encouragement was a substantial factor in Rockwell Debt Free Properties' unlawful acts.

As a result, Plaintiffs were injured.  Each Defendant is jointly and severally liable for Rockwell Debt Free Properties' unlawful conduct.  Plaintiffs seek rescission of the TIC Interests associated with the Plano Venue that were sold to the Plaintiffs. Alternatively, Plaintiffs seek damages, costs, and pre- and post-judgment interest in the event the Plano Venue is sold.  Plaintiffs also seek an award of attorneys' fees.

## X.    Count IX – Conspiracy

The Plaintiffs incorporate and re-allege in full the preceding paragraphs.

All Defendants came together for the unlawful purpose of selling unregistered securities and defrauding Plaintiffs.  In doing so, all Defendants agreed on accomplishing this goal and/or implementing the fraudulent scheme detailed herein.  At a minimum, Rockwell

Debt Free Properties committed statutory fraud under Section 27.01 of the Texas Business and Commerce Code and sold unregistered securities in violation of federal and Texas securities laws.

Plaintiffs suffered injury as a proximate result of these wrongful acts. Each Defendant is jointly and severally liable for all acts done by any one of Defendants in furtherance of the conspiracy.  Plaintiffs seek rescission of the TIC Interests associated with the Plano Venue that were sold to the Plaintiffs.  Alternatively, Plaintiffs seek damages, costs, and pre- and post-judgment interest in the event the Plano Venue is sold.  Plaintiffs also seek an award of attorneys' fees.

## CONDITIONS PRECEDENT

All conditions precedent to the Plaintiffs' claim for relief have been performed, have occurred, or have been waived.

## PUNITIVE DAMAGES

The Plaintiffs also invoke Texas Civil Practices & Remedies Code Section 41.003 and seek recovery of punitive damages against all Defendants for their fraud, malice, and/or gross negligence.

## ATTORNEYS' FEES

The Plaintiffs seek recovery of all costs and reasonable attorneys' fees as allowed by applicable law, equity, and contract.

## REQUEST FOR DISCLOSURE

Pursuant to Texas Rule of Civil Procedure 194, Defendants are requested to disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

# JURY DEMAND

The Plaintiffs demand a jury trial and have or will tender the jury fee to the Clerk.

# PRAYER

Therefore, the Plaintiffs respectfully requests that Defendants be cited to appear and answer, and that this Court enter judgment in favor of the Plaintiffs and against Defendants as follows:

Enter judgment in favor of the Plaintiffs on each of their claims; and

Order rescission of the Plaintiffs' purchase of the TIC Interests for the Plano Venue, including the rescission of the applicable PSAs, Settlement Statements, Property Administration Agreements, and Tenant-in-Common Agreements, the return of the TIC Interests to Rockwell, and the return of the consideration plus interest less income received by the Plaintiffs; or

Alternatively, an award of the Plaintiffs' actual damages;

An award of exemplary damages and the Plaintiffs' reasonable attorneys' fees, expenses, pre- and post-judgment interest, and court costs; and

An award of all such other relief to which the Plaintiffs are entitled.

Date: August 30, 2019                    Respectfully Submitted,


                                         */s/Rachel K. O'Neil*
                                         _____
                                         Robert T. Slovak
                                         Texas Bar No. 24013523
                                         rslovak@foley.com
                                         Rachel K. O'Neil
                                         Texas Bar No. 24068616
                                         rkoneil@foley.com
                                         Brandon C. Marx
                                         Texas Bar No. 24098046
                                         bmarx@foley.com
                                         Foley Gardere
                                         Foley & Lardner LLP
                                         2021 McKinney Avenue, Suite 1600
                                         Dallas, Texas 75201
                                         Telephone: 214.999.4334
                                         Facsimile: 214.999.3334

                                         **Attorneys for Plaintiffs**

# EXHIBIT 1

# LEASE AGREEMENT

between

## ROCKWELL DEBT-FREE PROPERTIES
### a Utah Corporation

and

## NOAH CORPORATION
### as Tenant

**Dated December 1, 2018**
**Plano, TX**

# TABLE OF CONTENTS

ARTICLE 1. DEMISED PREMISES ...................................................................................4

ARTICLE 2. TERM AND USE...........................................................................................4

2.1. Commencement Date and Initial Term. .......................................................................4

2.2. Renewal Option...........................................................................................................4

2.3. Use. ..............................................................................................................................4

ARTICLE 3. RENT. ............................................................................................................4

3.1. Date on Which Rent Begins. ........................................................................................4

3.2. Additional Rent. ...........................................................................................................4

3.3. Base Annual Rent. ........................................................................................................4

3.4. Manner of Payment. .....................................................................................................5

ARTICLE 4. TAXES AND ASSESSMENTS.....................................................................5

4.1. Real Property Taxes and Assessments. ........................................................................5

4.2. Payment of Real Estate Taxes. .....................................................................................6

ARTICLE 5. SUBORDINATION. ......................................................................................6

ARTICLE 6. TENANT IMPROVEMENTS UPON PREMISES........................................6

ARTICLE 7. REPAIRS AND MAINTENANCE................................................................6

ARTICLE 8. ENVIRONMENTAL MATTERS. .................................................................7

8.1. Warranties of Tenant and Indemnification of Landlord................................................7

ARTICLE 9. ALTERATIONS TO PREMISES. .................................................................8

ARTICLE 10. FIXTURES AND PERSONAL PROPERTY. .............................................8

ARTICLE 11. SIGNAGE. ...................................................................................................8

ARTICLE 12. LIENS..........................................................................................................8

ARTICLE 13. LAWS AND ORDINANCES. .....................................................................9

13.1. Compliance. ...............................................................................................................9

13.2. Illegal and Improper Use, Nuisance. ..........................................................................9

13.3. Electrical Equipment. .................................................................................................9

13.4. ADA. ..........................................................................................................................9

ARTICLE 14. SERVICES. ..................................................................................................9

14.1. Utilities. ......................................................................................................................9

14.2. Payment. .....................................................................................................................9

14.3. Garbage Collection......................................................................................................9

14.4. Interruption of Services...............................................................................................9

ARTICLE 15. DAMAGE TO PREMISES. ............................................................................................ 10

ARTICLE 16. INSURANCE. ................................................................................................................ 10

ARTICLE 17. INDEMNIFICATION. .................................................................................................... 11

ARTICLE 18. ASSIGNMENT, SUBLETTING AND OWNERSHIP. ................................................... 11

18.1. Tenant. .......................................................................................................................................... 11

18.2. Landlord. ...................................................................................................................................... 11

ARTICLE 19. ACCESS TO PREMISES. .............................................................................................. 11

ARTICLE 20. DEFAULTS BY TENANT AND REMEDIES. ............................................................... 11

20.1. Events of Default. ......................................................................................................................... 11

20.2. Remedies. ...................................................................................................................................... 12

ARTICLE 21. SURRENDER OF PREMISES. ...................................................................................... 13

ARTICLE 22. EMINENT DOMAIN. .................................................................................................... 13

22.1. Termination of Lease. ................................................................................................................... 13

22.2. Election Not to Terminate. ........................................................................................................... 13

22.3. Right to Compensation. ................................................................................................................ 13

ARTICLE 23. MISCELLANEOUS. ....................................................................................................... 13

23.1 . Attorneys' Fees. ........................................................................................................................... 13

23.2. Notices. ......................................................................................................................................... 13

23.3. Remedies. ...................................................................................................................................... 14

23.4. Successors and Assigns. ............................................................................................................... 14

23.5. Waiver. .......................................................................................................................................... 14

23.6. Holding Over. ............................................................................................................................... 14

23.7. Interpretation. ............................................................................................................................... 14

23.8. Covenant of Title and Quiet Enjoyment. ..................................................................................... 14

23.9. Estoppel. ....................................................................................................................................... 14

23.10. Recording. ................................................................................................................................... 15

23.11. Force Majeure and Permitted Delays. ....................................................................................... 15

23.12. Limitations on Landlord's Liability. .......................................................................................... 15

23.13. Consent. ...................................................................................................................................... 15

23.14. Severability. ................................................................................................................................ 15

23.15. Governing Law and Venue. ........................................................................................................ 15

23.16. Time of the Essence. ................................................................................................................... 16

23.17. Entire Agreement. ....................................................................................................................... 16

23.18. Preliminary Negotiations. ........................................................................................... 16

23.19. Accord and Satisfaction. ............................................................................................ 16

23.20. Counterparts. ............................................................................................................... 16

ARTICLE 24. GUARANTY OF TENANT OBLIGATIONS. .............................................. 16

ARTICLE 25. NONCOMPETITION. ..................................................................................... 17

# LEASE AGREEMENT

This Lease Agreement (this "Lease"), dated December 1, 2018, is entered into by and between ROCKWELL DEBT-FREE PROPERTIES, INC, ITS SUCCESSORS AND/OR ASSIGNS ("Landlord"), and NOAH CORPORATION ("Tenant").

**ARTICLE 1. DEMISED PREMISES.** In consideration of the rents, covenants, and agreements contained herein, Landlord leases to Tenant, and Tenant leases from Landlord, the real property situated in the City of Plano in Dallas County in the State of Texas, more particularly described on the attached Exhibit A (the "Premises") and all improvements constructed or otherwise located thereon, including without limitation the business, recreation, and community center constructed on the Premises (the "Facility").

## ARTICLE 2. TERM AND USE.

**2.1. Commencement Date and Initial Term.** The initial term of this Lease (the "Initial Term") shall commence on the date first above written (the "Commencement Date") and shall end upon the close of business on the last day of the month in which the twenty first anniversary of the Commencement Date occurs. Rent for the month of the Commencement Date, if other than the first day of the month, shall be prorated for that period. As used in this Lease, the term "Lease Year" shall mean (a) the period beginning on the Commencement Date and ending on the last day of the month in which the first anniversary of the Commencement Date occurs and (b) each successive twelve-month period during the Initial Term or any Renewal Term (as defined below) that ends on the last day of the month in which an anniversary of the Commencement Date occurs.

**2.2. Renewal Options.** Provided Tenant is not in default under any term, condition or covenant contained in this Lease at the time of the exercise of the option to renew the Initial Term of the Lease, Tenant shall have the option to extend the Initial Term for two additional ten-year terms (**"Renewal Term"**) on the same terms and conditions as provided herein. Notice of the exercise of such option to renew shall be given by Tenant to Landlord, in writing, no later than 60 days and no earlier than 180 days before the expiration of the Initial Term or the then current Renewal Term, as the case may be. Notice shall be given in accordance with the provisions of Article 23.2 of this Lease.

**2.3. Use.** Tenant shall use the Premises for a multi-use business, recreation, and community center and related uses. Tenant shall not use the Premises for any purpose other than as a multi -use business, recreation, and community center without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Tenant will keep the Premises in a clean and orderly condition.

## ARTICLE 3. RENT.

**3.1. Date on Which Rent Begins.** Tenant shall pay Rent (as defined below) beginning upon the Commencement Date. "Rent" shall consist of both Base Annual Rent and all Additional Rent (as each of those terms is defined below).

**3.2. Additional Rent.** Tenant shall pay all costs of utilities and necessary maintenance applicable to the Premises, all real estate taxes and other assessments against the Premises, and costs for insurance required herein, which costs are referred to as "Additional Rent" and are set forth in more detail below.

**3.3. Base Annual Rent.** Tenant shall pay to Landlord, for the use and occupancy of the Premises, annual rent in the amounts set forth below ("Base Annual Rent"). The annual rent shall increase by 2% as

outlined in the Base Rent Schedule below. The Base Annual Rent shall be paid in twelve equal monthly installments each Lease Year.

Base Rent Schedule

| | Period | Annual Base Rent | Monthly Installment |
|---|---|---|---|
| Year 1 | 12/01/2018 - 11/30/2019 | $ 432,000 | $ 36,000 |
| Year 2 | 12/01/2019 - 11/30/2020 | $ 440,640 | $ 36,720 |
| Year 3 | 12/01/2020 - 11/30/2021 | $ 449,453 | $ 37,454 |
| Year 4 | 12/01/2021 - 11/30/2022 | $ 458,442 | $ 38,203 |
| Year 5 | 12/01/2022 - 11/30/2023 | $ 467,611 | $ 38,968 |
| Year 6 | 12/01/2023 - 11/30/2024 | $ 476,963 | $ 39,747 |
| Year 7 | 12/01/2024 - 11/30/2025 | $ 486,502 | $ 40,542 |
| Year 8 | 12/01/2025 - 11/30/2026 | $ 496,232 | $ 41,353 |
| Year 9 | 12/01/2026 - 11/30/2027 | $ 506,157 | $ 42,180 |
| Year 10 | 12/01/2027 - 11/30/2028 | $ 516,280 | $ 43,023 |
| Year 11 | 12/01/2028 - 11/30/2029 | $ 526,606 | $ 43,884 |
| Year 12 | 12/01/2029 - 11/30/2030 | $ 537,138 | $ 44,761 |
| Year 13 | 12/01/2030 - 11/30/2031 | $ 547,880 | $ 45,657 |
| Year 14 | 12/01/2031 - 11/30/2032 | $ 558,838 | $ 46,570 |
| Year 15 | 12/01/2032 - 11/30/2033 | $ 570,015 | $ 47,501 |
| Year 16 | 12/01/2033 - 11/30/2034 | $ 581,415 | $ 48,451 |
| Year 17 | 12/01/2034 - 11/30/2035 | $ 593,043 | $ 49,420 |
| Year 18 | 12/01/2035 - 11/30/2036 | $ 604,904 | $ 50,409 |
| Year 19 | 12/01/2036 - 11/30/2037 | $ 617,002 | $ 51,417 |
| Year 20 | 12/01/2037 - 11/30/2038 | $ 629,342 | $ 52,445 |

**3.4. Manner of Payment.** Rent shall be paid in lawful currency of the United States of America, in advance, without notice or invoicing from Landlord, on or before the first day of each and every month during the Initial Term and any Renewal Term hereof, beginning on the Commencement Date and ending on the effective termination of this Lease. If the Base Annual Rent shall be determined under the provisions of Article 3.1 above to commence on a date other than the first day of the month, then the Base Annual Rent for such period shall be prorated accordingly. All payments of rent and other sums shall be paid or mailed to Landlord at Landlord's address set forth in Article 23.2 or to such other payee or address as Landlord may designate from time to time in writing.

**ARTICLE 4. TAXES AND ASSESSMENTS.**

Tenant shall pay Additional Rent to Landlord for taxes and assessments as follows:

**4.1. Real Property Taxes and Assessments.** Tenant shall be responsible for all real property taxes, general and special assessments, water and sewer charges, or any other governmental charges and fees associated with membership in a property owner's association (collectively "Real Estate Taxes") that may be levied or assessed against the Premises, the Facility, or any improvements related thereto by any lawful authority for each calendar year or portion thereof commencing on the Commencement Date.

**4.2. Payment of Real Estate Taxes.** Tenant shall pay as Additional Rent all Real Estate Taxes. Such payments shall be made by Tenant to Landlord within twenty (20) days of receiving notice from Landlord, which notice shall state the amount of such Real Estate Taxes. If Landlord or Tenant, after receiving Landlord's consent, and at Tenant's sole cost and expense, undertakes action to appeal the assessments made regarding Real Estate Taxes and receives any refund by reason of that appeal or for any other reason, Tenant shall be entitled to receive any such refund within thirty (30) days after Landlord's receipt of the refund.

**ARTICLE 5. SUBORDINATION.** The leasehold interest granted to Tenant under this Lease shall be subject and subordinate to all mortgages or trust deeds which may now or hereafter affect the Premises, and also to all renewals, modifications, consolidations, and replacements of such mortgages and trust deeds; provided that the holder of any such instrument agrees in writing that Tenant's possession of the Premises will not be disturbed so long as Tenant will continue to perform its duties and obligations under this Lease or any renewal thereof per paragraph 2.2 herein. Although no instrument or act on the part of Tenant shall be necessary to effectuate such subordination, Tenant will, nevertheless, execute and deliver in a prompt and diligent manner such further instruments continuing such subordination of Tenant's leasehold interest as may be desired by the holders of such mortgages or trust deeds. In the event any proceedings are brought for foreclosure, or in the event of the exercise of the power of sale under any mortgage or deed of trust, upon any such foreclosure or sale, Tenant agrees to recognize such beneficiary or purchaser as Landlord under this Lease.

**ARTICLE 6. TENANT IMPROVEMENTS UPON PREMISES.** If at any time the Premises do not comply with codes as required by regulations of governing authorities, then the Premises will be brought up to the proper standards at Tenant's expense and in accordance with plans approved in writing in advance by Landlord. Tenant shall ensure that all contractors responsible for any work on the Premises shall provide Landlord and Tenant with a one-year warranty on all such work. If the Premises, at any time, are required to be brought up to proper standards with respect to Tenant's specific use thereof, then the Premises shall be brought up to proper standards at Tenant's expense. If Tenant fails to prosecute such repairs and improvements diligently and continuously to completion, then Landlord may prosecute such repairs and improvements itself and charge 105% of the amount of the actual costs thereof to Tenant as Additional Rent.

**ARTICLE 7. REPAIRS AND MAINTENANCE.**

Tenant agrees, at its own cost and expense, to keep the Premises, each and every part thereof, and any and all appurtenances in good condition and repair during the term of this Lease, and to make all repairs to, or replacements of, the Premises and appurtenances to the Premises. Tenant agrees to surrender the Premises at the termination of this Lease in good condition, ordinary wear and tear excepted. Tenant shall maintain all portions of the Premises and adjoining areas in a clean and orderly condition, free of dirt, rubbish, debris, and unlawful obstructions. Landlord shall not be required to furnish any services or facilities or make any repair or alteration in or otherwise maintain the Premises or adjoining areas. Tenant agrees to keep all of the Premises, including without limitation, the roof, doors, window casements, glazing, interior walls, floors, ceilings, carpets, interior plumbing, interior pipes, electrical wiring, HVAC systems, alarms and fire suppression systems, utility lines, the exterior and interior of the Facility and the improvements located therein, the interior walls and interior decorating in good condition and repair. Tenant agrees to repair or pay for the repair of any damage to the Premises resulting from the acts of Tenant, Tenant's employees, agents, representatives, vendors, customers and invitees. Tenant shall also be responsible to pay all janitorial and cleaning costs to the keep the Premises clean and free of debris. If repairs for which the Tenant is responsible are not completed with twenty (20) days after Tenant has received written notice from Landlord of such state of disrepair, or if such repairs cannot reasonably be

6

completed within such twenty (20) day period and Tenant shall fail to commence such repairs within twenty (20) days after notice and proceed diligently thereafter, then Landlord may perform such repairs and charge 105% of the amount of the actual cost thereof to Tenant as Additional Rent.

## ARTICLE 8. ENVIRONMENTAL MATTERS.

**8.1. Warranties of Tenant and Indemnification of Landlord.** Tenant shall indemnify, defend and hold Landlord and its successors and assigns, owners, managers, partners, affiliates, representatives, officers, employees and agents ("Landlord Parties") harmless from, and Landlord shall have no liability for or responsibility to pay, any claims, judgments, damages, fines, penalties, costs, liabilities (including sums paid in settlement of claims) or loss including attorneys' fees, consultants' fees, and expert fees which arise during or after the Initial Term or any Renewal Term, in connection with the presence of or that arises out of any act or omission of the Tenant as it relates to toxic or Hazardous Materials (as defined below) in, on or under the Premises to the extent the presence of such Hazardous Materials is not caused by Landlord. This indemnification shall survive the termination of this Lease. Furthermore,

8.1.1. Tenant warrants that it shall not cause any Hazardous Materials to be used, generated, stored or disposed of on, under or about, or transported to or from the Premises unless the same is specifically approved in advance by Landlord, in writing, other than small quantities of retail, household and office chemicals customarily sold over-the-counter to the public and which are related to Tenant's permitted uses of the Premises;

8.1.2. Tenant warrants that it shall comply with all obligations imposed by environmental laws and all other restrictions and regulations upon the use, generation, storage or disposal of Hazardous Materials at, to or from the Premises;

8.1.3. Tenant warrants that it shall deliver promptly to Landlord true and correct copies of all notices received by Tenant from any governmental authority with respect to the use, generation, storage or disposal by Tenant of Hazardous Materials at, to or from the Premises and shall immediately notify Landlord both by telephone and in writing of any unauthorized discharge of Hazardous Materials by Tenant that Tenant reasonably believes poses an imminent hazard to the Premises, the public or the environment;

8.1.4. Tenant shall complete fully, truthfully and promptly any questionnaires sent by Landlord with respect to Tenant's use of the Premises and its use, generation, storage and disposal of Hazardous Materials at, to or from the Premises that are required;

8.1.5. If Landlord conducts any environmental inspections because it has reasonable cause to believe that Tenant's activities have or are likely to result in a violation of environmental laws or a release of Hazardous Materials on the Premises and such violation by Tenant has actually occurred, then Tenant shall pay to Landlord, as Additional Rent, the costs incurred by Landlord for such inspections;

8.1.6. Tenant shall cease immediately upon written notice from Landlord any activity which violates any environmental laws; and

8.1. 7. After notice to Landlord, Tenant shall promptly remove, clean up, dispose of or otherwise remediate, in accordance with environmental laws and good commercial practice, any Hazardous Materials on, under or about the Premises, unless such Hazardous Materials are on, under, or about the Premises due to the act of the Landlord.

7

The foregoing indemnifications of Tenant shall survive any assignment, transfer or termination of the Lease. As used herein, the term "Hazardous Materials" means any hazardous, toxic or dangerous substance, waste or material which is or becomes regulated under any applicable federal, state, or local statute, ordinance, rule, regulation or other law now or hereafter in effect pertaining to environmental protection, contamination or cleanup, which now or hereafter is designated as a "hazardous waste" as defined by the Resource Conservation and Recovery Act of 1976 (42 U.S.C. 6901 et seq.) as amended from time to time and any regulations promulgated thereunder, and/or as a "Hazardous Substance" under the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. 9601 et seq.) as amended from time to time and any regulations promulgated thereunder, or under the laws of the State of Texas; without limiting the foregoing, Hazardous Materials shall include, but not be limited to, any substance which after being released into the environment and upon exposure, ingestion, inhalation, or assimilation, either directly from the environment or indirectly by ingestion through food chains, will or may reasonably be anticipated to cause death, disease, behavior abnormalities, cancer and/or genetic abnormalities.

**ARTICLE 9. ALTERATIONS TO PREMISES.** Tenant shall not make any exterior or structural alterations in any portion of the Premises, nor any alterations which may substantially affect the value of the Premises without, in each instance, first obtaining the written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Tenant shall be permitted to make interior non-structural alterations, additions and improvements without Landlord's prior consent. Except as otherwise provided in Article 10 below, all alterations, additions, improvements or fixtures made in or upon the Premises, either by Landlord or Tenant, shall be Landlord's property upon termination of the Lease and shall remain a part of the Premises without compensation to Tenant.

**ARTICLE 10. FIXTURES AND PERSONAL PROPERTY.** Any trade fixtures, equipment, inventory, trademarked items, signs, decorative soffit, counters, shelving, showcases, mirrors and other removable personal property installed in or on the Premises by Tenant at its expense ("Tenant's Property"), shall remain the property of Tenant. Tenant at its expense shall immediately repair any damage occasioned by the removal of Tenant's Property and upon expiration or earlier termination of this Lease, shall leave the Premises in a neat and clean condition, free of debris, normal wear and tear excepted. Tenant shall pay before delinquency all taxes, assessments, license fees and public charges levied, assessed or imposed upon its business operation in the Premises as well as upon Tenant's Property. If any such items of Tenant's Property are assessed with property of Landlord, then such assessment shall be equitably divided between Landlord and Tenant to the end that Tenant shall pay only its equitable portion of such assessment. If Landlord and Tenant cannot agree on the equitable division of such a combined assessment, an accountant acceptable to each of them shall reasonably determine the basis of so prorating any such assessments and such determination shall be binding upon both Landlord and Tenant. Such tax assessments, fees or charges referred to in this Article 10, if not timely paid by Tenant, may, at Landlord's sole option, be paid by Landlord and charged to Tenant as Additional Rent.

**ARTICLE 11. SIGNAGE.** Upon receiving the prior written consent of Landlord, Tenant may place signage on the Premises in accordance with and as approved by the local governmental authorities. The costs of all subsequently placed signage or alterations to existing signage shall be at the sole cost and expense of Tenant.

**ARTICLE 12. LIENS.** Tenant shall not permit to be created nor to remain undischarged any lien, encumbrance or charge arising out of any work or work claim of any contractor, mechanic, laborer of Tenant or material supplied by a materialman to Tenant which might be, or become, a lien or encumbrance or charge upon the Premises. If any lien or notice of lien on account of an alleged debt of Tenant or any notice of contract by a party engaged by Tenant or Tenant's contractor to work in the Premises shall be claimed against the Premises, Tenant shall, within thirty (30) days after notice of the claim, cause the same

to be discharged of record by payment, deposit or bond. Tenant's failure to do so shall constitute a default under this Lease and Landlord shall have the remedies available in Article 20 of this Lease.

## ARTICLE 13. LAWS AND ORDINANCES.

**13.1. Compliance.** Tenant agrees to comply with all laws, ordinances, orders and regulations regarding Tenant's particular use, occupancy or alterations of the Premises, and the cleanliness, safety or operation thereof, including without limitation all licensing of the Facility and the personnel engaged to provide services therein. Tenant agrees to comply with the reasonable regulations and requirements of any insurance underwriter, inspection bureau or similar agency with respect to any portion of the Premises installed by Tenant.

**13.2. Illegal and Improper Use, Nuisance.** Tenant agrees not to (a) permit any illegal practice to be carried on or committed on the Premises; (b) make use of or allow the Premises to be used for any purpose that might invalidate or increase the rate of insurance therefor; (c) keep or use or permit to be kept or used on the Premises any flammable fluids, gases, or explosives without the prior written permission of Landlord except for normal cleaning products; (d) use the Premises for any purpose whatsoever which might create a nuisance; (e) deface or injure the Facility; (f) commit or suffer any waste; or (g) install any electrical equipment that could cause any substantial likelihood of exceeding the capacity of the electrical system within the Facility.

**13.3. Electrical Equipment.** In connection with any electrical equipment on the Premises, Tenant shall, at Tenant's own expense, make from time to time whatever changes are reasonably necessary to comply with the requirements of the insurance inspectors, underwriters, government authorities and codes.

**13.4. ADA.** Tenant shall comply with the Americans With Disabilities Act of 1990 (the "ADA") and the regulations promulgated thereunder. Tenant hereby expressly assumes all responsibility for compliance with the ADA relating to the Premises and Tenant's specific use of the Premises. Any alterations to the interior, non-structural portions of the Premises made by Tenant for the purpose of complying with the ADA or which otherwise require compliance with the ADA shall be done in accordance with the provisions of the Lease; provided, that the Landlord's consent to such alterations shall not constitute either Landlord's assumption, in whole or in part, of Tenant's responsibility for compliance with the ADA, or representation or continuation by Landlord that such alterations comply with the provisions of the ADA.

## ARTICLE 14. SERVICES.

**14.1. Utilities.** At all times after the Commencement Date, Tenant shall ensure that the necessary mains, conduits, meters and all connections and other facilities are provided and maintained to make water, sewer, gas, phone and electricity available to the Premises.

**14.2. Payment.** Tenant shall be solely responsible for and promptly pay all charges for the use and consumption of sewer, gas, electricity, water, phone and all other utility services used within the premises.

**14.3. Garbage Collection.** Tenant shall provide a service for collection of refuse and garbage and shall pay the cost thereof.

**14.4. Interruption of Services.** Landlord shall not be liable to Tenant in damages or otherwise if the utilities or services are interrupted or terminated because of necessary repairs, installations, or improvements, or any cause beyond Landlord's reasonable control, and not directly attributable to the

negligence of or breach of this Lease by Landlord or its agents, nor shall any such interruption or termination relieve Tenant of the performance of any of its obligations hereunder.

**14.5 Easements and Access.** Tenant shall have the authority to grant easements, rights of way, rights of entry and any other applicable instrument on behalf of Landlord in order to facilitate access to the premises and the installation of all utilities and public services on the premises including, but not limited to; communications, electrical, gas, water and so forth.

**14.6 Post Construction Maintenance.** As Tenant is solely responsible for the maintenance of the property per Article 7, Tenant shall have the authority to enter into any necessary agreements on behalf of the property owner(s) required by the municipality for the post-construction maintenance of the site including, but not limited to, inspections, reports, storm water management, SWPPP, BMP (Better Management Practices) and any other items related thereto.

## ARTICLE 15. DAMAGE TO PREMISES.

If the Premises are hereafter damaged or destroyed or rendered partially tenantable for their accustomed use, by fire or other casualty insured under the coverage which Tenant is obligated to carry pursuant to Article 16 hereof, then Landlord shall, within thirty (30) days after such casualty, commence repair of such Premises and within one hundred eighty (180) days after commencement of such repair restore the Premises to substantially the same condition in which it was immediately prior to the occurrence of the casualty, except as otherwise provided in this Article 15 In no event shall Landlord be required to repair or replace Tenant's Property. The proceeds of the pertinent insurance policies shall be applied to the cost of repairing or restoring the Premises and Tenant shall pay the balance, if any, of the cost of repairing or restoring same.

## ARTICLE 16. INSURANCE.

Tenant agrees to carry, during the Initial Term and any Renewal Term hereof, all risk property insurance with the Landlord as the named insured ("Landlord's Property Insurance") covering fire and extended coverage, vandalism and malicious mischief: sprinkler leakage and all other perils of direct physical loss or damage insuring the improvements and betterments located in or on the Premises and all appurtenances thereto (excluding Tenant's Property) for the full replacement value thereof. Tenant shall furnish Landlord with a certificate of such Landlord's Property Insurance, and such insurance shall provide Landlord with thirty (30) days written notice before any termination or change in such insurance.

Tenant also agrees to carry commercial general liability insurance on the Premises during the Initial Term and any Renewal Term covering both Tenant and Landlord as their interest may appear, giving Landlord and Tenant a minimum of thirty (30) days written notice by the insurance company prior to cancellation, termination or change in such insurance. Such insurance may have a deductible of not more than $10,000 and shall be for limits of not less than $1,000,000 per person and $1,000,000 per accident or occurrence for bodily injury and $250,000 for property damage per accident or occurrence or such greater amount as may from time to time be reasonably required by Landlord in accordance with other similar property in the, Plano, TX market.

If Tenant fails to provide Landlord with certificates of insurance for the policies required pursuant to this Article 17, Landlord may purchase such insurance and charge Tenant for the cost thereof as Additional Rent.

10

Landlord and Tenant and all parties claiming under them mutually release and discharge each other from all claims and liabilities arising from or caused by any casualty or hazard, covered or required hereunder to be covered in whole or in part by insurance on the Premises or in connection with property on or activities conducted on the Premises, and waive any right of subrogation which might otherwise exist in or accrue to any person on account thereof. This waiver shall not be required if the insurance carrier charges an additional premium in order to provide such waiver and the party benefiting from the waiver does not agree to pay the additional premium.

**ARTICLE 17. INDEMNIFICATION.** As a material consideration to Landlord for entering into this Lease on the terms and conditions contained herein, Tenant hereby indemnifies and agrees to hold Landlord and the Landlord Parties harmless from and against any and all claims, demands, liabilities, and expenses, including reasonable attorneys' fees, arising from Tenant's use of the Premises or from any act permitted, or any omission to act, in or about the Premises by Tenant or its agents, employees, contractors, customers or invitees or from any breach or default by Tenant of this Lease, except to the extent caused solely by Landlord's acts or omissions. In the event any action or proceeding shall be brought against Landlord by reason of any such claim, Tenant shall defend the same at Tenant's expense by counsel reasonably acceptable to Landlord (as approved by Landlord in writing).

## ARTICLE 18. ASSIGNMENT, SUBLETTING AND OWNERSHIP.

**18.1. Tenant.** Tenant may not transfer, assign or sublet its interest in this Lease without first obtaining Landlord's written consent, which shall not be unreasonably withheld, conditioned or delayed. Any assignment or subletting shall not release Tenant from its obligations and liabilities under this Lease. Tenant shall provide not less than thirty (30) days' notice to Landlord prior to any proposed transfer, assignment, or subletting and shall pay all costs and expenses, including reasonable attorneys' fees, incurred by Landlord in reviewing and responding to any request for Landlord's consent to an assignment or sublease hereunder.

**18.2. Landlord.** Landlord shall have the right to transfer, assign and convey, in whole or in part, any or all of the right, title and interest to the Premises, provided, such transferee or assignee shall be bound by the terms, covenants and agreements herein contained, and shall expressly assume and agree to perform the covenants and agreements of Landlord herein contained.

## ARTICLE 19. ACCESS TO PREMISES.

Upon reasonable prior notice, Landlord or Landlord's agent shall have the right to enter the Premises during usual business hours to examine the same; to show the Premises to prospective purchasers or lessees; and to make such repairs, alterations, improvements or additions as are necessary without the same constituting an eviction of Tenant in whole or in part.

## ARTICLE 20. DEFAULTS BY TENANT AND REMEDIES.

**20.1. Events of Default.** The occurrence of any of the following shall constitute a material default and breach of this Lease by Tenant:

**20.1.1.** Any failure by Tenant to pay Rent or any other payment required to be made by Tenant hereunder when due. In addition, if Tenant fails to make any payment within ten (10) days of such payment's due date, Tenant shall be obligated to pay a late payment fee equal to five percent (5%) of the payment then due, plus accruing interest on the amount of the late payment (including the late fee) at the rate of eighteen

percent (18%) per annum, compounding monthly. The obligation to pay late fees and accruing interest shall not require prior written notice.

20.1.2. A failure by Tenant to observe and perform any other provision of this Lease to be observed or performed by Tenant, where such failure continues for fifteen (15) days after written notice thereof by Landlord to Tenant, except that this fifteen (15) day period shall be extended for a reasonable period of time if the alleged default is not reasonably capable of cure within such time period and Tenant proceeds to diligently cure the default prior to the expiration of such time period.

20.1.3. The making by Tenant of any general assignment for the benefit of creditors, the filing by or against Tenant of a petition to have Tenant adjudged a bankrupt, or a petition for reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant, the same is dismissed within sixty (60) days) the appointment of a trustee or receiver to take possession that is not restored to Tenant within thirty (30) days, or the attachment, execution or other judicial seizure that is not discharged within thirty (30) days.

**20.2. Remedies.** In the event of any default by Tenant, then Landlord shall be entitled to the following cumulative remedies (in addition to any other remedies available at law or in equity):

20.2.1. Landlord may terminate this Lease by giving written notice of termination to Tenant, in which event Tenant shall immediately surrender the Premises to Landlord. If Tenant fails to so surrender the Premises, then Landlord may, without prejudice to any other remedy it has, including possession of the Premises or arrearages in Rent or other damages, reenter and take possession of the Premises and expel or remove Tenant and any other person occupying the Premises or any part thereof, in accordance with applicable law; or

20.2.2. Landlord may re-enter and take possession of the Premises without terminating the Lease and relet the Premises and apply the Rent received to the account of Tenant. If Landlord so re-enters and takes possession of the Premises as set forth above, Landlord agrees to use reasonable efforts to relet the Premises for a commercially reasonable rate at the time of such reletting. No reletting by Landlord shall be considered to be for Landlord's own account, unless Landlord has notified Tenant in writing that this Lease has been terminated. In addition, no such reletting shall be considered an acceptance of Tenant's surrender of the Premises unless Landlord so notifies Tenant in writing; or

20.2.3. Landlord may re-enter the Premises without terminating the Lease and without being liable for any damages, whether caused by the negligence of Landlord or otherwise, and do whatever Tenant is obligated to do under the Lease. Tenant shall pay to Landlord, upon demand, the reasonable expenses paid by Landlord in satisfying Tenant's obligations under the terms of this Lease. Any sums so expended by Landlord hall bear interest at the rate of eighteen percent (18%) per annum from the date expended until the date Landlord is repaid.

20.3. Duty to Mitigate Damages. In the event of any default by Tenant under this Lease, Landlord shall in each case use its reasonable efforts to mitigate its damages.

20.4. Abandonment. If Landlord obtains possession of the Premises as a result of Tenant's abandonment of the Premises or by a decree from a court of competent jurisdiction, this shall not be construed as an election to terminate this Lease unless Landlord provides Tenant with a written notice of this election.

20.5. Non-Hindrance. Upon any termination or expiration of this Lease, Landlord may operate the Facility as then presently constituted as a multi-use business, recreation, conference, and event center or

for any other lawful purpose without hindrance or objection from Tenant and or its related entities; provided that in so doing, Landlord shall not, and shall not allow any tenant of the Premises to, hold itself out as operating a Noah's facility or use the Tenant's name or trademarks. Further, Landlord shall have no rights in or license to use or otherwise benefit from any websites owned by Tenant, Tenant's parent, Noah Corporation ("Noah"), or their respective subsidiaries or affiliates. The parties hereto agree that Noah is an intended third-party beneficiary of this Article.

**ARTICLE 21. SURRENDER OF PREMISES.** Tenant shall, upon the expiration of the Initial Term or, if applicable, any Renewal Term hereof, or any earlier termination of this Lease for any cause, surrender to Landlord the Premises, including, without limitation, all alterations, improvements and other additions which may be made or installed by either party to, in, upon or about the Premises. Tenant may not remove its improvements to or permanent alterations of the Premises, but it may at its own cost and expense and without damage to the Premises remove Tenant's Property, as defined in Article 10 above.

**ARTICLE 22. EMINENT DOMAIN.**

**22.1. Termination of Lease.** In the event a substantial portion of the Premises shall be appropriated or taken under the power of eminent domain by any public or quasi-public authority, then at the election of Tenant, upon thirty (30) days' written notice to Landlord, this Lease shall terminate and expire as of the date of such taking, and both Landlord and Tenant shall thereupon be released from any liability thereafter accruing hereunder. For purposes of this Article 22.1, a "substantial portion of the Premises" means (a) thirty percent (30%) or more of the parking areas of the Premises or (b) twenty-five percent (25%) or more of the Premises.

**22.2. Election Not to Terminate.** If Tenant elects not to so terminate this Lease, Tenant shall remain in that portion of the Premises which shall not have been appropriated or taken as herein provided, and Landlord agrees, at Landlord's cost and expense up to the amount received by Landlord under Article 22.3 below, to restore the remaining portion of the Premises to a complete unit of like quality and character as existed prior to such appropriation or taking as soon as reasonably possible. Thereafter, all Rent and payment obligations of Tenant shall be adjusted on an equitable basis, taking into account the relative value of the portion taken as compared to the portion remaining. For the purpose of this Article 22.2, a voluntary sale or conveyance in lieu of condemnation, but under threat of condemnation shall be deemed an appropriation or taking under the power of eminent domain.

**22.3. Right to Compensation.** The compensation awarded or paid for the total or partial taking of the Premises through the exercise of the power of eminent domain shall belong to Landlord.

**ARTICLE 23. MISCELLANEOUS.**

**23.1. Attorneys' Fees.** In the event of any default under the terms of this Lease or any dispute regarding its terms and conditions or enforcement, the unsuccessful party agrees to reimburse the prevailing party for all expenses and costs, including reasonable attorneys' fees incurred in enforcing the terms hereof. Such reimbursement shall include all legal expenses incurred, whether enforcing is sought by suit or otherwise and shall be in addition to any other damages or relief awarded or obtained.

**23.2. Notices.** Notices and demands required, or permitted, to be sent to those listed hereunder shall be sent by certified mail, return receipt requested, postage prepaid, by facsimile transmission or by Federal Express or other reputable overnight courier service and shall be deemed to have been given upon the date the same is postmarked, if sent by certified mail, or the day deposited with UPS or such other reputable overnight courier service, or the day after the facsimile transmission is made, but shall not be deemed received until one (1) business day following deposit with UPS or other reputable overnight courier service

or three (3) days following deposit in the U.S. mail if sent by certified mail to address shown below, and addressed to:

**Landlord:**

ROCKWELL DEBT-FREE PROPERTIES, INC
c/o Rockwell Debt-Free Properties, Inc.
8494 South 700 East, Suite 200
Sandy, UT 84070

**Tenant:**
NOAH CORPORATION
3400 N Ashton Blvd Ste 490
Lehi, UT 84053
Attn: William J. Bowser

or at such other address requested in writing by a party upon ten (10) days' notice to the other parties.

**23.3. Remedies.** All rights and remedies of Landlord and Tenant herein created or otherwise extending at law are cumulative, and the exercise of one or more rights or remedies may be exercised and enforced concurrently or consecutively and whenever and as often as deemed desirable.

**23.4. Successors and Assigns.** All covenants, promises, conditions, representations and agreements herein contained shall be binding upon, apply and inure to the parties hereto and their respective heirs, executors, administrators, successors and assigns; it being understood and agreed, however, that the provisions of Article 18 are in nowise impaired by this Article 23.4.

**23.5. Waiver.** The failure of Landlord or Tenant to insist upon strict performance by the other of any of the covenants, conditions, and agreements of this Lease shall not be deemed a waiver of any subsequent breach or default by the other in any of the covenants, conditions and agreements of this Lease. No surrender of the Premises by Tenant shall be affected by Landlord's acceptance of Rent or by other means whatsoever unless the same is evidenced by Landlord's written acceptance of the surrender.

**23.6. Holding Over.** If Tenant or any party claiming under Tenant remains in possession of the Premises or any part thereof after any termination or expiration of this Lease, Landlord, in Landlord's sole discretion, may treat such holdover as an automatic renewal of this Lease for a month-to-month tenancy subject to all the terms and conditions provided herein.

**23.7. Interpretation.** The parties hereto agree that it is their intention hereby to create only the relationship of Landlord and Tenant, and no provision hereof, or act of either party hereunder, shall ever be construed as creating the relationship of principal and agent, or a partnership, or a joint venture or enterprise between the parties hereto.

**23.8. Covenant of Title and Quiet Enjoyment.** Landlord covenants that Tenant or any permitted assignee or sublessee of Tenant, upon the payment of the Rent and performance of the covenants hereunder, shall and may peaceably and quietly have, hold and enjoy the Premises and improvements thereon during the Initial Term or any Renewal Term.

**23.9. Estoppel.** Tenant agrees that from time to time, upon not less than ten (10) days prior written request by Landlord or any third party to which the Landlord desires to grant a security interest in the Premises (a "Lender"), Tenant shall deliver to Landlord or Lender a statement in writing certifying:

14

23.9.1. That this Lease is a true and exact copy of the Lease between the parties;

23.9.2. That this Lease is unmodified and in full force and effect (or if there have been modifications that the same is in full force and effect as modified and identifying the modifications);

23.9.3. That there are not, to the best of Tenant's knowledge, any offsets, defenses or counterclaims with respect to the payment of Rent or in the performance of the other terms, covenants and conditions on the part of the Tenant or Landlord to be performed pursuant to this Lease, other than as set forth in that certain Promissory Note of even date herewith made by Landlord in favor of Tenant;

23.9.4. The dates to which rentals and other charges have been paid; and

23.9.5. So far as Tenant is aware, Landlord is not in default under any provision of this Lease; and if Landlord is in default, specifying each such default of which Tenant may have knowledge, it being understood that any such statement so delivered may be relied upon by any prospective purchaser, mortgagee, or assignee of any mortgage of the Premises.

**23.10. Recording.** Tenant shall not record this Lease but shall record a memorandum of this Lease in a form acceptable to Landlord with the Lake County Recorder. Any recording costs associated with the memorandum shall be borne by Tenant.

**23.11. Force Majeure and Permitted Delays.** In the event that either party hereto shall be delayed or hindered in or prevented from the performance required hereunder, by reason of strikes, lockouts, labor troubles, failure of power, riots, insurrection, war, acts of God, or other reason of like nature not the fault of the party delayed in performing work or doing acts (a "Permitted Delay" or "Permitted Delays"), such party shall be excused for the period of time equivalent to the delay caused by such Permitted Delay. Notwithstanding the foregoing, any extension of time for a Permitted Delay shall be conditioned upon the party seeking an extension of time delivering written notice of such Permitted Delay to the other party within ten (10) days of the event causing the Permitted Delay.

**23.12. Limitations on Landlord's Liability.** Notwithstanding anything to the contrary contained in this Lease, in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of this Lease to be observed, honored or performed by Landlord, Tenant shall look solely to the estate and property of Landlord in the land and building(s) owned by Landlord comprising the Premises for the collection of any judgment (or any other judicial procedures requiring the payment of money by Landlord) and no other property or assets of Landlord shall be subject to levy, execution, or other procedures for satisfaction of Tenant's remedies.

**23.13. Consent.** Unless expressly stated otherwise herein, wherever in this Lease Landlord or Tenant is required to give its consent or approval, such consent or approval shall not be unreasonably withheld, conditioned or delayed.

**23.14. Severability.** Any provision of this Lease which shall prove to be invalid, void or illegal shall in no way affect, impair or invalidate any other provisions hereof and such other provisions shall remain in full force and effect.

**23.15. Governing Law and Venue.** This Lease shall be governed by and construed in accordance with the laws of the State of Texas applicable to contracts executed and performed wholly in such state. The parties agree that all actions or proceedings arising in connection with this Lease shall be tried and litigated only in the state and federal courts located in the State of Texas. Each party waives, to the extent

permitted under applicable law, any right each may have to assert the doctrine of forum non conveniens or to object to venue to the extent any proceeding is brought in accordance with this Article 23.15.

**23.16. Time of the Essence.** Time shall be of the essence of this Lease.

**23.17. Entire Agreement.** This Lease contains all of the agreements of the parties hereto with respect to matters covered or mentioned in this Lease and no prior agreement, letters, representations, warranties, promises, or understandings pertaining to any such matters shall be effective tor any such purpose. This Lease may be amended or added to only by an agreement in writing signed by the parties hereto or their respective successors in interest.

**23.18. Preliminary Negotiations.** The submission of this document by Landlord for examination does not constitute an offer to lease or a reservation of an option to lease. In addition, Landlord and Tenant acknowledge that neither of them shall be bound by the representations, promises or preliminary negotiations with respect to the Premises made by their respective employees or agents. It is their intention that neither party be legally bound in any way until this Lease has been fully executed by both Landlord and Tenant.

**23.19. Accord and Satisfaction.** No payment by Tenant or receipt by Landlord of a lesser amount than the monthly Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction; and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of any Rent or to pursue any other remedy in this Lease provided.

**23.20. Counterparts.** To facilitate execution, this Lease may be executed in as many identical counterparts as may be required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts, taken together, shall collectively constitute a single instrument. It shall not be necessary in making proof of this Lease to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages. A facsimile or other reproduction of this Lease may be executed by one or more parties hereto, and an executed copy of this Lease may be delivered by one or more parties hereto by facsimile or similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any party hereto, all parties hereto agree to execute an original of this Lease as well as any facsimile or other reproduction hereof.

**ARTICLE 24. GUARANTY OF TENANT OBLIGATIONS.** Noah Corporation hereby unconditionally guaranties the full, prompt, and complete payment of Rent by Tenant hereunder and the performance and observance by Tenant of all Tenant's obligations under this Lease. Noah agrees that this guaranty shall be enforceable without Landlord first resorting to or exhausting: (a) any remedy against Tenant or any other party obligated in connection with this Lease; (b) any remedy in any way related to this Lease; or (c) any collateral available as security for the payment or performance of any of the obligations of Tenant under this Lease. Noah further agrees that, in the event of a default by Tenant under this Lease, Noah will pay all costs incurred in connection with the enforcement of any of the obligations of such guarantor hereunder, including court costs and reasonable attorneys' fees, whether incurred with or without suit or before or after judgment.

16

**ARTICLE 25. NONCOMPETITION.** Except as set forth in Article 20.5, Landlord agrees that during the period commencing on the date hereof and ending on the two-year anniversary of the termination or expiration of this Lease, Landlord  may not directly or indirectly own any interest in, manage, control, participate in (whether as an officer, director, manager, employee, partner, equity holder, member, agent, representative or otherwise), consult with, render services for, or in any other manner engage in any business that is competitive with the Business (as defined below), either directly or indirectly, anywhere in the United States of America. For purposes of this Section, the term "Business" shall mean the business of owning and operating multi-use business, recreation, conference, and event centers. The parties hereto agree that Noah is an intended third-party beneficiary of this Article.

[Remainder of page intentionally left blank}

IN WITNESS WHEREOF, the parties hereto have executed this Lease to be effective for all purposes as of the date first set forth above.

**LANDLORD:**

ROCKWELL DEBT-FREE PROPERTIES, INC
ITS SUCCESSORS AND/OR ASSIGNS

By: _____
Christopher J. Ashby, Manager

**TENANT:**

NOAH CORPORATION

By: _____
William J. Bowser, President

The undersigned has executed this Lease as of the date first written above solely for purposes of evidencing his agreement to the guaranty specified in Article 24 of this Lease.

NOAH CORPORATION

By: _____
William J. Bowser, President

P.O Box 1289
Riverton, Utah 84065

*[Signature page to Lease Agreement]*

## EXHIBIT A

## LEGAL DESCRIPTION OF THE PREMISES

# EXHIBIT 2

DocuSign Envelope ID: 5E53959B-25D2-4948-8A55-5769CB4B4B5F

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement") is made and entered into as of the **27th** day of **November**, **2018**, by and between Rockwell Debt-Free Properties, Inc. (hereinafter referred to as "Seller"), and J & J Real Estate Investments, LLC an Indiana limited liability company , (hereinafter referred to as "Buyer").

*Buyer understands and acknowledges that any sales professionals involved in this transaction do not have authority to make representations on behalf of or to bind Seller. Buyer further acknowledges that Buyer is not entering into this Agreement in reliance on any representations made by any sales professionals, and that Buyer has had sufficient opportunity to investigate, to Buyer's satisfaction, the nature, character and quality of the Property (as such term is defined below).*

Buyer's Initials:   JR _____   JP _____

**1. Purchase and Sale.** The Seller is the owner and/or holder of a an undivided **2.76** percent interest (the "Property Interest") in the real property described herein below, together with the improvements thereon, which real property is commonly known as the **Noah's** located at **5280 Towne Square Drive** in the City of **Plano**, State of **Texas** ("Property") **75024**, which is more particularly described on <u>Exhibit A</u> attached hereto and incorporated herein by this reference. The Property is subject to the lease agreement, which is more particularly described on <u>Exhibit B</u> attached hereto and incorporated herein by this reference the 'Description of Lease'. The Seller agrees to sell to the Buyer, and the Buyer agrees to purchase from the Seller, the Property Interest upon the terms and conditions set forth in this Agreement. In addition, Seller shall assign an undivided **2.76** percent interest in Seller's rights and interest in and to the Lease to Buyer (the "Lease Interest"), and Buyer hereby agrees to fully assume all of Seller's obligations associated with the Lease Interest at Closing, subject to the terms and conditions set forth in this Agreement.

**2. Purchase Price.** The purchase price shall be (**$170,113.66**), payable as follows:

    **2.1**    (**$0.00**) as non-refundable earnest money, to be wired within 48 hours from the execution of this Agreement, to Seller or a title company of Seller's choosing. Buyer understands and acknowledges that this earnest money obligation is effective upon the mutual execution of this Agreement, and failure to make the required earnest money deposit shall constitute an event of default pursuant to the terms and conditions set forth herein.

    **2.2**    The balance of the purchase price shall be wired, or otherwise transferred, to First American Title Company within twenty-four hours of closing.

**3. 1031 Exchange.** This Section shall only apply in the event the Buyer desires to have all or a portion of the transactions contemplated by this Agreement qualify for nonrecognition treatment under Section 1031 of the Internal Revenue Code of 1986, as amended (the "Code" with the

transaction being referred to herein as a "1031 Exchange"). For purposes of this Agreement, any portion of the Purchase Price that is to be paid with funds Buyer desires to qualify as a 1031 Exchange shall be referred to as "1031 Funds."

   **3.1**     The Seller agrees to reasonably cooperate in a 1031 Exchange transaction, which will provide that all or a portion of the purchase price for the Property will be paid with funds that Buyer desires to qualify for nonrecognition treatment (the "1031 Funds") by __N/A__ (the "Accommodator" which term shall include all requirements pursuant to the regulations under Section 1031 of the Code and guidance issued by the Internal Revenue Service relating to "qualified exchange accommodation arrangements" and "exchange accommodation titleholders"); provided, that the Seller shall (1) have a reasonable time to review any documents to be signed, (2) not incur any costs associated therewith (the Buyer will pay any costs that are incurred by Seller) and (3) not waive or relinquish any rights under the Agreement.  Buyer hereby indemnifies and holds the Seller free and harmless from any liability (including, but not limited to the tax ramifications to the Buyer of such tax-free exchange) arising by reason of performing the acts required hereby to effectuate such 1031 Exchange, except insofar as such liability is attributable to the failure of Seller to perform as required hereunder.

   *The Buyer acknowledges that it has been advised to obtain independent tax and legal advice regarding the transaction described herein and acknowledges and agrees that it has not relied upon any advice, statements or representations made by the Seller or any of the Seller's agents, employees, members, consultants, or attorneys. The Buyer acknowledges and agrees that the Buyer will consult tax and legal professionals regarding the 1031 Exchange and hereby waives any and all claims against the Seller, the Seller's agents, employees, members, consultants, or attorneys related to the 1031 Exchange.*

Buyer's Initials: _JR_  _JP_

   **3.2**     Notwithstanding anything to the contrary set forth in this Section, the Closing is not contingent or conditioned upon the Buyer being able to successfully complete a 1031 Exchange and the Closing Date shall not be extended to accommodate a 1031 Exchange.

**4. Title Insurance.**  At Settlement, Seller agrees to pay for an endorsement to the standard-coverage owner's policy of title insurance insuring Buyer in the amount of the Purchase Price.  In addition, any supplementary title insurance coverage shall be at Buyer's expense.

**5. "As Is" Condition.** Buyer acknowledges that it is buying Seller's interest in the Property, together with the improvements to be and/or being constructed thereon, "as is" and the physical condition of the Property, together with the improvements to be and/or being constructed thereon, is deemed to be satisfactory to the Buyer. Buyer is not relying and will not rely upon any representations and warranties of Seller or anyone acting or claiming to act by, through, or under Seller, or on Seller's behalf concerning the Property, including the improvements to be and/or being constructed thereon, the Lease, or any documents, studies, plans and/or any other materials delivered to Buyer by Seller. Buyer shall purchase the Seller's interest in the Property and the

DocuSign Envelope ID: 5953959B-25D2-4948-8A55-5769C1B4B4BE

Lease without recourse to the Seller or any employee, agent, officer, director, member or trustee of Seller, it being the intent of the parties that no liability of any kind or character shall ever attach to or be asserted against Seller or any employee, agent, officer, director or member of Seller for any reason or cause whatsoever, other than liability arising from Seller's fraud. Accordingly, except in the case of fraud, no law suit or cause of action shall ever be commenced, filed or prosecuted by Buyer against Seller or any employee, agent, officer, director or member of Seller, no judgment shall ever be taken, rendered or entered against any of them based upon the transactions contemplated in this Agreement. Buyer does hereby and shall defend, release, indemnify and hold harmless Seller from and against any and all claims, expenses, including reasonable attorney's fees, and liabilities arising under or in connection with the Property and the Lease from and after the Closing Date, other than liability arising from Seller's fraud.

**6. Closing.** Closing shall be on or before **January 4, 2019** 5:00 p.m. M.S.T., or sooner at Seller's discretion (the "Closing Date"). Subject to tender or payment at Closing as required herein and compliance by the Buyer with the other terms and provisions hereof, Seller shall execute and deliver a good and sufficient statutory warranty deed to Buyer at Closing, conveying Seller's interest in the Property and the Lease free and clear of all liens and encumbrances, except liens and encumbrances of record. In addition, at Closing the parties shall execute the following documents:

    **6.1**    Final Settlement Statement

    **6.2**    Tenancy in Common Agreement

    **6.3**    Property Management Agreement

**7. Closing Costs.** It is agreed that the escrow fees and other customary closing costs shall be paid by the Seller.

**8. Proration of Certain Items.**

    **8.1**    Except as expressly set forth in this Agreement, each party shall bear its own costs (including attorneys' fees) in connection with its negotiation, due diligence investigation and conduct of the Purchase and Sale Transaction.  Seller shall pay the cost of any prior survey initially delivered by Seller.  Seller shall pay the cost of the Survey, the premium for the standard coverage portion of the Title Policy, but not the cost of any extended coverage and endorsements obtained by Buyer as part of the Title Policy, and the recording fees.

    **8.2**    All real property taxes and assessments accrued for the current year shall be prorated between the parties as of the Closing.

    **8.3**    All transfer, proceeds or other taxes (not including general state and federal income taxes of Seller, if any) imposed upon this transaction by any state or local entity shall be paid by Seller.

**9. Arbitration.** Any dispute between the parties will be submitted to binding arbitration according to the Commercial Rules of the American Arbitration Association, but need not be filed with that

DocuSign Envelope ID: 5253956B-25D2-4948-8A55-5769C1B4B4BF

organization. Except for actions relating to the payment of money for services rendered, an action under this Agreement must be filed within 90 days of the date of closing pursuant to this Agreement. Arbitration will be conducted in Texas, before a single arbitrator. The parties will be entitled to conduct discovery in accordance with the Federal Rules of Civil Procedure as in effect when arbitration occurs, limited to document production and depositions and subject to further limitation by the arbitrator to secure just and efficient resolution of the dispute. If the amount in controversy exceeds $25,000, the arbitrator's decision will include a statement specifying in reasonable detail the basis for and computation of the award, if any. Judgment upon the award may be entered in any court having jurisdiction.

**10. Severability.** If any provision of this Agreement or any portion of any provision of this Agreement shall be deemed to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not alter the remaining portion of such provision, or any other provision hereof, as each provision of this Agreement shall be deemed severable from all other provisions hereof so long as removing the severed portion does not materially alter the overall intent of this Agreement.

**11. Time is of the Essence.** Time is of the essence hereof.

**12. Representation.** Buyer acknowledges that Seller has advised Buyer to seek competent legal advice and counsel from other professionals to evaluate the Property, Lease, tenant, due diligence items, and the terms and provisions of this Agreement. REAL ESTATE TRANSACTIONS ARE COMPLEX; THE SELLER DOES NOT REPRESENT YOU AND CANNOT GIVE YOU LEGAL ACCOUNTING OR REAL ESTATE ADVICE. PLEASE REVIEW ALL DUE DILIGENCE MATERIALS WITH ANY ATTORNEY OR ADVISOR OF YOUR OWN CHOOSING AT YOUR EXPENSE PRIOR TO EXECUTING THIS CONTRACT.

**13. Attorneys' Fees.** If there is any litigation between Seller and Buyer to enforce or interpret any provisions or rights under this Agreement, the unsuccessful party in such litigation, as determined by the court, shall pay to the successful party, as determined by the court, all costs and expenses, including but not limited to reasonable attorneys' fees, incurred by the successful party, such fees to be determined by the court sitting without a jury.

**14. Entire Agreement; Binding Effect.** This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof, and any prior agreements pertaining hereto, whether oral or written, have been merged and integrated to this Agreement and have been superseded by this Agreement. This Agreement shall be binding upon and shall inure to the benefit of the parties hereof and their respective successor, legatees, heirs, legal representatives and permitted assigns. No subsequent modifications of any of the terms of this Agreement shall be valid, binding upon the parties, or enforceable unless made in writing and signed by the parties.

**15. Counterparts and Facsimile Documents.** This Agreement may be signed in counterparts, and each counterpart bearing an original signature shall be considered one document with all others bearing original signatures. Also, facsimile transmission or other electronic transmission of any signed original document shall be the same as delivery of an original.

**16. Default.** If Buyer defaults in the performance of its obligations under this Agreement, Seller's sole and exclusive remedies shall be to (a) retain the earnest money as and for its liquidated

DocuSign Envelope ID: 5953953B-25D2-494B-8A55-5769C1B4B4BE

damages if the earnest money has been received by Seller, or (b) to sue Buyer for the earnest money if Buyer has failed to make the required earnest money deposit as of the date of default. All parties agree that because of the impracticability and extreme difficulty of fixing and ascertaining actual damages that Seller would in such event sustain by reason of such default of Buyer, and the amount of earnest money is agreed to be equivalent to the damages that Seller would sustain for a breach by Buyer. Upon the occurrence of default by Buyer, the Seller's remedies hereunder shall be immediately exercisable without the requirement of further written authorization from or notice to Buyer. If Seller defaults in the performance of its obligations under this Agreement or otherwise breaches the provisions herein, the earnest money shall be immediately delivered to Buyer as Buyer's sole and exclusive remedy.

**17. Release of Information.** Buyer authorizes and instructs the title company to release any and all information pertaining to the Buyer's closing, as requested by Seller.

**18. Governing Law.** This Agreement will be subject to, and governed by the laws of the state of Texas.

**19. Waiver.** The waiver by any party hereto of any right granted to it hereunder shall not be deemed to be a waiver of any other right granted hereunder, nor shall the same be deemed to be a waiver of a subsequent right obtained by reason of the continuation of any matter previously waived.

**20. Buyer Acknowledgements.** The Property may already be constructed or in some stage of development. Buyer approves and acknowledges that this transaction may involve a simultaneous closing. Simultaneous Closing is defined herein as the Seller acquiring the property and selling it to the Buyer all on the same day.

**21. Further Assurances.** Each party agrees (a) to execute and deliver such other documents and (b) to do and perform such other acts and things, as any other party may reasonably request, in order to carry out the intent and accomplish the purposes of this Agreement, including but not limited to signing any amendment to this Agreement if subsequent to the execution of this Agreement it is discovered that this Agreement must be modified to conform to Texas real estate laws.

Signature page to follow

DocuSign Envelope ID: 5E53955B-25D2-4948-8A55-5769C1B4B4BE

        IN WITNESS WHEREOF, the parties have set their hands and seals effective the day and year first above written.

**SELLER:**       Rockwell Debt-Free Properties, Inc.

By: _Christopher J. Ashby_

Name: ____Christopher J. Ashby____

Title: _____President_____


**BUYER:**       J & J Real Estate Investments, LLC an Indiana limited liability company

By: _Joseph Rogers_

Name: Joseph Rogers, Manager

By: _Jessica Rogers_

Name: Jessica Rogers, Member

DocuSign Envelope ID: 5953959B-25D2-4948-8A55-5769C1B4B4BF

# EXHIBIT A

## Property Description

TRACT 1: (Fee Simple)

Being all of Lot 3R, Block A, of Headquarters Village, an Addition to the City of Plano, Collin County, Texas, according to the replat thereof recorded in Volume 2015, Page 598, Map Records, Collin County, Texas.

TRACT 2: (Non-Exclusive Easement Estate)

Non-Exclusive Easement rights granted pursuant to Declaration of Easements and Restrictive Covenants Regarding the Lakes Systems for Haggar Square as described in Article VI therein recorded in Volume 5058, Page 2633, and under cc# 03R16449 Real Property Records of Collin County Texas.

TRACT 3: (Non-Exclusive Easement Estate)

Non-Exclusive Easement rights granted in Reciprocal Easement Agreement entered into as of 05/01/2007, by and between Headquarters, L.P., Headquarters II, L.P., ASG Preston Creek Retail Center, Ltd., and Haggar Square Owners Association, Inc., filed 06/20/2007, and recorded under cc# 20070620000842970, Real Property Records of Collin County, Texas

TRACT 4: (Non-Exclusive Easement Estate)

Non-Exclusive Easement rights granted in Reciprocal Easement Agreement entered into as of 03/30/2007, by and between Headquarters, L.P., and Headquarters II, L.P., filed 06/20/2007, and recorded under cc# 20070620000842980, Real Property Records of Collin County, Texas. Note: The Company is prohibited from insuring the area or quantity of the land described herein. Any statement in the above legal description of the area or quantity of land is not a representation that such area or quantity is correct, but is made only for informational and/or identification purposes and does not override Item 2 of Schedule B hereof.

DocuSign Envelope ID: 5263959B-25D2-4948-8A55-5769C1848BF

## EXHIBIT B

## Description of Lease

LEASE GUARANTOR Noah Corporation
LEASE TERM 20-year initial term
RENT INCREASES 2% annual escalations
RENEWAL OPTIONS Two 10-year renewal options

# EXHIBIT 3



PROPERTY ADMINISTRATOR AGREEMENT<br>(Noah's - 5280 Towne Square Drive, Plano, TX 75024)

This PROPERTY ADMINISTRATOR AGREEMENT (this "Agreement") is made this **27th** day of **November**, **2018** ("Effective Date") by and between the undersigned tenant in common (TIC) owners and any tenant in common owners that execute a counterpart to this Agreement (collectively, "Co-owners") of the property located at <u>5280 Towne Square Drive, Plano, TX 75024</u> ("Property") and LeFevre Management, Inc., a Utah corporation d/b/a Cadence Property Administrators ("Property Administrator" or "PA", together with the Co-owners, the "Parties").

RECITALS

A.      The Co-owners own the Property as tenants in common pursuant to that certain Tenancy in Common (TIC) Agreement with an original effective date of <u>December 7, 2018</u>, by and among the Co-Owners (the "TIC Agreement").

B.      The Property is subject to a lease by and between the Co-owners' predecessor in interest to the Property and <u>Noah's</u> ("Tenant") dated <u>December 1, 2018</u> (the "Original Lease").

C.      The Property Administrator is in the business of providing administration services for properties owned by tenants-in-common similar to the Property and has the qualifications, financial resources, and experience to perform all aspects of this Agreement.

D.      The Co-owners desire to employ Property Administrator in the administration of the Property, as outlined herein, and Property Administrator desires to assume such duties upon the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** for valuable consideration, including the promises, covenants, representations and warranties hereinafter set forth, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally and equitably bound, agree as follows.

AGREEMENT

1.      **Engagement of Property Administrator**: During the Term of this Agreement defined below, Property Administrator agrees, for and in consideration of the compensation hereinafter provided, and Co-owners hereby appoint, or accept the previous appointment of, the Property Administrator, subject to the terms of this Agreement, to perform the work set forth herein.  Everything performed by Property Administrator under this Agreement shall be done as

1

an independent contractor of Co-owners. All obligations or expenses incurred in accordance with the terms of this Agreement, including the pro rata portion used in connection with or for the benefit of the Property shall be for the account of, on behalf of, and at the expense of the Co-owners except as otherwise specifically provided; provided, however, Co-owners shall not be obligated to reimburse Property Administrator for overhead expenses of Property Administrator, except such overhead expenses as set forth in an approved budget.

    2.    **Term**: The Term of this Agreement shall expire on December 31, 2019.

    3.    **Termination by Co-owners**: During the Term of this Agreement, the PA may only be terminated by written notice authorized and signed by all of the Co-owners of the Property and with stated cause and provided to Property Administrator at least sixty (60) days prior to the termination date.

    4.    **Termination by Property Administrator**: The PA may terminate this Agreement at any time by providing written notice to Co-owners sixty (60) days prior to the termination date.

    5.    **Automatic Extension**: If the PA does not receive written notice of termination at least sixty (60) days prior to the end of the Term of this Agreement signed by all of the Co-owners of the Property, this Agreement shall automatically renew for another twelve (12) months and according to the terms herein.

    6.    **Nature of Relationship**: The Property Administrator shall, except as provided herein, in the name of and on behalf of Co-owners and at Co-owners' expense act as Co-owners' agent and perform the work and duties described herein. The PA is engaged for the work and duties described herein only. The PA retains the sole right to control or direct the manner in which the work and duties described herein are to be performed. The PA hereby represents that the PA has obtained all stated and necessary insurance and licensing required under this Agreement or by law and will maintain all policies in good standing until the completion of the work and duties herein. The PA also understands and agrees that neither the Co-owners shall be withholding any taxes on behalf of the PA and that the PA is responsible for any and all tax liability, local, state, federal or otherwise, for compensation received under this Agreement.

    7.    **Compensation**: Co-owners agree to compensate the PA for the work and duties described herein as follows:

    a.    <u>Monthly Fee</u>: The PA shall receive a fee of <u>$35</u> per month for the work and duties provided hereunder. In the event the Term of the Agreement is extended, automatically, or otherwise, the Monthly Fee may be increased according to the mutual written agreement of the Parties.

    b.    <u>Additional Services</u>: In the event the Co-owners engage PA to perform any work beyond the work and duties set forth in this Agreement, the PA will be entitled to payment according to a separate agreement between the PA and the Co-owners.

DocuSign Envelope ID: 5953959B-25D2-4948-8A55-5769C1B4B4BF

       8.    **Property Administrator Work and Duties**: The PA shall provide the following work and duties:

       a.    <u>Rent</u>: The PA shall collect monthly rent either directly from the tenant of the Property or from the property manager hired under separate agreement to manage the Property. The PA shall deduct any of the PA's fees and costs expressly authorized by this Agreement and disperse the net rent to Co-owners along with a monthly statement within five (5) days of the receipt thereof. Rents are considered received by the PA at the time such deposit has cleared the PA's bank account.

       b.    <u>Tax Forms</u>: The PA shall provide 1099 forms to the Co-Owners.

       c.    <u>Representation of Co-owners</u>: The PA shall be the representative of the Co-owners to the Tenant and/or the Tenant's property manager for all matters related to herein. The PA may also assist the Tenant with obtaining insurance, the processing of payment to insurance companies, tax authorities, or other third party service providers related to the Property. However, any fees paid to the PA for such services shall be paid directly to the PA by the Tenant and not the Co-owners and shall be in addition to the Fees paid to PA by the Co-owners.

On occasion there could be instances where the PA must interface with other third parties (contactors, service providers, taxing authorities, etc.) on behalf of the co-owners. If this activity entails more than two hours in any given calendar month, the PA will be entitled to compensation of $75.00 per hour and will provide a detailed written invoice to the Co-Owners of such activity. Payment of this invoice will be deducted from the monthly rent payment in a prorated fashion.

       d.    <u>Notices to and Voting of Co-owners</u>: The PA shall notice and conduct any vote of the Co-owners required under the TIC Agreement, this Agreement and/or any other agreement or law governing the Co-owners.

       e.    <u>Sale of Co-owners' Undivided Interest</u>: The PA shall assist any Co-owner desiring to sell its undivided interest in the Property by providing written notice of the offer to sell to the other Co-owners as required by section 8.3 and 8.4 of the TIC Agreement (see Exhibit A – "Process for Sale of TIC Interests"). Should the selling Co-owner desire to engage the PA to provide further services in connection with the closing of such sale, the selling Co-owner shall pay a fixed fee of $500 to the PA for those services. In the event no other Co-owner responds to the written offer to sell, the selling Co-owner may engage the PA to assist in the sale and closing of the undivided Property interest for a flat fee of $750 to an existing owner of another similar party sold by Rockwell. If the Co-owner desires PA assistance in selling their interest beyond current and similar owners listed above, then such transaction will be negotiated and mutually agreed upon in writing by the PA and the selling Co-owner.

       f.    <u>Tenant Lease Renewal</u>: The PA shall assist with the renewal of the Lease with any existing tenant of the Property at the end of such Lease.

DocuSign Envelope ID: 5653953B-25D2-4948-8A55-5769C1B4B4BE

g.     Insurance Claims: The PA shall notify all Co-owners regarding any
insurance claim, providing all relevant details of the occurrence requiring such a claim. The PA
shall be authorized to make such claim with any insurance company unless specifically
instructed in writing not to do so by a Co-owner. The PA shall facilitate all documentation for
such claim.  Please refer to section 14 below for additional insurance information.

9.      **Co-owners Share of Property Costs**: In the event that any repairs (those items
outside the lease agreements with tenants) are required of the Co-owners, then all Co-owners
shall share, in accordance with their percentage ownership interest in the Property, in the cost of
such repairs. The Co-owners may direct the PA, by way of separate agreement signed by at least
a simple majority of the Co-owners, to withhold a portion of each Co-owners' net monthly rent
to set aside in a reserve account for such repairs. The PA shall act as a fiduciary of such reserve
account, with all the same duties and obligations of agency provided for hereunder. Any such
reserve account shall be the property of the Co-owners and, unless the PA receives written
instruction otherwise, the PA shall release Co-owners' share of the reserve to the Co-owners in
the event of sale of the Property, cancellation or termination of the Lease, or Co-owners' sale of
Co-owners' interest in the Property.

10.     **Property Administrator Reimbursement**: Prior approval of the Co-owners shall
not be required for monthly or recurring operating charges, for bills less than $1,000.00 per
instance, or if in Property Administrator's opinion emergency expenditures over the maximum
are needed to protect the Property from damage, prevent injury to persons, avoid suspension of
necessary services, avoid penalties, fines, or suspension of services to Tenant called for in the
Lease or rental agreement or by law. If, for any reason, this Agreement is cancelled, all bills shall
be paid before any proceeds are disbursed to the Co-owner. Property Administrator shall not be
required to advance Property Administrator's own funds in connection with the Property or this
Agreement. However, if Property Administrator elects to advance any funds, Co-owners shall
promptly repay to Property Administrator, within five (5) business days of Property
Administrator's written request, the amount advanced. Funds advanced by the Property
Administrator shall accrue interest at the rate of 2% monthly and the accrued interest shall be
paid to the Property Administrator from the Co-owners' account proceeds before any funds are
disbursed to Co-owners. Co-owners shall pay for any collections costs incurred for Property
Administrator to cure past due accounts, including reasonable attorneys' fees.

11.     **Sale of Property**: In the event the Co-Owners elect to sell the Property, the PA
may submit a bid to list and sell the Property for the Co-owners. Any such listing or sales
agreement shall be by separate written agreement.

12.     **Vacating Tenant**: In the event the Tenant vacates the Property, the PA may
submit a bid to procure a new tenant. Any such service shall be by separate written agreement.

13.     **Indemnification**: The Co-owners shall indemnify, defend and hold the Property
Administrator harmless from all suits or other claims not arising out of gross negligence by
Property Administrator, including but not limited to, those alleging any negligence of
Property Administrator or its employees in connection with the Property, Co-owners, or
management  thereof, and from liability for damage to the Property and the injuries to

DocuSign Envelope ID: 5953959B25D2-4948-8A55-5769C184B4BE

or death of any employee or other person. The Co-owners shall pay all expenses incurred by Property Administrator, including, but not limited to, all attorneys' fees, costs and expenses incurred to represent Property Administrator or Property Administrator's employees in regard to any claim, proceeding, or suit, in connection with or arising out of this Agreement or the fulfillment of any of Property Administrator's obligations hereunder.

14.     **Property and Liability Insurance**. The Co-owners shall assure that property and liability insurance policies are in place on the Property at all times as per the terms of the lease. All co-owners are provided a copy of the lease at closing.  In most cases, this policy will be paid by the tenant on behalf of the Landlord.  There are some cases when the co-owners will be responsible for the liability portion of the landlord insurance.  The PA will assist co-owners in obtaining required landlord insurance.  The Tenant is also required to carry a separate Tenant Property and Liability insurance policy per the lease.  The PA will verify and ensure all policies are in place and current.

**Please note:**  It is the co-owner's responsibility to understand the requirements and coverage of the policies called for in the lease.  For example, stated policies exclude damage done by earthquakes or floods, unless the property is in a flood zone.  If the co-owners wish to purchase additional coverage than that provided in the Landlord policy, a majority vote will be required and additional premium costs will be prorated as per each ownership interest.

The PA will keep the Insurance Agent (Landlord's policy) updated regarding any changes in property ownership through the life of the lease.

15.     **Writing Requirement**: Any writing required of the PA or Co-owners hereunder for approval or voting purposes may consist of a signed, written document mailed to the address below or an email sent to the email address below, or originating from any obligated party. Any mail sent to a physical address shall be deemed delivered three (3) days after deposit into the United States Postal Service. All legal documents will be sent registered, certified or overnighted at Co-owners' expense.

16.     **Modifications**: No modification of this Agreement is permitted during the Term of this Agreement without the advance, written authorization of all of the Co-owners and the Property Administrator. In the event of an automatic renewal of this Agreement, then such renewal shall be without amendment or modification of this Agreement, except as otherwise provided for herein.

17.     **Attorney's Fees**: In any action, proceeding, arbitration or mediation arising out of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees.

18.     **Binding Effect.** This Agreement will be binding upon and will inure to the benefit of each of the Co-owners and their respective heirs, executors, administrators, legal representatives, successors, and assigns.

19.     **Multiple Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but when taken together shall constitute

DocuSign Envelope ID: 5B539E9B-25D2-4948-8A55-5769C1B484BF

one and the same agreement.  Facsimile and photocopy signatures, including those delivered electronically in .pdf format, shall be binding and effective and shall have the same force and effect as original signatures.

20.     **Authority.**  Each person who signs this Agreement on behalf of any Party to the Agreement represents that he or she has been duly authorized by that Party to enter into this Agreement and to bind the Party.

21.     **Partial Invalidity and Integration**: Should any section of any part of any section of this Agreement be rendered  void, invalid or unenforceable for any reason by a court or law exercising competent jurisdiction, such a determination  shall not render void, invalid or unenforceable any  other  section or any part of any section in this Agreement. The drafting, execution and delivery of this Agreement by the Parties have been induced by no representations, statements, warranties or agreements other than those expressed in this Agreement. This Agreement  embodies the entire understanding of the Parties, and there are no further or other agreements or understandings, written or  oral, in effect between the Parties relating to the subject matter hereof, unless expressly referred to in this Agreement.

22.     **Governing Law**: This Agreement will be subject to, and governed by, the laws of the State of Utah.

*[Signatures on following page]*

DocuSign Envelope ID: 5253959B-25D2-4948-8A55-5769C1B4B4BF

**PROPERTY ADMINISTRATOR**:

LEFEVRE MANAGEMENT, INC., a
Utah corporation d/b/a
Cadence Property Administrators

By: 
Scott LeFevre, Principal

**CO-OWNERS:**

J & J Real Estate Investments, LLC an Indiana limited liability company

By: 
Joseph Rogers, Manager

By:
Jessica Rogers, Member

1389470

## **EXHIBIT A**



## **PROCESS FOR SALE OF TIC INTERESTS**

As outlined in your Tenancy-in-Common (TIC) agreement with the other co-owners of the property purchased from Rockwell Debt-Free Properties, if you as a co-owner desire to sell all or part of your TIC ownership, adherence to the following process is required and will result in a professional and efficient interaction for all parties involved.

Per the TIC agreement, each of the other co-owners have the first right to purchase from another selling co-owner (Section 8.3 & 8.4).  Should no buyers emerge from this group, then the seller may market and sell the property as they wish.

Cadence Property Administrators (PA) will coordinate the communication and exchange of information to co-owners in this action, and if desired, will also communicate this "sale" information to owners/investors of other similar properties.

**Step 1:**
Co-owner shall complete, sign, scan, and email the attached TIC Sale Information Sheet to sell@cadencepa.com.

**Step 2:**
Upon receipt, PA will notify the other co-owners in the property.  This information will be emailed to each co-owner at the email on file.  Interested recipients will then have 15 days to respond to the PA to initiate discussion and negotiation with the seller.  PA will field inquiries and connect these co-owners immediately.  Please work through the PA in this communication.

**Step 3:**
If an agreement is made between co-owners, PA will, upon seller's request, facilitate the transaction for a fixed fee of $500 (per the PA agreement).  If parties to the sale wish to conduct this transaction on their own without PA assistance, they are welcome to do so, or use another facilitator.  Any additional costs required to convey the interests shall be split equally between the selling co-owner and the buying co-Owner, or by other mutually agreed upon terms.

**Step 4 (if needed):**
If no co-owners in the property express an interest in purchasing the subject TIC share within the required timeframe, the seller can ask the PA to share this property sale information with other owners of similar type properties.  PA will field inquiries and connect interested parties with the seller.

If an agreement is made between these parties, PA will, upon seller's request, facilitate the transaction for a fixed fee equal of $750 (per the PA agreement).  If parties to the sale wish to conduct this transaction on their own without PA assistance, they are welcome to do so, or use another facilitator.  Any additional costs required to convey the interests shall be split equally between the seller and buyer, or by other

mutually agreed upon terms.

## **Additional Information**

As outlined in the TIC agreement, if no other co-owner in the property purchases the Seller's interest, the Seller can market the property in any legal manner desired , including but not limited to, listing the property for sale on a multiple listing service (either "MLS only" or with a listing Broker), listing the property on other sites that are dedicated to selling fractional interests, or by notifying a property sponsor (like Rockwell Debt Free Properties) of the availability of the property for one of their client's exchange or cash requirements.

If Seller does not take advantage of the service under Step 4, or does, but ultimately negotiates a sale with an outside third party (not notified or coordinated through the PA), Seller may hire and negotiate the services of other professionals/agents as they so choose.   PA may be one of those parties hired and fees will be negotiated separately in this instance.

## **Cadence Commitment**

Cadence Property Administrators is committed to providing owners with timely and professional assistance as outlined in the PA Agreement and the steps above.

# Direct Deposit

Complete the form below to authorize Cadence Property Administrators (PA) to directly deposit your monthly net rental income into your bank account of choice.  We have found that Direct Deposit is absolutely the safest and fastest method of payment and ask you to accept this method of payment.  Your information is completely secure and will not be shared with anyone. If you have any questions, please call Scott LeFevre at Cadence Property Administrators at 801-828-6888.

Owner Name/Entity: J & J Real Estate Investments, LLC an Indiana limited liability company

Address: 4549 North County Road, 400 East, Pittsboro, IN 46167

Phone: 317-417-0385

Email: Joe.Rogers@ads-pipe.com

Property (Tenant/City/State): Noah's – Plano, Texas

Bank Name:  ███████████████

Routing #: (9 digits): ███████    [X] Checking or [ ] Savings #  ███████████

I authorize the Property Administrator and my bank to automatically deposit my rent payments into my account listed above (this includes my authorization to correct entries made in error.) I agree that the ACH transactions authorized herein shall comply with all applicable U.S. Law. This authorization will remain in effect until I give written notice to cancel it.

Signature: *Joseph Rogers*        Date: 12/21/2018
— DocuSigned by —
18994EA17E8F499...

Signature: *Jessica Rogers*        Date: 12/21/2018
— DocuSigned by —
18994EA17E8F499...

10

# EXHIBIT 4

DocuSign Envelope ID: 5953950B-25D2-4948-8A55-5769C1B4B4BE

## TENANCY IN COMMON AGREEMENT

THIS TENANCY IN COMMON AGREEMENT (this "Agreement") is entered into as of the **27th** day of **November**, **2018**, by and among the parties that execute this Agreement or a counterpart to this Agreement (the "Owners"). The Owners may be referred to herein individually as a "party" or collectively as the "parties."

## RECITALS

A.      The Owners have jointly purchased certain real property, which is more particularly described on Exhibit A (the "Property").

B.      The Owners hold legal title to the Property as tenants in common.

C.      The Owners desire to enter into this Agreement to govern their relationship with respect to the Property. The Owners intend that their relationship with respect to the Property shall be as tenants in common. The Owners do not intend that any provision of this Agreement shall be construed as establishing a partnership, joint venture, trust, or other business entity.

D.      The Owners intend that their relationship meet the requirements for a private letter ruling under Rev. Proc. 2002-22.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual covenants and promises herein made, and in consideration of the representations and warranties herein contained and for other good and valuable consideration the receipt and adequacy of which are hereby acknowledged, the Owners, intending to become legally bound, hereby agree as follows:

*1.   **Nature of Ownership**.* The Owners hereby agree that they shall continue to hold title to the Property as tenants in common. The Owners agree that they shall not take any action, or fail to take an action, that would cause the ownership of the Property to be classified as a partnership, joint venture, or other business entity. The Owners shall not file any tax return, statement, form, or other document with any governmental body or agency that would cause the Owners' arrangement to be classified in any manner other than as the co-ownership of real property as tenants in common. The Owners shall not: (a) conduct any business under a common name; (b) execute any agreement or other document identifying any or all of the Owners as partners, shareholders, or members of a business entity; or (c) otherwise hold out their relationship as a partnership or other form of business entity. Notwithstanding any other provision of this Agreement, under no circumstances may the number of Owners exceed 35 (counting husband and wife as a single person).

*2.   **Ownership Interests.*** The names of the Owners and their percentage share of undivided interests in the Property ("Ownership Percentages") are set forth on Exhibit B.

*3.   **Management of the Property**.* The Owners hereby agree that the Property shall be

1

operated and managed subject to the following requirements:

 **3.1.**   ***Expenses.*** With the exception of those expenses paid by the tenant as set forth in the lease agreement, any expenses incurred with respect to the Property shall be the Owners' obligation. Each Owner shall pay its share of expenses in amount proportionate to the Owner's Ownership Percentage. Payment must be made within 30 days of receipt by the Owner of a written notice showing the amount needed to cover such Owner's share of the Property's expenses.

 **3.2.**   ***Improvements.*** In the event the Owners improve the Property, subject to the consent provisions outlines in Section 6.1, each Owner shall be obligated for such improvement costs in an amount proportionate to the Owners' Ownership Percentages. The Owners shall have the option to determine whether to assess each Owner for such Owners' proportionate amount of the improvement costs or whether to finance the total improvement costs as a joint debt of the Owners. In the event an assessment is made, payment must be made within 30 days of receipt by the Owner of written notice of the amount needed to cover such Owner's share of improvement costs.

 **3.3.**   ***Mortgage Indebtedness.*** The Property, in the future, may be encumbered by one or more blanket construction or blanket permanent loans, which may be secured by a mortgage or trust deed against the Property ("Mortgage Indebtedness"). The Owners agree that no Mortgage Indebtedness may be obtained from an Owner, a manager, a lessee, or a person related to an Owner, a manager, or a lessee. The Owners agree the Mortgage Indebtedness and the expenses of incurring or complying with the terms thereof will be the responsibility of the Owners in accordance with their Ownership Percentages. Each Owner must pay any principal or interest due on any Mortgage Indebtedness in proportion to their Ownership Percentage. In the event that a Mortgage Indebtedness is refinanced, any proceeds from the refinancing not used to pay Mortgage Indebtedness, costs, or expenses will be distributed to the Owners in accordance with the Owner's Ownership Percentage. Gross receipts from the operation of the Property or from the sale of the Property must be applied by each Owner to pay Mortgage Indebtedness in accordance with the Ownership Percentage. These obligations will exist despite any agreement by the Owners to be jointly and severally liable on any Mortgage Indebtedness and will not affect the relationship between the Owners and the lenders of any Mortgage Indebtedness.

 **4.**   ***Default.*** Failure of any Owner to pay such Owner's proportionate share of any amount due within 91 days of the date that the Owner is notified (verbally, electronically, or by registered mail) it is due under this Agreement shall constitute a Default and shall give the other Owners the right to purchase the defaulting Owner's interest in the Property on the terms and conditions provided in Section 8. Alternatively, any other Owner has the option, but not the obligation, during such time as the defaulting Owner is in default, to advance an amount of money equal to the amount of the payment the defaulting Owner was requested to make. Such advance will be considered to be a recourse loan to the defaulting Owner bearing interest at the rate of 15 percent per annum and payable on demand, and in any event within a period not to exceed 31 days from the date of the advance. Until such advance and any accrued and outstanding interest are paid in full, any distribution or proceeds payable to a defaulting Owner due to such Owner's interest in the Property are assigned to and will be paid to the advancing Owner (with the understanding that such amounts will be treated as having been paid to the defaulting Owner and thereafter paid by

DocuSign Envelope ID: 5653959B-25D2-4948-8A55-5769C1B4B4B6

the defaulting Owner to the advancing Owner).

### 5. Revenue, Expenses, Deductions, and Disbursements

**5.1.** **Revenue, Expenses, and Deductions.** The revenues, expenses, and deductions from the operation and any sale of the Property will be shared by the Owners in proportion to their Ownership Percentages.

**5.2.** **Disbursements.** Proceeds received from any sale or refinancing of the Property, or from the condemnation or destruction of any of the Property, after such Proceeds have been used to pay any (1) encumbrance or Mortgage Indebtedness on the Property, (2) anticipated expenses, and (3) reasonable reserves for contingencies as determined by the Owners, will be disbursed to the Owners in proportion to their respective Ownership Percentages. However, the Owners may determine to use part or all of the proceeds to reduce or repay any Mortgage Indebtedness, contract, or other liability incurred in connection with the Property and to disburse any balance of the proceeds.

### 6. Owner Activities and Voting

**6.1.** **Voting.** Unless otherwise specified, all decisions under this Agreement must be approved by a vote of Owners who own more than 50 percent of the Ownership Percentages in the Property. Notwithstanding the foregoing, any sale of all the Property, lease or re-lease of all or any portion of the Property, any negotiation or renegotiation of any mortgage indebtedness, the hiring or firing of any manager, or the negotiation of any management contract (or any extension or renewal of that contract) must be by **unanimous** approval of the Owners. In the event that legal action is initiated by any Owner(s) to enforce the decision making structure of this Section 6, the prevailing party or parties shall be entitled to recover the costs thereof from the non-prevailing party or parties. An Owner who has consented to an action in conformance with this Section 6 may provide a power of attorney to any person to execute a specific document with respect to that action, but may not provide to any person a global power of attorney to act with respect to the Owner's interest in the Property.

**6.2.** **Owners' Right to Manage/Management Agreements.** Owners have the right and obligation to manage the Property. The Owners may enter into identical management or brokerage agreements, which must be renewable at least once a year. Any such agreement shall not be with a lessee of the Property. The management agreement may authorize the manager to: (i) maintain a common bank account for the collection and deposit of rents; and to (ii) offset expenses associated with the Property against any revenues before disbursing each Owner's share of net revenues. In all events, however, the management agreement must require the manager to disburse to the Owners their share of net revenues in a timely manner. The management agreement may also authorize the manager to prepare statements for the Owners showing their share of revenue and costs from the Property. In addition, the management agreement may authorize the manager to obtain or modify insurance on the Property, and to negotiate modifications of the terms of any lease or any Mortgage Indebtedness subject to approval of the Owners under Section 6. Any fees to be paid by the Owners to any manager, broker, or other Owner i) may not exceed the fair market value of the services provided, ii) must be comparable to fees paid by unrelated parties for

DocuSign Envelope ID: 5F539559-25D2-4948-8A55-5769CDAB48BF

similar services, and iii) may not depend in whole or in part on the income or profits derived from the Property. This requirement will not prevent a management fee that is based on gross receipts.

**6.3.     No Business Activities.** The Owners may engage only in Property-related activities that are customarily performed in connection with the maintenance and repair of rental real property. See Rev Rule 75-374, 1975-2 CB 261. Activities will be considered customary if they would not prevent an amount received by an organization described in IRC § 511(a)(2) from qualifying as rent under IRC Section 512(b)(3)(A) and the regulations thereunder. Activities of Owners will include activities of their agents, property managers and entities controlled by the Owners, but will not include activities of Owners (or the entities they control) who have been Owners for less than six months.

**6.4.     Leases.** All leases must be bona fide leases for federal tax purposes. Rents paid by a lessee must reflect the fair market value for the Property. The determination of the rent amount must not depend in whole or in part on the income or profits derived by any person from the leased Property (other than fixed income based on a fixed percentage or percentages of receipts or sales), cash flow, increases in equity, or similar arrangements.

**6.5.     No Compensation.** None of the Owners nor their agents or representatives will be entitled to any compensation for management or other services rendered in connection with the Property unless such compensation is expressly authorized by the unanimous consent of the Owners.  In addition, notwithstanding any agreements, discussions, or understandings to the contrary, neither Rockwell Debt Free Properties, Inc., nor any of its principals, shareholders, officers, agents, directors, employees, or affiliates shall be entitled to any compensation for management or other services rendered in connection with the Property.

**7.     Liens and Encumbrances.**  Each owner shall have the right to encumber the Owner's undivided interest in the Property except as may be prohibited by the terms of any Mortgage Indebtedness and as further provided in this Section 7.  In the event that an Owner separately encumbers the Owner's Ownership Percentage in the Property or suffers an encumbrance against that Ownership Percentage (including without limitation any judicial attachment, any judgment lien, any lien arising out of the order or judgment of any court, any lien in connection with taxes claimed due to any governmental unit, and any lien arising under federal or state bankruptcy or insolvency laws), the Owner does hereby indemnify and hold each of the other Owners harmless from and against any and all claims, costs, demands, and expenses (including reasonable attorney fees) relating to such Owner Encumbrance. No Owner may acquire an Ownership Percentage in the Property utilizing debt financing from another Owner, the manager, or any lessee of the Property.

**8.     Transfer or Partition of Ownership Interest**

**8.1.     Restrictions on Sale.** An Owner may sell, convey, transfer, or seek a partition of the Owner's undivided interest in the Property during life or upon death or disability only in compliance with the terms of this Section 8. If the Owner is a corporation, limited liability company, partnership, trust, or other business entity (an "Owner Entity"), an interest in such Owner Entity may be sold, conveyed, or transferred only in compliance with the terms of this

DocuSign Envelope ID: 5953B59B-25D2-4948-8A55-5769C0484B5E

Section 8. Upon death or disability, the legal representative of the Owner will have authority to act on behalf of the Owner.

    **8.2.**      *Transfer to Permitted Transferee.* An Owner may sell, convey, or transfer the Owner's interest in the Property to the Owner's spouse or children, or to an Entity owned only by the Owner or the Owner's spouse or children, without the consent of the other Owners and without compliance with the first-offer provisions of Section 8. An Owner may sell, convey, or transfer the Owner's interest in an Owner Entity to the spouses or children of the Owner without the consent of the other Owners and without compliance with the first-offer provisions of Section 8. In either of the above situations, however, no such transfer, sale or conveyance will be valid if it causes the resulting number of total Owners in the Property to exceed 35, per the terms and provisions of Paragraph 2 herein.

    **8.3.**      *Right of First Offer.* An Owner may not sell, convey, or transfer the Owner's undivided interest in the Property, or seek a partition of the Owner's undivided interest in the Property, unless the Owner (the "Selling Owner") first offers to sell the Selling Owner's undivided interest to the other Owners under the terms of this Section 8.

    **8.4.**      *Offers to Other Owners.* The Selling Owner must, in writing, offer the Selling Owner's undivided interest in the Property to each of the other Owners. The means of communicating the offer to the other Owners shall be via written communication from the property manager by email or similar means. The other Owners shall have 15 days to submit to the Selling Owner an offer for the interest. If the Selling Owner receives no responses after the 15th day, he/she/they/it shall be free to market the undivided Property interest elsewhere.

    **8.5.**      *Fair Market Value.* The accepted interests of the Selling Owner in the Property must be purchased for the entire Property's fair market value multiplied by the Ownership Percentage being purchased.

    **8.6.**      *Closing.* The sale of the Selling Owner's interest in the Property must close on the date agreed to by the parties, unless no such date has been agreed to, in which case the sale will close 30 days after the later of: (i) the date the parties agreed on the fair market value of the Property; or (ii) the date of the arbitrator's determination. The obligation of the Selling Owner to close is subject to obtaining the consent of the holders of any Mortgage Indebtedness. Any purchasing Owner must pay the purchase price in cash. The Selling Owner must execute a warranty deed conveying the property free and clear of any lien or encumbrance that is exclusive to the interest being sold. Any transfer taxes must be paid by the Selling Owner. Real property taxes and rents will be prorated to the day of closing. The sale will close in escrow and the Selling Owner must pay one-half of any closing costs, and the purchasing Owner(s) must pay the other half in proportion to the interest in the Property they are purchasing from the Selling Owner.

    **8.7.**      *Execute Agreement Counterpart.* Except for a purchaser pursuant to a partition action, the transferee of an Owner's interest (whether all or a portion) in the Property must execute a counterpart to this Agreement acknowledging the transferee's intent to be bound by this Agreement.

**8.8.** **_Right to Purchase Following Default._** In the event of a default by an Owner under Section 8, any non-defaulting Owner may, in a writing sent to all of the Owners, declare that the non-defaulting Owner desires to purchase the interest of the defaulting Owner. In such event, the transaction shall be treated as if the defaulting Owner desired to sell the defaulting Owner's interest in the Property to each of the other Owners under Section 8 and had sent out a notice to all of the Owners under Section 8 which must be subject to the conditions set forth in Section 8.

**8.9.** **_Certain Conditions on Lenders._** No lender, with respect to any debt that encumbers the Property, or with respect to any debt incurred to acquire an undivided interest in the Property, may be an Owner, a person related to an Owner, the manager, or any lessee of the Property. In the event of a lender foreclosure the lender would become an Owner subject to all of the same rights and restrictions as the other Owners under this Agreement.

**8.10.** **_Right to Purchase Minority Vote Owners._** In the event an Owner votes with the minority to not take an action requiring a unanimous vote under this Agreement (a "Minority Owner"), and at least a 75 percent interest in the Property voted with the majority, any Owner voting with the majority (a "Majority Owner") may, in a writing that is sent to all of the Owners within 60 days of the non-unanimous vote, declare that the Majority Owner desires to purchase the interest of the Minority Owner(s). In such event, the transaction shall be treated as if the Minority Owner desired to sell the Minority Owner's interest in the Property to the Majority Owners in accordance with and subject to the conditions of this Section 8, except that the Owner of the Minority Interest to be sold pursuant to this Paragraph 8.10, may seek Arbitration in accordance with Paragraph 11.

**9.** **_Sale of the Property._** Upon the agreement of the Owners pursuant to Section 8, the Property shall be sold and the net proceeds distributed to the Owners under the terms of this Agreement

**10. Termination of Co-tenancy Agreement**

**10.1.** **_Events of Termination._** The co-tenancy agreement will continue until terminated by the occurrence of one of the following events: (i) the sale of the entire Property; or (ii) the unanimous agreement of the Owners to terminate this Agreement.

**10.2.** **_Effect on Obligations._** Termination will not affect the rights or obligations of the Owners that arose prior to the termination.

**11. Arbitration.** The parties hereto agree to submit to binding arbitration any controversy or claim arising out of or related to this Agreement, or any claimed breach of this Agreement. A single arbitrator chosen by mutual consent of the parties will hear the arbitration. The arbitration will be conducted in Texas and in accordance with the commercial arbitration rules of the American Arbitration Association then in effect, although another arbitration service may be selected. The arbitrator will conclude the arbitration and issue an award no later than 180 days following service of the demand for arbitration by either of the parties. Judgment upon the arbitrator's award may be entered in any court of competent jurisdiction. The prevailing party will be entitled to an award of all its arbitration fees and costs and attorney fees and costs, including

DocuSign Envelope ID: 52639E59-85D2-4948-8A55-5769C1848486

expert witness fees, if so awarded by the arbitrator.

**12. *Attorney Fees.*** In the event of suit, action, or arbitration to enforce any of the terms of this Agreement, the prevailing party or parties and costs, including expert witness fees, will be awarded such sum as the court or arbitrator may adjudge reasonable as attorney fees in such suit, action, or arbitration and in any appeal there from.

**13. *Binding Effect.*** This Agreement will be binding upon and will inure to the benefit of each of the Owners, their respective heirs, executors, administrators, legal representatives, successors, and assigns.

**14. *Recordation.*** The parties may record this Agreement, or a memorandum of this Agreement, in the deed records of the county in which the Property is located. In such event, this Agreement will run with the land.

**15. *Amendment.*** This Agreement may be amended at any time only by the Owners by a writing executed by all of them.

**16. *Integration.*** This Agreement contains the entire agreement of the Owners and supersedes all prior and contemporaneous agreements between them with respect to the co-tenancy. Except as fully set forth herein, there are no representations, agreements, or understandings, oral or written, among the Owners relating to their relationship as tenants in common. The recitals set forth at the beginning of this Agreement are incorporated in their entirety and made part hereof.

**17. *Counterparts.*** This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument; and any party or signatory hereto may execute this Agreement by signing any counterpart. Executed documents delivered by facsimile, or other electronic means, shall have the same force and effect as original, executed documents.

**18. *Assignment.*** Neither this Agreement, nor any right or interest herein, may be assigned by a party hereto.

**19. *Review by Attorney.*** Each party acknowledges that it has had the opportunity to review this Agreement prior to execution with its own legal counsel.

**20. *Reservations.*** Any rights not expressly granted under this Agreement are reserved by the parties.

**21. *Severability.*** If any term or provision of this Agreement is to any extent invalid or unenforceable, the remainder of this Agreement will not be affected thereby, and each term or provision of this Agreement will be valid and enforceable to the fullest extent permitted by law.

**22. *Governing Law.*** This Agreement will be subject to, and governed by, the laws of the state of Texas.

**OWNERS:**

J & J Real Estate Investments, LLC an Indiana
limited liability company

By: _Joseph Rogers_____
Name: Joseph Rogers, Manager

By: _Jessica Rogers_____
Name: Jessica Rogers, Member

DocuSign Envelope ID: 5953953B-25D2-4948-8A55-5769C1B484BF

# EXHIBIT A

## Description of the Property

TRACT 1: (Fee Simple)

Being all of Lot 3R, Block A, of Headquarters Village, an Addition to the City of Plano, Collin County, Texas, according to the replat thereof recorded in Volume 2015, Page 598, Map Records, Collin County, Texas.

TRACT 2: (Non-Exclusive Easement Estate)

Non-Exclusive Easement rights granted pursuant to Declaration of Easements and Restrictive Covenants Regarding the Lakes Systems for Haggar Square as described in Article VI therein recorded in Volume 5058, Page 2633, and under cc# 03R16449 Real Property Records of Collin County Texas.

TRACT 3: (Non-Exclusive Easement Estate)

Non-Exclusive Easement rights granted in Reciprocal Easement Agreement entered into as of 05/01/2007, by and between Headquarters, L.P., Headquarters II, L.P., ASG Preston Creek Retail Center, Ltd., and Haggar Square Owners Association, Inc., filed 06/20/2007, and recorded under cc# 20070620000842970, Real Property Records of Collin County, Texas

TRACT 4: (Non-Exclusive Easement Estate)

Non-Exclusive Easement rights granted in Reciprocal Easement Agreement entered into as of 03/30/2007, by and between Headquarters, L.P., and Headquarters II, L.P., filed 06/20/2007, and recorded under cc# 20070620000842980, Real Property Records of Collin County, Texas.
Note: The Company is prohibited from insuring the area or quantity of the land described herein. Any statement in the above legal description of the area or quantity of land is not a representation that such area or quantity is correct, but is made only for informational and/or identification purposes and does not override Item 2 of Schedule B hereof.

DocuSign Envelope ID: 52539E5B-25D2-4948-8A55-5769C1B4B4BF

## EXHIBIT B

### "Ownership Percentages"

100.00%   Rockwell Debt-Free Properties, Inc.
          8494 S. 700 E. #200
          Sandy, UT 84070

# EXHIBIT 5

**Kenneth L. Maun**
**Tax Assessor & Collector**
**Collin County**



2300 Bloomdale Road Ste. 2324
P.O. Box 8046
McKinney, TX 75071
Ph: 972-547-5020
Metro: 972-424-1460 ext. 5020

36,830,674-1

**STATEMENT DATE:** 03/18/2019
**ACCOUNT:** R935400A003R1

**TAX STATEMENT 2018**

LEGAL: HEADQUARTERS VILLAGE (CPL)
BLK A
LOT 3R; (REPLAT)

ROCKWELL DEBT-FREE PROPERTIES INC & ETAL
NOAH'S-PLANO
3400 N ASHTON BLVD, STE 490
LEHI, UT 84053

PIDN: 2725249
ACRES: 1.844

OWNER: ROCKWELL DEBT-FREE PROPERTIES INC & E
PARCEL ADDRESS: 0005280 TOWNE SQUARE DR

EXEMPTION CODES:

| NON-HOMESITE VAL 2,859,098 | APPRAISED VALUE 2,859,098 | | | | | |
|---|---|---|---|---|---|---|
| **TAXING ENTITIES** | **EXEMPTION AMOUNT** | **TAXABLE VALUE** | **TAX RATE PER $100** | **BASE TAX** | | **PENALTY & INTEREST** |
| COLLIN COUNTY | 0 | 2,859,098 | 0.180785 | 5168.82 | | 465.20 |
| PLANO CITY | 0 | 2,859,098 | 0.460300 | 13160.43 | | 1184.44 |
| COLLIN COLLEGE | 0 | 2,859,098 | 0.081222 | 2322.22 | | 209.00 |
| FRISCO ISD | 0 | 2,859,098 | 1.440000 | 41171.01 | | 3705.39 |
| | | | SUBTOTAL | 61,822.48 | | 5,564.03 |
| | | | PENALTY & INTEREST | 5564.03 | | |
| | | | TOTAL AMOUNT DUE | 67,386.51 | | |

**IF THE PROPERTY DESCRIBED IN THIS DOCUMENT IS YOUR RESIDENCE HOMESTEAD, YOU SHOULD CONTACT THE COLLIN COUNTY TAX OFFICE REGARDING A RIGHT YOU MAY HAVE TO ENTER INTO AN INSTALLMENT AGREEMENT DIRECTLY WITH THE COLLIN COUNTY TAX OFFICE FOR THE PAYMENT OF THESE TAXES.**

*This top portion and your canceled check will serve as your receipt.*

*Detach and return this portion with your check payable to:*

**Collin County**
2300 Bloomdale Road Ste. 2324
P.O. Box 8046
McKinney, TX 75071
972-547-5020

DELINQUENT DATE: 02/01/2019

**TOTAL AMOUNT DUE**
**$67,386.51**

^^ **AMOUNT DUE ON RECEIPT** ^^

OWNER: ROCKWELL DEBT-FREE PROPERTIES INC & ETAL
PIDN: 2725249

*R935400A003R1*
**ACCOUNT:** R935400A003R1   2018

ROCKWELL DEBT-FREE PROPERTIES INC & ETAL
NOAH'S-PLANO
3400 N ASHTON BLVD, STE 490
LEHI, UT 84053

| IF PAID IN | | AMOUNT DUE |
|---|---|---|
| APR | 11% | 68,822.95 |
| MAY | 13% | 69,859.40 |
| JUN | 15% | 71,095.84 |
| JUL | 18% + 20 % | 86,111.54 |
| AUG | 19% + 20 % | 86,832.84 |

20180R935400A003R1000067386510006862295000690594000000000000C01

# EXHIBIT 6

# ▉FOLEY GARDERE
**FOLEY & LARDNER LLP**

ATTORNEYS AT LAW

2021 MCKINNEY AVENUE, SUITE 1600
DALLAS, TX 75201-3340
214.999.3000 TEL
214.999.4667 FAX
WWW.FOLEY.COM

WRITER'S DIRECT LINE
214.999.4893
rkoneil@foley.com EMAIL

April 24, 2019

**Email & Certified Mail**

Attn: Christopher J. Ashby
Rockwell Debt-Free Properties
8494 South 700 East
Suite 200
Sandy, Utah 84070
chris@rockwelltic.com

> Re:   Exercise of Rescission Rights pursuant to Texas Securities
> Act and the Federal Securities Act of Tenant in Common
> Units Purchased in Real Property Located at 5280 Towne
> Square Drive, Plano, Texas 75024

Dear Mr. Ashby,

We represent tenant in common owners Anne D. Kern, J & J Real Estate Investments, LLC, Town and Campus, Inc., the Craig A. Cousins Trust, the Kent S. Seymour and Donna G. Seymour Family Trust, the Rose Family Trust, John T. Barnett and Patricia A. Barnett, Cynthia A. Wolz, Eldridge Holdings TOO LLC, and Xenocorp, LLC (collectively, the "Plano TIC Owners").

The Plano TIC Owners purchased tenant in common interests (the "TIC Interests") associated with the real property located at 5280 Towne Square Drive, Plano, Texas 75024 from Rockwell Debt-Free Properties ("Rockwell") between December 2018 and January 2019.

The marketing materials that Rockwell distributed to the Plano TIC Owners contained the bold declaration:

> "The Tenant in Common (TIC) interests offered and sold by Rockwell Debt-Free Properties constitute interests in real property. They do not constitute securities. Consequently, federal and state laws regulating the sale of securities do not apply with respect to the sale of TIC interests, and purchasers of TIC interests will not be entitled to the protections afforded to purchasers of securities under federal and state securities laws. Nothing in the attached offering documents should be construed as an offer or a solicitation of an offer to buy or sell securities."

| | | | | |
|---|---|---|---|---|
| AUSTIN | DETROIT | MEXICO CITY | SACRAMENTO | TAMPA |
| BOSTON | HOUSTON | MIAMI | SAN DIEGO | WASHINGTON, D.C. |
| CHICAGO | JACKSONVILLE | MILWAUKEE | SAN FRANCISCO | BRUSSELS |
| DALLAS | LOS ANGELES | NEW YORK | SILICON VALLEY | TOKYO |
| DENVER | MADISON | ORLANDO | TALLAHASSEE | |

**≡FOLEY GARDERE**

**FOLEY & LARDNER LLP**

April 24, 2019
Page 2

The statement, among others made by Rockwell to the Plano TIC Owners, was false.

The TIC Interests are a security. Section 4(A) of the Texas Securities Act defines a "security" to include an "investment contract." Tex. Rev. Civ. Stat. Ann. Art. 581-4(A). The Texas Supreme Court has defined an "investment contract" to mean:

> "[A] contract, transaction, or scheme through which a person pays money to participate in a common venture or enterprise with the expectation of receiving profits, under circumstances in which the failure or success of the enterprise, and thus the person's realization of the expected profits, is at least predominately due to the entrepreneurial or managerial, rather than merely ministerial or clerical, efforts of others."

*Life Partners, Inc. v. Arnold*, 464 S.W.3d 660, 681 (Tex. 2015). The TIC Interests fall under this definition.

Likewise, Section 2(a)(1) of the Securities Act defines a "security" into include an "investment contract." 15 U.S.C. § 77b(a)(1). Specifically, the United States Supreme Court defined "investment contract" to mean:

> "[A] contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise."

*S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946). The United States Securities and Exchange commission and federal courts have held that the TIC Interests are securities.[1] *Omni Brokerage, Inc. Argus Realty Inv'rs, L.P. Passco Companies*, *LLC*, 2009 WL 153818, at *1 (Jan. 14, 2009) (SEC stating in no action letter that it disagreed with position that that tenant in common interests were not securities within the meaning of Section 2(a)(1) of the Securities Act and that it was unable to assure that enforcement action would not be pursued in the absence of registration or applicable registration exemption); *Berthel Fisher & Co. Fin. Servs., Inc. v. Larmon*, 2011 WL 3294682, *1 (D. Minn. 2011) ("[B]ecause TIC investments are securities, they may be offered for sale only through a licensed broker-dealer, with the terms of the offering described in a private placement memorandum.").

---

[1] Nothing in this letter should be construed as an election of laws, remedies, or causes of action by the Plano TIC Owners and the Plano TIC Owners make no waiver concerning the same.

# FOLEY GARDERE
## FOLEY & LARDNER LLP

April 24, 2019
Page 3

Despite the TIC Interests qualifying as securities, it appears that Rockwell has failed to register them as securities, and no exemption has been filed with the Securities Commission of the State of Texas or the United States Securities and Exchange Commission. Of course, no applicable registration exemption could exist as Rockwell has generally solicited the TIC Interests to the public and a recent version of Rockwell's website wrongly claimed "[y]ou do not have to be an accredited investor to purchase a Rockwell Debt-Free Property." Additionally, it appears that Rockwell has failed to comply with Sections 3(a)(4)(A) and 3(a)(5)(A) of the Exchange Act by not registering with the United States Securities and Exchange Commission as a broker-dealer prior to selling of the TIC Interests.

Thus, Rockwell has—at a minimum—violated Section 7(A) of the Texas Securities Act by selling or offering to sell the TIC Interests as unregistered securities.[2] Tex. Rev. Civ. Stat. Ann. art. 581-7(A). Rockwell has also failed to comply with registration and exemption requirements associated with the Securities Act of 1933. Pursuant to Section 33(A) of the Texas Securities Act, the Plano TIC Owners have an absolute right to rescind their purchase of the TIC Interests. Tex. Rev. Civ. Stat. Ann. art. 581-33(A). **Accordingly, the Plano TIC Owners demand rescission of the TIC Interests by Rockwell returning a sum equal to the amount the Plano TIC Owners paid for the TIC Interests less the amount of rent the Plano TIC Owners received.**

The total amount due each Plano TIC Owner for rescission must also be paid back at a rate of 5% interest, accruing from the date of their initial investment to the date the capital is returned to the Plano TIC Owner.[3] Tex. Rev. Civ. Stat. Ann. art. 581-33(D)(1); *see also* 15 U.S.C. § 77e(a) (providing that it is unlawful to sell unregistered security through the use of the mails or interstate commerce); 15 U.S.C. § 77l(a) (providing a right of rescission for violations of § 77e); 15 U.S.C. § 78cc(b) (providing that every contract made in violation of the Exchange Act is void); *Reg'l Properties, Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552, 554-55 (5th Cir. 1982) (holding private right of action to rescind contract exists when broker-dealer fails to register). Additionally, demand is also made for Rockwell to pay the taxes associated with the capital gains for each of these investments failing to qualify for Section 1031 treatment.

Moreover, in marketing the TIC Interests to the general public and in connection with the Plano TIC Owners' purchase of the TIC Interests, Rockwell and its agents, including Rockwell directors, managers, and employees, made numerous misrepresentations and omissions of

---

[2] Furthermore, as discussed in more detail below, Rockwell and its agents have violated both the Texas Securities Act and Securities Act of 1933 through the making or omission of numerous false, misleading, and/or fraudulent material facts.

[3] The Plano TIC Owners remain able, ready, and willing to tender the TIC Interests to be held in escrow by an agreeable state or national bank doing business in the state of Texas to facilitate this rescission.

# ⬛FOLEY GARDERE
**FOLEY & LARDNER LLP**

April 24, 2019
Page 4

material facts concerning the nature of the TIC Interests and the viability of Noah's Corporation ("Noah's"). We understand that by no later than mid-2018, Rockwell knew that Noah's was suffering significant financial difficulties and had several conversations with Noah's founder, William Bowser, about Noah's inability to meet its lease obligations, including because Noah's was in tens of millions of dollars in debt. Rockwell likewise knew, and apparently concealed from the Plano TIC Owners and others, that tax payments were delinquent on the Plano property and others across the country. Indeed, Rockwell contributed to Noah's unsustainable debt obligations by itself loaning Noah's $6 million in mid-2018. Despite this, Rockwell and Noah's continued their fraudulent scheme to purchase pre-existing Noah's properties, renegotiate the Noah's leases to support a substantial increased valuation, and to immediately induce Section 1031 investors to purchase those properties on the basis of false representations about their value and performance. In this way, Rockwell pocketed upwards of $1 million per transaction. This much is known without the benefit of discovery; we anticipate uncovering further evidence of dishonest conduct should litigation become necessary.[4]

Based on this understanding of the facts, we believe Rockwell and its principals (and any other individual or entity benefitting from this conduct) have engaged in fraud. Therefore, the Plano TIC Owners provide Rockwell with notice of their intent to bring claims against Rockwell and individuals engaging or benefiting from this conduct, including but not limited to, Brian K. Taylor, Christopher J. Ashby, Scott L. Rutherford, Jordan S. Nelson, and Scott W. Beynon for common law fraud, statutory fraud, making untrue statements and/or omissions in connection with the offer of securities, and violations of the Texas Deceptive Trade Practices Act.[5]

Additionally, Rockwell entered into a Purchase and Sale Agreement ("PSA") and Tenancy In Common Agreement ("TIC Agreement") with each of the Plano TIC Owners. Pursuant to Section 8.2 of the PSAs, Rockwell was obligated to pay for its prorated portion of all real property taxes and assessments accrued through the year 2018.  Pursuant to Section 4 of the TIC Agreement, Rockwell is in Default should it not comply with that obligation. As you are well-aware, Noah's failed to make the required property tax payment for that year, and Rockwell has not paid to the Plano TIC Owners, or any other party the property, the property taxes accruing from January 1, 2018 to the date Rockwell sold the property to the Plano TIC Owners. Thus, to the extent the PSA is not set aside by your fraud, demand is made for

---

[4] It has also known that the sales proceeds for the tenant in common interests associated with the KinderCare Learning Center in Puyallup, Washington that were supposed to be used for the construction of the property have been absconded or otherwise improperly used by Rockwell for other purposes.

[5] To the extent that Rockwell and any individuals or entities liable to the Plano TIC Owners have fraudulently transferred assets to avoid the payment of any judgment, the Plano TIC Owners may also pursue available remedies against the transferees to recover such judgment.

# ⦚FOLEY GARDERE

## FOLEY & LARDNER LLP

April 24, 2019
Page 5

Rockwell to pay these pro-rated taxes to the Plano TIC Owners immediately.  Further, notice is provided to Rockwell that it is in Default under the TIC Agreement.

If you fail to comply within ten days of the demands made in this letter (i.e., on or before **May 5, 2019**) the Plano TIC Owners anticipate commencing legal action against Rockwell, its principals, and any other individual or entity that participated or benefitted from these transactions. As stated above, such causes of actions may include, but are not limited to, common law and statutory fraud, state and federal securities law violations, and violations of the Texas Deceptive Trade Practices Act. Remedies available to the Plano TIC Owners include rescission, benefit-of-the-bargain and consequential damages, punitive damages, and the recovery of attorneys' fees and costs.

Please direct all further communications regarding this matter to me. It is my hope we can resolve this matter without the need for court intervention. I welcome your call should you care to discuss. My direct line is 214-999-4893.

Sincerely,

Rachel K. O'Neil

CC:    Robert T. Slovak (*Firm*)
       Brandon C. Marx (*Firm*)

4817-3733-4165.1

# EXHIBIT 7

# KIRTON | McCONKIE

Shawn T. Richards
srichards@kmclaw.com
801.323.5931

May 10, 2019

Rachel K. O'Neil
Foley & Gardere LLP
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201-3340

RE:    Rockwell Debt Free Properties, Inc. and the Plano TIC Owners

Dear Rachel:

As mentioned in my email to you earlier this week, this firm represents Rockwell Debt Free Properties, Inc. and its affiliated companies (collectively, "Rockwell"). We have reviewed the letters you sent to Rockwell and reviewed the legal authorities you cited, especially in your April 24, 2019 letter. While we disagree with your legal conclusions, we look forward working with you toward an early resolution of this dispute. We hope that such a resolution will be possible. Capitalized terms used herein will have the same meaning as in your April 24 letter.

In your letter, your clients are taking the position that the TIC Interests are securities rather than interests in real property. As support, you cite to several cases dealing with investment contracts and factually dissimilar cases dealing with TIC interests. In *Life Partners*, the court articulated what an "investment contract" means in Texas, but the facts of that case are inapposite to the facts at hand. The *Howey* case cited in your letter is similar in that it articulates the factual inquiry necessary to determine whether an investment contract is a security. But none of the cases you cite stand for the proposition that a TIC interest is automatically an investment contract and therefore, a security. And there is no bright-line rule for making such a determination. Rather, whether a TIC interest constitutes an investment contract is a fact-based inquiry into the intentions and actions of the parties. *San Francisco Residence Club, Inc. v. Amado*, 773 F. Supp. 2d 822, 829 (N.D. Cal. 2011) (holding that whether a TIC investment could be characterized as a security was a fact-based inquiry). I believe you acknowledge as much in your letter when you articulate the fact-based tests set forth in *Life Partners* and *Howey*. In your letter, you jump to the ultimate conclusion that the TIC Interests are securities but you provide no analysis showing how you got there.

The factual backdrop here is much different from the cases you cite, including the SEC "no action" letter. The facts of those cases demonstrate that the sellers were much more involved in the property and had much more oversight in the property, and over the purchasers, on a going forward basis. We believe that the second and fourth elements of the *Howey* test (and the test articulated in *Life Partners*) are not satisfied here. There does not appear to be a pooling of assets among the Plano TIC Owners and the fortunes of the Plano TIC Owners are neither linked, nor tied, to Rockwell's fortunes. More significantly, the Plano TIC Owners have the real

ATTORNEYS AT LAW          Kirton McConkie Building, 50 East South Temple, Salt Lake City, UT 84111          801.328.3600 tel          801.321.4893 fax
www.kmclaw.com          Key Bank Tower, 36 South State Street, Suite 1900, Salt Lake City, UT 84111          801.328.3600 tel          801.321.4893 fax
Thanksgiving Point Four, 2600 W Executive Parkway, Suite 400, Lehi, UT 84043          801.426.2100 tel          801.426.2101 fax

Rachel K. O'Neil
May 10, 2019
Page 2

and ultimate control and management of the Property. In *Albanese v. Florida National Bank of Orlando*, 823 F.2d 408, 410 (8th Cir. 1987), the Eighth Circuit Court of Appeals held: "If the investor retains the ability to control the profitability of his investment, the agreement is no security." All decisions with respect to the Property rest with the TIC owners. This includes decisions regarding property managers, decisions as to when and how to ultimately dispose of the Property, decisions regarding the Property's tenant and every other decision attendant with owning real property. Because the power to manage and control the Property is in the hands of the TIC Owners (and not Rockwell), the TIC Owners are not relying primarily upon the efforts of others in their expectations of a profit. Also, the power and ability to manage and control the Property does not lie only in the TIC Owners acting collectively as a single group. Rather, each TIC Owner has the right and ability to cause a partition or sale of the property. This further supports the conclusion that each TIC Owner is not looking to the efforts of others for its profits, but is relying upon its own efforts and its own decisions with respect to the Property. In addition to control over the Property, the very nature of a TIC interest makes it clear that the TIC Owners are not looking to the efforts of others for their "profit." Instead, the TIC Owners are looking to the purchased asset—the property—to produce the profit. In other words, the profit is inherent in the property. Thus, although a purchaser of real property, whether developed or undeveloped, naturally hopes the real property will generally increase in value over time, such appreciation does not necessarily come from a common enterprise, as it may be inherent in the real property itself. Conceptually, the sale of TIC interests by Rockwell is no different than if it were to sell a commercial building to a single purchaser. That transaction would clearly be considered to be a sale of real estate and not a sale of securities. Selling the same commercial building to two or more buyers who take title as tenants in common does not somehow cause what is clearly a real estate transaction to become a securities transaction. Thus, Rockwell disagrees with your conclusion that the TIC Interests are securities.

Rockwell also categorically denies that it knew in mid-2018 that Noah's was suffering significant financial difficulties. It knew of no such thing. At no point did Rockwell sell a TIC interest in a property subject to a Noah's lease with knowledge that Noah's was unable to meet its lease obligations, or that Noah's was allegedly tens of millions of dollars in debt. The conversations you reference between Rockwell and Bil Bowser never happened. Rockwell did not know about Noah's tax problem and therefore did not conceal anything. Rockwell did loan Noah's $6 million, but it did so under the absolute assurance from Noah's that it was on solid financial footing and that future projections looked better than ever. And that makes sense because why would Rockwell loan $6 million to an entity that it knew was not financially solid? Rockwell understood from Noah's clear representations that it was on solid financial grounds with projected profits to be higher than ever before. It turns out that Noah's representations may have been false; and, and if so, Rockwell was a victim of those misrepresentations. Rockwell and its principals did not engage in fraud or anything of the like, and if your clients intend on asserting such a claim, it will be met with a vigorous defense.

The foregoing notwithstanding, Rockwell has never wanted to be adverse to any TIC owners and still does not want that. We understand that TIC owners of properties subject to a

Rachel K. O'Neil
May 10, 2019
Page 3

Noah's lease are collectively close to reaching a workout plan.  Rockwell is hopeful that this
workout plan will resolve all outstanding issues and allow the TIC owners to earn a profit from
rent payments.  Rockwell is certainly willing to take part in discussions about how to resolve
everything globally so as to prevent parties from protracted and expensive litigation.  Rockwell
does not have any existing contractual rights with respect to the Property or the management of
the Property.  And Rockwell also does not have any control over Noah's or how Noah's
operates.  However, to the extent Rockwell can be of assistance in facilitating a global resolution,
Rockwell is willing to participate.  We certainly feel that it would be worthwhile to pump the
breaks on litigation to allow this workout plan to come to fruition.  It is in everyone's best
interest to have patience while meaningful resolution-based discussions are occurring.

Finally, we will look into the prorated property tax issue you reference and get back to
you on that.  As I understand it, the property tax obligation was rolled into the lease and assumed
by the tenant.  I will see if there is any additional information I can uncover on that.

Please contact me with any questions.

Very Truly Yours,

KIRTON MCCONKIE

Shawn T. Richards

4816-0110-9398.1

# EXHIBIT 8

Kenneth L. Cannon II (3705) (kcannon@djplaw.com)
Penrod W. Keith (4860) (pkeith@djplaw.com)
**DURHAM JONES & PINEGAR, P.C.**
111 South Main Street, Suite 2400
P O Box 4050
Salt Lake City, UT   84110-4050
Telephone:  (801) 415-3000
Fax:  (801) 415-3500

Proposed Attorneys for Debtor and Debtor in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>NOAH CORPORATION,[1] a Utah corporation,<br><br>Debtor and Debtor in Possession.<br><br>Tax ID Number:  02-0706434 | Bankruptcy Case No. 19-23840<br><br>Chapter 11<br><br>Honorable R. Kimball Mosier |

## DECLARATION OF WILLIAM J. BOWSER IN
## SUPPORT OF DEBTOR'S FIRST DAY MOTIONS

---

[1] The following limited liability companies were formerly subsidiaries of Noah Corporation but have been merged into Noah Corporation:  Noah Operations Albuquerque NM, LLC; Noah Operations Auburn Hills MI, LLC; Noah Operations Bedford NH, LLC; Noah Operations Blue Ash OH, LLC; Noah Operations Charlotte NC, LLC; Noah Operations Chesapeake VA, LLC; Noah Operations Cranberry PA, LLC; Noah Operations Des Moines IA, LLC; Noah Operations Dickinson TX, LLC; Noah Operations Fairview TX, LLC; Noah Operations Fossil Creek TX, LLC; Noah Operations Greenville SC, LLC; Noah Operations High Point NC, LLC; Noah Operations Hoover AL, LLC; Noah Operations Irving TX, LLC; Noah Operations Katy TX, LLC; Noah Operations Kingston TN, LLC; Noah Operations Lake Mary FL, LLC; Noah Operations Lincolnshire IL, LLC; Noah Operations Little Rock AR, LLC; Noah Operations Louisville KY, LLC; Noah Operations Madison WI, LLC; Noah Operations Memphis TN, LLC; Noah Operations Mentor OH, LLC; Noah Operations Morrisville NC, LLC; Noah Operations Naperville IL, LLC; Noah Operations New Albany OH, LLC; Noah Operations Oklahoma City OK, LLC; Noah Operations Omaha NE, LLC; Noah Operations Overland Park KS, LLC; Noah Operations Plano TX, LLC; Noah Operations San Antonio TX, LLC; Noah Operations South Jordan UT, LLC; Noah Operations Southpointe PA, LLC; Noah Operations Tulsa OK, LLC; Noah Operations Utah Valley UT, LLC; Noah Operations Westminster CO, LLC; and Noah Operations Wichita KS, LLC.

I, William J. Bowser, hereby declare as follows:

1.      I am the President of Noah Corporation (the "Debtor," the "Company," or "Noah's").  I am responsible for and familiar with the day-to-day operations, business, and financial affairs of the Company.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge or my review of relevant documents.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

2.      The Company commenced a case under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") on May 28, 2019 (the "Petition Date").

3.      I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this chapter 11 case and in support of the first day motions and applications (the "First Day Motions") filed contemporaneously herewith.

4.      This Declaration is intended to provide a summary overview of the Company's business and this chapter 11 case.  Part I provides an overview of the Debtor's organizational structure, business, capital structure, events giving rise to the commencement of the chapter 11 case, and the Debtor' financial outlook. Part II provides a summary of the First Day Motions which the Debtors seek to be heard on an expedited basis immediately following the commencement of these cases.

## A.      THE DEBTOR

5.      The Debtor is a Utah Corporation.  It was created in 2003 and I was its founder. The Company opened its first events venue in Lindon, Utah in 2007.  It has grown rapidly and currently operates 42 events venues in 25 states.

6.      The Debtor employs approximately over 500 full-time and part-time employees.
The Debtor's corporate offices are currently in South Jordan, Utah.

**B.      THE DEBTOR'S BUSINESS**

7.      The Company began operation of its first events venue facility in Lindon Utah in
January 2007.  It opened its second facility in South Jordan, Utah in December 2009.  Thereafter,
the Company followed a modest growth plan with events facilities opening in Chandler, Arizona
in the fall of 2010 Westminster, Colorado in the spring of 2011, and Irving, Texas in the spring
of 2012).  These first five facilities were solid incubators that helped to refine the size and layout
of the facilities, governing policies and procedures to run multiple facilities across a wide
geographical area, develop levels of management, and develop reservation software for booking,
payment plans, and collection.

8.      With five locations across four states, solid bookings, a firm foundation in place,
and despite an extremely difficult business environment during the "Great Recession," the
Company was armed with confidence and began pursuing national developers to help accelerate
growth.  The Company researches potential markets, does site analysis, entitles properties where
necessary, produces site plan drawings along with all building elevations and thereafter submits
the projects to developers as long-term lease opportunities. The result of those efforts has
produced 42 (37 additional) facilities during the period from the fall of 2012 until the present
which mathematically is approximately six new facilities per year with the most recent opening
in March 2019.  A Salt Lake based company, which raises funding through the sale of tenant in
common interests, Rockwell Debt Free 1031 ("Rockwell") has purchased all of the Company's
available inventory of new locations over the past four years. The Company employs over 400

people across 25 states and will host over 4,000 events in 2019 with gross revenues of around $35 million.

9.      As Noah's participated in the development of sites and then entered into a lease with the owners of the property, it created a new limited liability company subsidiary for each site. Ultimately, approximately 40 subsidiaries relating to the various venue facilities were created. Initially, it was intended that each subsidiary would have its own bank account and enter into its own contracts with clients for the events venue it leased. It became clear over time, however, that this structure was inefficient and costly. The Company developed a custom computer program with an India-based software developer, Kavinya, to process initial inquiries, manage the sales process, make reservations, take payments, and execute events. It became clear to the Company that a more centralized program for all of the venue facilities was much better and it transitioned to this process.

10.     The Company's core business is to host events along with the associated beverage services. The Company does not offer catering services, photography services, entertainment or other ancillary services associated with the event industry. In short, the core of the Company's business is the rental of event-based space. Early in the life of an events facility weddings and social events represent nearly 85 percent of the events with 15 percent being corporate events. Facilities ultimately mature into a ratio closer to 60 percent wedding and social events and 40 percent corporate.

11.     The Company first began to feel the beginnings of operational financial stress as related to the growth in the first quarter of 2017. The ratio of newer facilities to more established facilities began to have an ever eroding effect on cash flows to support those ratios. In short, we

simply grew too fast and lost our ability to react quickly to an ever-changing market by focusing

too heavily on new locations versus making sure the fledgling locations had all the proper

support.  Simultaneously Noah's embarked on a quite expensive sister venture called "DUO".

DUO was designed to leverage the Company's national brand, "Noah's."[2]  The Company

approached property owners who had unique and interesting properties on which we could host

outdoor events by essentially taking the excess lead volume being created by the Company and

using the assets of nearby facilities, thereby broadening the venue offerings.  The acquisition of

partner property owners was a tremendous success, however, translating that success into

wedding bookings was an unmitigated failure which deepened the already brewing financial

distress of the core business.

12.     Additional financial stress was then caused by the trend in the wedding industry

towards smaller wedding guest lists.  In fact, by the middle of 2018, we had lowered our prices

for the first time in a decade.  The necessary price decreases were due in part to industry trends,

but additionally due to the competitive forces associated with owners of warehouse properties

and similar properties "dumping" vacant and largely unused weekend space onto the market at

aggressive prices.  Consequently, as the Company moved through the middle and latter quarters

of 2017, we began examining and thereafter implementing new streamlined operational protocols

for labor loads at the facility level, leadership structure at the middle management level and

"rolling up" all of our operating facilities to realize significant savings in accounting, legal

oversight cost, as well as tax preparation and reporting expenses at the corporate level.  Reining

---

[2] There are two DUO entities which are subsidiaries of the Company, DUO Venues, LLC, and DUO
Construction, LLC.  Neither of them has been merged into to the Company and neither is in bankruptcy.

in all of the operational expenses, however, has proved to be an insufficient bridge to profitability. Ever-rising lease and property tax rates must not only be mitigated, but reduced to near market rates in order to balance our income to expense ratio.

13. The Company has hesitated to take the step of seeking to renegotiate lease rates but it has had to pursue this course over the last year as we are in a peculiar position with our landlords. Typically a business that leases a facility uses that facility as a place to conduct business, but another space of similar square footage would suffice. Noah's facilities are custom built for our business and the destabilization of the lease on that building in any way is a destabilizing force to the Company's entire enterprise. The facilities are purpose built and location and atmosphere sensitive. As a result, not just any old space will suffice. The Company should not have procrastinated the day of renegotiation that has brought us to this point but we now face a situation where both the Company and our landlords are forced to make long term decisions while holding a short fuse.

14. Despite all of the current turmoil, the Company believes we have a compelling case for a successful future should with new lease agreements as well as more favorable debt term lengths and rates. As the Company has sought restructuring of its leases and unsecured debtor, it has seen much-improved occupancy at the lower rates as well as ever increasing beverage revenues. Additionally, by placing a moratorium on growth, we have seen significant improvements in customer satisfaction through better online reviews and employee sales closing ratios through more intensive training. Additional revenue streams have been created as we have focused more attention on the existing enterprise.

15.     There have been challenges recently.  Several landlords declared defaults under the leases and three subsidiaries of the Company were required to file chapter 11 petitions to avoid eviction from the venue facilities that they lease.  Noah Operations Richardson TX, LLC; Noah Operations Sugarland TX, LLC; and Noah Operations Chandler AZ, LLC (the "Affiliates") all filed chapter 11 petitions in this Court (*In re Noah Operations Richardson TX, LLC*, Bankr. Case No. 19-23492), *In re Noah Operations Sugarland TX, LLC,* (Bankr. Case No. 19-23571), and *In re Noah Operations Chandler AZ, LLC*, Bankr. Case No. 19-23810.  Those cases are presently pending in this Court and the Debtor and the Affiliates have all filed motions seeking joint administration of their cases, which is one of the First-Day Motions pending in this case.

16.     The Company's subsidiaries that lease events venues that had not filed bankruptcy were merged into the Company to consolidate and simplify the Company's structure. These subsidiaries are all listed in the footnote on the first page of this Declaration.  As I noted, the each of the subsidiaries was initially formed with the intent to operate a specific facility leased by that subsidiary.  It was intended that each subsidiary have its own bank account and enter into its own contracts with the customers for the facility leased by such subsidiary. From a business standpoint, however, the far better approach was to have the Company operate all of the facilities. At the time of the merger, none of the subsidiaries that were merged into the Company had its own bank account and none of them contracted directly with the customers that held events at the facility leased by such subsidiaries.  Rather, customers contracted directly with, and paid, Noah Corporation.  Essentially, the merged subsidiaries were, in most cases, simply named as the tenants on the leases. The only assets of those such subsidiaries were personal property

located at the facilities, consisting mostly of tables and chairs. All of the individuals who

operated the facilities were employees of the Company. All clients, vendors, and service

providers to the facilities contracted directly with the Company and not the subsidiaries. And the

pertinent insurance policies were also in the name of the Company (although the subsidiaries

were also insured under such insurance policies).

17.     For the reasons set forth above, several months prior to filing the statement of

merger, Noah's board of directors had already been seriously considering merging the

subsidiaries into the Company. Once it became apparent that the Company was going to file a

chapter 11 petition for itself, the Company decided to execute the already-contemplated merger

as an initial, unofficial task incident to its contemplated reorganization plan. The three Affiliates

who filed chapter 11 before the merger would have also been merged into the Company had such

subsidiaries not already filed chapter 11 petitions prior to the date of the merger. The merger

effectively consolidates and streamlines the Company's structure, rendering it more efficient and

more reflective of its actual operations. I believe that of the creditors of the Company or the

subsidiaries will not be harmed by the merger and I believe that most are benefited.

18.     With the actions taken by the Company and now leveraging our national footprint

and brand we have begun offering corporate memberships to national and regional companies

who host meetings and trainings across the country. Launching this program in December 2018

the membership program has already yielded over $300,000 in new sales volume in just four

months. The Company believes that annual capacities for membership revenues is well over $3

million per year per over the existing enterprise. Additionally, in January 2019, the Company

launched a national magazine ("Moments") utilizing our existing marketing staff. Existing

building staff, with support from the marketing team, are reaching out to vendors who supply goods and services to our clients to advertise in our online publication. Every Noah's location has its own edition (with national articles) with local vendor advertisements. Since its launch in January 2019 the program is now yielding over $40,000 per month in previously unrealized revenues. Revenue opportunity for the program is anticipated to reach over $250,000 per month in recurring revenues by the end of the fourth quarter of 2020.

19. By diversifying the Company's revenue streams well beyond the wedding and social markets, along with all of the aforementioned business strategies one could argue that the Company began its reorganization nearly one year ago. We started on this path later than we should have, but given the Company's new financial structure and the time necessary to fully realize all of these positive trends, including the time to substantially improve the ratio of mature to immature locations, the Company will fully recover for the benefit of its employees, clients, and creditors. Noah's will emerge from bankruptcy with a fair and reasonable plan of reorganization. It will use the "breathing spell" provided by chapter 11 of the Bankruptcy Code to renegotiate some or all of the leases, negotiate and adjust unsecured debt, and address overly high taxes to facilitate profitable operations going forward and payment of its debts.

## C.    FIRST-DAY MOTIONS

20. The Debtor has filed a number of "First-Day motions" to enable it to keep its workforce intact, reassure clients, renegotiate certain leases, and restructure its debt.

21. <u>Application to Employ Mark Hashimoto as Chief Restructuring Officer</u>. The Debtor has engaged Mark Hashimoto to act as its Chief Restructuring Officer. Mr. Hashimoto is

eminently qualified for this position and the Debtor has filed an application for Court approval of the appointment.

22.    <u>Employee Wage Motion</u>.  On the Petition Date, the Company's employees had been paid wages and salaries through May 18, 2019.  This left approximately ten days of unpaid wages and salaries.  In addition, a number of employees had unreimbursed expenses and health care claims payable by the Company.

23.    The Debtor employs approximately 506 people working in both full time and part time positions.  The Debtor's annual employment costs for all employees total approximately $11,148,000.

(a)    <u>Wages and Payroll Services</u>.

(1)    The Debtor's employees are working in both full and part-time positions in the United States (the "Employees"). The Debtor has incurred certain costs and obligations in respect of its Employees that remain unpaid as of the Petition Date because they accrued prior to the Petition Date and either the method of payment has not "cleared," or these obligations only become due and payable in the ordinary course of the Debtor's businesses on and after the Petition Date.

(2)    The average monthly gross payroll for all of the Debtor's Employees in the months prior to the filing has been approximately $923,000.  All of the Debtor's Employees are paid bi-weekly.  Approximately 457 of the Debtor's Employees are compensated at hourly rates, and approximately 49 of the Debtor's Employees are salaried.

(3)     The Debtor's employees are paid bi-weekly with payment made one week after the end of the Debtor's regular and customary payroll period.  A pay period ended on May 18, 2019 and employees were paid for that pay period on May 24, 2019.  The Employees pursuant to such payment have thus been paid current for services rendered through May 18, 2019 by a payroll service.  Such payment is made by direct deposit.  Accordingly, the Employees, as of the Petition Date, had incurred wages from May 19, 2019 until the Petition Date on May 28, 2019.  However, to the extent some payroll and expense-reimbursement checks issued to employees before the commencement of this case have not yet been presented for payment or have not yet cleared the banking system, the Debtor seeks permission to honor those prepetition amounts, if any.

(4)     The Debtor's payroll is administrated by King & McCleary Payroll Services LLC ("Payroll Agent") and paid through direct deposit or check in a few instances. Average monthly fees relating to the administration of the Debtor's payroll by Payroll Agent is approximately $5700 per month with fees apportioned and paid with each payroll.

(5)     As of the Petition Date, no Employee had earned more than $12,850, the statutory amount fixed by Bankruptcy Code Section 507(a)(4), solely in wages or salary that remained unpaid. As of the Petition Date, the total accrued unpaid wages for all Employees was approximately $325,000 including earned bonus payrolls and garnishments (the "Unpaid Wages"). The Debtor is seeking authorization to pay the Unpaid Wages pursuant to the Interim Order on an emergency basis.

      (b)    <u>Withholding Obligations</u>.  The Debtor routinely withholds from Employee wages certain amounts that the Debtor is required to transmit to third parties for such purposes as Social Security, Medicare, federal and state income taxes, Health and Welfare Plans (as defined below) contributions, defined contribution retirement plan contributions, payroll deduction payment programs for various optional insurance programs, garnishments, and child support and other similar orders (the "Withholding Obligations").  The Debtor believes that such withheld funds, to the extent that they remain in the Debtor's possession, are not property of the Debtor's bankruptcy estate.  The Debtor's estimated Withholding Obligations for the period including from May 19 through May 28 total approximately $130,000 for federal, employee and employer and related withholdings on wages and bonuses and some state withholding on wages as well as $2,000 in garnishments and $2500 in Health Savings Accounts payments ("HSA").  The Debtor also requests to pay an additional $39,000 for state wage withholding on states requiring quarterly payments – this amount represents withholding for April and May.  And finally an additional $25,000 to states that require monthly withholdings.  The Debtor represents that these amounts include employee/employer required withholdings and that such payment represents money withheld belong to employees or money held in trust for taxing agencies or money withheld, as set forth above, for garnishments or HAS payments.  The Debtor seeks authorization to continue paying the applicable Withholding Obligations in the ordinary course of business pursuant to the Interim Order.

      (c)    <u>Business Expense Reimbursement</u>.

      (1)    The Debtor customarily reimburses Employees who incur business expenses in the ordinary course of performing their business duties on behalf of

the Debtor, provided that such expenses satisfy the standards and guidelines of the applicable company's applicable expense reporting policy. Certain Employees travel as an indispensable part of their duties. To the extent they are incurred in accordance with applicable company policy, reimbursable expenses include lodging, transportation, meals, client entertainment expenses, professional licenses, and other miscellaneous business expenses (the "Reimbursement Obligations").

(2)     Approved Reimbursement Obligations are paid to Employees on a periodic basis upon receipt of a completed expense-reporting form evidencing the business expenses incurred. It is difficult for the Debtor to determine the exact amount of Reimbursement Obligations outstanding at any particular time because of the unpredictable and irregular nature of the travel and other events giving rise to the Reimbursement Obligations. Accordingly, the Debtor does not know the exact amount of Reimbursement Obligations accrued but unpaid as of the Petition Date, or the amount of Employee expenses incurred as of the Petition Date that are potentially eligible for reimbursement. The Debtor estimates approximately $176,701.59 in unpaid Reimbursement Obligations for which it seeks authority to pay on an interim and final basis.

(3)     The Debtor is seeking authority to pay Reimbursement Obligations for individual business expenses that were incurred in accordance with applicable company policy, in an amount of up to $12,850 per Employee under the Interim Order (total with unpaid wages not to exceed that amount), and any remaining reimbursement amounts that exceed the statutory limit consisting of the amounts of

$22,383.77 and $80,433.36 for two Employees under the Final Order, subject in each

case to compliance with all applicable company business expense reimbursement policies

and procedures and subject to the Debtor's reservation of right to present additional

evidence at or before the final hearing on the two larger reimbursements exceeding the

statutory limits for priority.

      (d)    <u>Health and Welfare Benefits</u>.

      (1)    The Debtor maintains a health and welfare benefit plans (the

"Health and Welfare Plan"), and the Debtor's obligations related thereto, the "Health and

Welfare Plan Obligations") for Employees, including, but not limited to, medical, dental

and vision insurance. Additionally, the Debtor provides health flexible spending accounts

and dependent care flexible spending accounts. The Debtor is self-insured with a

catastrophic limit of $30,000 per month per covered employee. The Debtor pays

premiums for covered employees and also pays claims incurred by employees.

      (2)    Regular (non-temporary) salaried and hourly Employees are

eligible for medical benefits upon being hired. The medical plans cover preventative care

in addition to diagnosis and treatment for injuries and diseases.

      (3)    The Debtor does not provide any retiree medical benefits to retired

employees. Accordingly, the Debtor does not have any obligations governed by

Bankruptcy Code Section 1114, which is limited to "retiree benefits" defined as

"payments to any entity or person for the purpose of providing or reimbursing payments

for retired employees and their spouses and dependents, for medical, surgical, or hospital

care benefits, or benefits in the event of sickness, accident, disability, or death under any

plan, fund, or program (through the purchase of insurance or otherwise) maintained or

established in whole or in part by the debtor prior to filing a petition commencing a case

under this title."

       (4)     Based on historical experience, the Debtor estimates that, as of the

Petition Date, the Health and Welfare Plans cost the Debtor approximately $39,000 per

month in insurance premiums and claims – which amount includes $11,000 withheld

from employees for the employee funded portion of the health care plan.  The Debtor is

seeking authorization under the Interim Order to pay all Health and Welfare Obligations.

       (e)     <u>Paid Time Off</u>.  Eligible Employees accrue paid time off credits based on

length of service.   Paid time off includes vacation and sick leave.  Eligible full-time employees

may use accrued Paid Time off after 1 month of employment and eligible part-time employees

may use accrued paid time off after 1 month of employment.  The Debtor's Employees are

compensated for unused paid time off  on termination of employment provided they have met the

service requirements to use accrued paid time off but in no case may they be compensated for

more than 240 hours (the foregoing obligations, the "("Paid Time Off Obligations").  The PTO

to date totals approximately $192,000.

       (f)     <u>Workers' Compensation Program</u>.  The Debtor's workers' compensation

program (the "<u>Workers' Compensation Program</u>") is provided by Traveler's and Ohio Bureau of

Worker's Compensation for all/some of the Debtor's Employees. The Workers' Compensation

Program provides statutory medical and wage replacement benefits.  The Debtor has an

established practice of paying wage replacement benefits for the initial days an Employee is

ineligible for statutory benefits (historically the first three days of absence due to qualifying

illness or injury). The total cost for the Workers' Compensation Program averages $215,000 per year (the "Workers' Compensation Obligations").

      24.    <u>Client Obligations, Critical Vendor, and Payments to Affiliates for Use of Their Properties</u>.

      (a)    <u>Client Obligations</u>.

      (1)    The Debtor is in the business of operating events venues to a large and diverse client base (the "Clients"). Clients will reserve a venue for a wedding, wedding reception, business meeting, family activity, and a host of other purposes. The Debtor takes the reservation, receives a generally non-refundable deposit for the reserved use of the venue, and provides the venue for the reserved purpose. The events venue business is extremely sensitive to perceptions and requires the Debtor to maintain an excellent reputation for the space and services it provides.

      (2)    The principal Client Obligations involves the receipt and, in certain circumstances, refund of Client deposits. The current amount of deposits that the Debtor has received that could be subject to refund is approximately $1,975,000. Although most deposits from Clients are non-refundable, in the event that a Client is inadvertently charged or pays a double deposit or pays for, example, linens that that client does not use, it is critical for the Debtor to refund the deposit or overpayment. In addition, if an event is not held because of a mistake by the Debtor or inability of the Debtor to provide the service or venue, it is critically important for the Debtor to refund the deposit or payment.

      (3)    Maintaining the loyalty, support, and goodwill of its Clients is critical to the Debtor's reorganization efforts. The Debtor believes that the success and

viability of its business, and ultimately the Debtor's ability to maximize the value of its estate, is dependent upon the patronage and loyalty of its clients. In this regard, the Client Obligations are critical, and any delay in honoring them will severely and irreparably impair customer relations and drive away valuable Clients, thereby harming the Debtor's efforts to maximize value for all interested parties.

(4)    It is standard in the Debtor's industry to refund deposits and overpayments to clients when there has been a mistake made with respect to the deposit or if the Debtor is unable to meet its obligation to rent the venue. The Debtor operates in a competitive industry. Therefore, the Debtor cannot afford to present anything less than a "business as usual" appearance to the public during the chapter 11 case. Much of the success and viability of the Debtor's business is dependent upon reputation, brand loyalty, and the confidence of its clients. If the Debtor is unable to refund prepetition deposits or overpayments in the ordinary course, disappointed clients could impair the Debtor's ability to conduct business and rent its venues for events will be severely hampered. On the other hand, continuing to honor Client Obligations as it has without interruption during the pendency of the chapter 11 case will help preserve the Debtor's valuable client relationships and goodwill, which will inure to the benefit of all of the Debtor's stakeholders including Debtor's landlords.

(5)    The Debtor has determined, in the sound exercise of its business judgment, that the satisfaction of the Client Obligations in the ordinary course of business, the payment of the Critical Vendor's unpaid prepetition claim, and the payment to the Affiliates for the use of their property are critical to its reorganization efforts. The

failure to honor these obligations could have a material adverse impact on the Debtor's

continued operation and, by extension, its efforts to complete an expeditious restructuring

that maximizes value for stakeholders.

(b)     Critical Vendor.  The Debtor developed its own reservation system with

the assistance of Kavinya, a software developer based in India (the "Critical Vendor").  The

Debtor uses this system to process initial inquiries, manage the sales process, make reservations,

take payments, and execute events on a server based in India.  The Debtor believes that the

Critical Vendor will turn off the server rendering the Debtor incapable of operating its venues

unless the Critical Vendor is paid $100,867.00 in past prepetition due invoices.  Payment of

amounts owing to the Critical Vendor prepetition is critical to the ongoing operations of the

Debtor.  Without access to the server holding the contact/sales process/reservations/payments/

execution of event software, the Debtor will be unable to operate its business.  The Critical

Vendor's location offshore complicates this issue.  The Debtor believes that if the prepetition

amounts owing to the Critical Vendor are not paid, the Critical Vendor will shut off the Debtor's

access to the server.  The Debtor is confident that if the Critical Vendor is paid prepetition

amounts owing to it and the Debtor continues to pay it for current charges, the Critical Vendor

will permit the Debtor to continue to use the process.

(c)     Payments to Affiliates.

(1)     The Debtor operates all of the venues, including those leased from

third parties by Noah Operations Richardson TX, LLC; Noah Operations Sugarland TX,

LLC; and Noah Operations Chandler AZ, LLC (the "Affiliates"), each of which has filed

a chapter 11 petition in this Court.  In re Noah Operations Richardson TX, LLC, Bankr.

Case No. 19 23492, pending before Hon. William T. Thurman); In re Noah Operations

Sugarland TX, LLC, Bankr. Case No. 19-23571, pending Hon. R. Kimball Mosier; and In

re Noah Operations Chandler AZ, LLC, Bankr. Case No. 19-23810, pending before Hon.

Joel T. Marker.

        (2)      Historically, the Debtor has operated the business and used the

venues leased from third parties, including the venues leased by the Affiliates. In

exchange, the Debtor has in the ordinary course paid the Affiliates for the use of the

leased venues. The monthly amount generally paid to or on behalf of the Affiliates is

approximately $45,000 per Affiliate. The Debtor currently intends to continue to operate

the venues of the Affiliates and believes that it is reasonable to continue to pay the

Affiliates a reasonable sum for use of the Affiliates' venues. The Debtor understands that

the Affiliates use amounts received from the Debtor to pay their own current obligations,

including lease payments and other postpetition obligations. The Affiliates would not use

these funds for prepetition obligations.

        (3)      Finally, the continued payment to the Affiliates in the ordinary

course for the use of their leased properties is critical. If they are not paid for such use,

they will not be able to make lease payments and other obligations and valuable venues

operated by the Debtor could be lost.

25.     <u>Joint Administration Motion</u>. The chapter 11 cases of the Debtor and the

Affiliates should be jointly administered with each other. In the absence of joint administration,

many duplicative efforts will have to be undertaken in these cases, at great expense to these

estates and their creditors without any concomitant benefit for those creditors. I anticipate that a

plan of reorganization filed in the Debtor's case will include the facilities leased by the Affiliates. Moreover, because this Motion requests that the estates only be jointly administered and not substantively consolidated at this time, there will be no adverse effect on any creditor.

26.     <u>Applications to Employ Professionals</u>. I have signed the various applications to hire professionals. The representations made in each of those applications are true and correct to the best of my knowledge.

27.     <u>Motion to Extend Time to File Schedules and Statements</u>. The Debtor's case is complicated, involves hundreds of creditors, over 200 utilities, approximately forty commercial real estate leases, hundreds of owners of tenant in common interests who hold fractionalized interests in these leases, and over 500 employees. The staff of the Debtor working with the CRO and the Debtor's counsel needs an additional time to properly prepare the schedules of assets and liabilities and statement of financial affairs.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct.

DATED this  31  day of May, 2019.

_____
William J. Bowser